# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF BIRMINGHAM FIREMEN'S AND POLICEMEN'S SUPPLEMENTAL PENSION SYSTEM, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| | **CLASS ACTION** |
| Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| CREDIT SUISSE GROUP AG, BRADY DOUGAN, TIDJANE THIAM and DAVID MATHERS, | |
| Defendants. | |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................................ 3

III.    PARTIES ................................................................................................................... 4

IV.     SUBSTANTIVE ALLEGATIONS .......................................................................... 6

        A.  Background .................................................................................................... 6

        B.  Defendants False and Misleading Statements............................................... 6

            1.  Credit Suisse's 2014 Annual Report Touts the Company's Comprehensive
                and Binding Risk Controls and Trading Limits .................................... 6

            2.  Defendant Thiam Takes The Helm Of The Bank, And Months
                Later Credit Suisse Completes An $8 Billion Debt Exchange Offering ............... 8

        C.  The Truth Is Revealed.................................................................................... 9

        D.  Defendants Knew and/or Recklessly Disregarded Knowledge About the Constantly
            Increasing Risky Illiquid Positions ............................................................ 11

V.      CLASS ACTION ALLEGATIONS ....................................................................... 12

VI.     UNDISCLOSED ADVERSE FACTS.................................................................... 14

VII.    LOSS CAUSATION.............................................................................................. 15

VIII.   SCIENTER ALLEGATIONS................................................................................ 16

IX.     APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
        DOCTRINE ........................................................................................................... 17

X.      NO SAFE HARBOR ............................................................................................. 18

XI.     COUNTS AGAINST DEFENDANTS................................................................... 19

XII.    PRAYER FOR RELIEF ........................................................................................ 24

XIII.   JURY TRIAL DEMANDED................................................................................. 25

Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System ("Plaintiff"), by and through its attorneys, brings this federal securities class action on behalf of all persons or entities that purchased or otherwise acquired Credit Suisse Group AG American Depositary Receipts ("ADRs") on the New York Stock Exchange ("NYSE") between March 20, 2015, and February 3, 2016, inclusive, (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et. seq*. (the "Exchange Act").  Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of public filings made by Credit Suisse Group AG ("Credit Suisse," the "Bank" or the "Company"), and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles, shareholder communications, conference call transcripts, and postings on Credit Suisse's website concerning the Company's public statements; and (d) review of other publicly available information concerning Credit Suisse and the Individual Defendants.

## I.      NATURE OF THE ACTION

1.      Credit Suisse is a Swiss multinational financial services holding company, with one of its four primary divisions focused on investment banking.  Throughout the Class Period, Defendants repeatedly touted in SEC filings that Credit Suisse maintained "comprehensive risk management processes and sophisticated control systems" governing its investment operations. A notable component of the Bank's risk management structure was its high-level Capital Allocation and Risk Management Committee ("CARMC"), which was responsible for, among

other obligations, establishing and allocating appropriate trading and risk limits for the Bank's various businesses.  Significantly, Credit Suisse represented in its Class Period filings that the trading and risk limits set by the CARMC were "binding" on the Bank's businesses and trading desks.  In addition, only senior management had the authority to <u>temporarily</u> increase a divisional risk committee limit and, even in those cases, such authority was limited to an "approved percentage for a period not to exceed 90 days."

2.      Contrary to Defendants' representations, however, Credit Suisse's trading and risk limits were not actually binding, and were routinely increased to allow the Bank to accumulate billions of dollars in extremely risky, highly illiquid investments.  Indeed, Defendants' scheme enabled the Bank to surreptitiously accumulate nearly $3 billion in distressed debt and U.S. collateralized loan obligations ("CLOs"), which were notoriously difficult to liquidate and required significant capital investments.  This outsized investment position—which was undisclosed to shareholders—violated Credit Suisse's purported risk protocols and rendered the Bank highly susceptible to losses when credit markets contracted.

3.      By the beginning of 2016, with credit markets tightening, Defendants could no longer hide the truth.  On February 4, 2016, Credit Suisse announced its Fourth Quarter and Full Year 2015 financial results, which included a massive $633 million write-down from the sale of the Bank's outsized, illiquid distressed debt and CLO positions—an incredible loss that would swell to nearly $1 billion in the ensuing weeks.  Even worse, Defendant Tidjane Thiam, Credit Suisse's recently-appointed CEO, explicitly admitted that these risky and outsized investments were only allowed because <u>trading limits were continuously raised</u>, which enabled traders take larger and larger positions in violation of the Bank's publicly-touted risk policies.  In addition,

Thiam acknowledged that Credit Suisse's investment bank had acquired these securities over the years as it was "trying to generate revenue at all costs."

4.      The market reacted in astonishment.  Analysts and former Credit Suisse insiders were incredulous that the position went unreported, responding with disbelief at the notion that Credit Suisse's senior executives did not know about the outsized illiquid positions sooner. Credit Suisse bankers said it was "***inconceivable***" that the CARMC was unaware of the holdings. A former Credit Suisse subsidiary board member remarked: "If the CFO didn't know about it, then sure as hell the chief risk officer would have, which means everybody would have . . . It's hard to imagine that nobody knew about this stuff."  In assigning an uncertainty rating to Credit Suisse's securities, a Morningstar report notably explained: "We're more worried by Thiam's admission that the bank held large illiquid position that he and other top managers did not know about in October."

5.      In the wake of Credit Suisse's revelations, the price of the Bank's ADRs declined from a close of $16.69 on February 3, 2016 to a close of $14.89 on February 4, 2016—an 11% drop that wiped out approximately $230 million in market capitalization.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's ADRs, Plaintiff and the other Class members have suffered significant losses and damages.

## II.   JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). A substantial portion of the acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information and the effects of the fraud, have occurred in this Judicial District. In addition, the Company's United States offices are located in this District at 11 Madison Avenue, New York, NY 10010. In addition, Defendants' ADRs are traded on the New York Stock Exchange.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

III.    PARTIES

11.     Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System, as set forth in the accompanying certification, attached hereto as Exhibit "A", purchased Credit Suisse ADRs during the Class Period, and suffered damages as a result of the federal securities law violations and the false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Credit Suisse Group AG is a corporation with its headquarters in Zurich Switzerland and its United States operations located at 11 Madison Avenue, New York, NY 10010.  Credit Suisse's ADRs are traded on the NYSE under the symbol "CS."

13.     Defendant Brady W. Dougan ("Dougan") served as the Chief Executive Officer of Credit Suisse from 2007 through June 30, 2015.

14.     Defendant Tidjane Thiam has served as the Chief Executive Officer of Credit Suisse since July 1, 2015.

15.     Defendant David R. Mathers ("Mathers") has served as Chief Financial Officer of Credit Suisse since 2012.

16.     Defendants Dougan, Thiam and Mathers are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, at the time each was employed by Credit Suisse, because of their positions with the Company, possessed the power and authority to control the contents of Credit Suisse's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant, while serving as a senior executive of Credit Suisse, was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or  shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, and were the result of the collective actions of the Individual Defendants.

IV.     **SUBSTANTIVE ALLEGATIONS**

    **A.      Background**

17.    Credit Suisse, based in Zurich, Switzerland, is a multinational financial services holding company that operated the Credit Suisse Bank and other financial services investments. The Bank's U.S. headquarters are located in New York, New York.  Credit Suisse operates through three regionally focused divisions: Swiss Universal Bank, International Wealth Management, and Asia Pacific.  These regional businesses are supported by two divisions that specialize in investment banking capabilities: Global Markets and Investment Banking & Capital Markets.  The Global Markets division provides a broad range of financial products, including securities sales, trading and execution, prime brokerage, and investment research.

18.    Between 2012 and 2015, in an effort to chase more and more revenue and feeding off a culture of "seeking revenue at any cost," traders at Credit Suisse's investment banking division racked more than $3 billion in incredibly risky, highly illiquid securities consisting mainly of distressed credit and U.S. CLOs.

    **B.      Defendants False and Misleading Statements**

        **1.      Credit Suisse's 2014 Annual Report Touts the Company's Comprehensive and Binding Risk Controls and Trading Limits**

19.    The Class Period begins on March 20, 2015, when Credit Suisse filed its 2014 Annual Report with the SEC on Form 20-F.  The 20-F was signed by Defendants Dougan and Mathers on behalf of Credit Suisse. The 2014 Annual Report touted the extensive risk protocols and practices in place at Credit Suisse to prevent the Bank from incurring any unnecessary risks, including risks posed by holding large positions of risky illiquid securities.

6

20.     The 2014 Annual Report explicitly stated that Credit Suisse had "comprehensive risk management processes and sophisticated control systems."  These processes included the Capital Allocation & Risk Management Committee ("CARMC").  According to the 20-F,

> CARMC is responsible for supervising and directing our risk profile, recommending risk limits at the Group level to the Risk Committee and the Board, establishing and allocating risk limits among the various businesses, and for developing measures, methodologies and tools to monitor and manage the risk portfolio.

21.     CARMC, in consultation with the Board of Directors and Credit Suisse executive management, was responsible for setting the Bank's risk limits and, according to the 2014 Annual Report, such limits were "***binding.***"  Where a breach of such limits did occur however, these instances were immediately reported to the "Chairman of the Board's Risk Committee and the Group CEO" (*i.e.*, Defendant Dougan and Thiam).  In addition, "written notification to the full Board" was provided at the next meeting.

22.     Credit Suisse's risk policies allowed for temporary increases in risk exposure, however such increases were limited to approved percentages and were not allowed to exceed 90 days.  As the 2014 Annual Report explained,

> **CARMC limits are binding** and generally set close to the planned risk profile to ensure that any meaningful increase in risk exposures is promptly escalated. The divisional chief risk officers and certain other members of senior management have the authority to temporarily increase the divisional risk committee limits by an approved percentage for a period not to exceed 90 days. Any divisional risk committee limit excess is subject to a formal escalation procedure and must be remediated or expressly approved by senior management.

23.     The risk protocols further explained that the Bank's risk limits were reviewed on a daily, weekly or monthly basis:

> The limit framework encompasses specific limits on a large number of different products and risk type concentrations… The majority of these limits are monitored on a daily basis. Limits for which the inherent calculation time is longer are monitored on a weekly basis. A smaller subset of limits relating to

7

exposures for which the risk profile changes more infrequently (for example, those relating to illiquid investments) is monitored on a monthly basis. In 2014, 98% of all limit excesses were resolved within the approved standard period. A smaller subset of limits relating to exposures for which the risk profile changes more infrequently (for example, those relating to illiquid investments) is monitored on a monthly basis.

24.     However, as explained below, these statements were knowingly and/or recklessly false and misleading because they failed to disclose that Defendants had been continuously raising risk limits with respect to the Bank's illiquid investments—so much so that its risk management processes were in fact, wholly false and illusory.

>   **2.     Defendant Thiam Takes The Helm Of The Bank, And Months Later Credit Suisse Completes An $8 Billion Debt Exchange Offering**

25.     On July 1, 2015, Defendant Dougan stepped down as CEO of Credit Suisse and was replaced by Tidjane Thiam.  Thiam took over after months of investor criticism of Defendant Dougan for failing to reform the Bank and scale back its risky investment banking business fast enough in the wake of the global regulations implemented after the worldwide recession in 2008 requiring banks to hold more capital.

26.     Almost immediately upon taking control, Thiam began an internal review of each of Credit Suisse Group's business lines, with the stated goal of reducing the size of Credit Suisse's investment bank and focusing the Company more on its wealth management clients. During the Class Period, on October 21, 2015, Defendant Thiam outlined his new strategy for the Bank in an investor day presentation in which Thiam referred to the securitized products and credit groups (both responsible for the illiquid positions discussed herein) as "ugly ducklings" because they were very profitable but consumed a ton of capital.

27.     Thiam's plan for Credit Suisse focused on deleveraging and increasing the Bank's capital cushion which had been one of the worst performers of all the European banks.  Thiam's

Investor Day presentation included an announcement that the Bank would seek to raise 6 billion CHF ($6.1 billion) in capital through a rights offering in Switzerland. Without disclosing the truth about their outsized illiquid investments, Credit Suisse completed the rights offering on December 3, 2015.

28.     Then, on December 15, 2015, Credit Suisse co-issued $8 billion in long term debt with its subsidiary, Credit Suisse Group Funding (Guernsey) Limited in a debt exchange offering (the "Exchange Offering"). Credit Suisse also guaranteed the Exchange Offering. In connection with the Exchange Offering, Credit Suisse filed a Registration Statement with the SEC on form F-4. The Registration Statement and Prospectus for the Exchange Offering was signed by Defendants Thiam and Mathers and explicitly incorporated the 2014 Annual Report by reference, including the statements contained therein touting to the market the comprehensive and binding nature of the Company's risk protocols and control systems.

### C.     The Truth Is Revealed

29.     On February 4, 2016, with billions of dollars of additional capital now in their possession, Credit Suisse publicly announced its Fourth Quarter and Full Year 2015 financial results. In doing so, Credit Suisse's global markets group reported an adjusted pre-tax loss of 658 million CHF ($686.35 million). What shocked investors the most however was that of the $686 million in losses that were reported, *$632 million were attributable to write-downs from sales of illiquid securities.*

30.     Also on February 4, 2016, prior to the market's open, Credit Suisse held a conference call with analysts to discuss the Fourth Quarter and Full Year 2015 results. During that Call, Thiam explained:

> As we mentioned, in the fourth quarter, we saw significant mark-to-market losses of $632 million across both Global Markets and IBCM. The losses were incurred

across our securitized products, credit and corporate loan books, although the majority were incurred in the leveraged finance business in distressed trading, underwriting and par….

31.     As a result of the Company's announcement on February 4, 2016, the price of Credit Suisse ADRs declined from a close of $16.69 on February 3, 2016 to a close of $14.89 on February 4, 2016; a drop of 11% wiping out approximately $230 million in market capitalization.

32.     On March 23, 2016, in a conference call with market analysts outlining revisions to Thiam's restructuring plan, Defendant Thiam was forced to provide a more in-depth explanation to investors as Credit Suisse announced an additional $346 million in write-downs that would hit the books in the first quarter of 2016 as a result of the sale of those risky and illiquid securities. In disclosing the additional write-down, Thiam admitted that "clearly, something didn't go right there or something went wrong."  Thiam further stressed: "I will say that even internally, the scale of those positions was a surprise to a number of people and was not a widely-known fact.  So then you can fault our system."

33.     In a Bloomberg News interview the same day, Defendant Thiam further admitted that the the Company's revenue-seeking culture was to blame for the Bank's recent troubles.

> **Thiam**: …there needs to be a cultural change, because its completely unacceptable.  And there has been people consequences around that.  It is unacceptable.

> **Interviewer**: Were people trying to withhold information or was it just –

> **Thiam**:  It's a very interesting question.  It's linked to a cost problem. If you're costs are too high, and you're not taking them down, you will lead a revenue-driven strategy. ***A lot of the problem in the investment bank is that people have been trying to generate revenue at all costs if I may say so.***

34.     On March 23, 2016, as reported by *The New York Times* and *Reuters*, Thiam further admitted that the reason Credit Suisse had improperly acquired the risky and illiquid securities was because, in contrast to the Company's assurances that risk limits were "binding,"

the Company had <u>continuously raised its trading limits to allow traders to take ever-increasing positions</u>.

### D.   Defendants Knew and/or Recklessly Disregarded Knowledge About the Constantly Increasing Risky Illiquid Positions

35.    The Individual Defendants knew or recklessly disregarding knowledge of the Bank's ever-growing position in the illiquid investments.  According to an article published by the International Financing Review ("IFR"), "two Credit Suisse bankers told IFR the real surprise was that Thiam, installed as chief executive less than a year ago, could claim that the bank's positions were not known about.  The bankers, who asked not to be named, said it was inconceivable that the bank's Capital Allocation and Risk Management Committee (CARMC) was unaware of the holdings."

36.    As set forth above, CARMC reported directly to the executive board members, including the Individual Defendants.  As the IFR article continued, "The COO, the CFO knew about the [positions taken by] these businesses. CARMC happens every month. The notion that people didn't know is simply not believable."

37.    In addition, a former board member of a Credit Suisse investment banking subsidiary directly implicated Defendant Mathers in particular, saying "[i]f the CFO didn't know about it, then sure as hell the chief risk officer would have done, which means everybody would have done."…"<u>It's hard to imagine that nobody knew about this stuff</u>."

38.    In the wake of Defendant Thiam's admissions, the Bank's purported ignorance was also questioned by market analysts.  For instance, on March 24, 2016, Morningstar Research stated:

> We're more worried by Thiam's admission that the bank held large illiquid position that he and other top managers did not know about in October. These positions were behind the $633 million write-downs in the fourth quarter and another $346 million of write-downs in the first quarter.  We're most disturbed by

his comment that bankers built up these positions supported by a culture that encouraged revenue at any cost. He attributed that pressure to a too-high cost base, but we're less sure; we think culture is very hard to turn around, and investors should brace themselves for continued volatility in results.  We plan to maintain our high uncertainty rating.

39.     Similarly, Morgan Stanley's March 24, 2016 report also remarked:

CS has finally acknowledged that their outsized positions in illiquid credit positions no longer work…We would be interested to know when mgmt [sic] became aware and why this was not disclosed in the capital raising prospectus in Dec, given markets weakened in Nov.  Does this create additional litigation risk? We are also keen to hear about changes in risk management.

## V.     CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased or otherwise acquired Credit Suisse ADRs during the Class Period and  who were damaged thereby (the "Class"). Excluded from the Class are Defendants, members of the immediate family of each of the Individual Defendants, any subsidiary or affiliate of Credit Suisse and the directors, officers and employees of the Company or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

41.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Throughout the Class Period, Credit Suisse ADRs were actively traded on the NYSE, an open and efficient market, under the symbol "CS." Millions of Credit Suisse ADRs were traded publicly during the Class Period on the NYSE. Record owners and the other members of the Class may be identified from records maintained by

Credit Suisse and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the other members of the Class, and has retained counsel competent and experienced in class and securities litigation. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

b.    Whether Defendants participated in and pursued the common course of conduct complained of herein;

c.    Whether documents, press releases, and other statements disseminated to the investing public and the Company's ADR holders during the Class Period misrepresented material facts about the business, finances, and prospects of Credit Suisse;

d.    Whether statements made by Defendants to the investing public during the Class Period misrepresented and/or mitted to disclose facts about the business, finance, value, and performance of Credit Suisse;

13

e. Whether the market price of Credit Suisse ADRs during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f. The extent to which the members of the Class have been damaged and the proper measure of damages.

44. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.  UNDISCLOSED ADVERSE FACTS

45. The market for Credit Suisse ADRs was an open, well-developed and efficient market at all relevant times. As a result of these materially false and misleading statements and failures to disclose described herein, Credit Suisse ADRs traded at artificially inflated prices during the Class Period. Plaintiff and the other members of the Class purchased or otherwise acquired Credit Suisse ADRs relying upon the integrity of the market price of the Company's ADRs and market information relating to Credit Suisse, and have been damaged thereby.

46. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Credit Suisse ADRs, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse non-public information and

misrepresented the truth about the Company, as well as its business, accounting, financial operations and prospects, as alleged herein.

47.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and the other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and misleading statements about Credit Suisse's financial well-being and prospects.

48.     These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's ADRs to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements made during the Class Period resulted in Plaintiff and the other members of the Class purchasing the Company's ADRs at artificially inflated prices, thus causing the damages complained of herein.

## VII.    LOSS CAUSATION

49.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Credit Suisse's ADRs and operated as a fraud or deceit on Class Period purchasers of Credit Suisse's ADRs by failing to disclose to investors that the Company's financial results were materially misleading and misrepresented material information. When Defendants' misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the prices of Credit Suisse's ADRs fell precipitously as the prior inflation came out of the Company's stock price. As a result of their purchases of Credit Suisse's ADRs during the Class Period, Plaintiff and the other Class members suffered economic loss.

50.     By failing to disclose the true state of the Company's financial statements, investors were not aware of the true state of the Company's financial status. Therefore, Defendants presented a misleading picture of Credit Suisse's business practices and procedures. Thus, instead of truthfully disclosing during the Class Period the true state of the Company's business, Defendants caused Credit Suisse to conceal the truth.

51.     Defendants' false and misleading statements had the intended effect and caused Credit Suisse's ADRs to trade at artificially inflated levels throughout the Class Period. The stock price drops discussed herein caused real economic loss to investors who purchased the Company's ADRs during the Class Period.

52.     The decline in the price of Credit Suisse ADRs after the truth came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of Credit Suisse ADR price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of Credit Suisse's ADRs and the subsequent decline in the value of Credit Suisse's ADRs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VIII.   SCIENTER ALLEGATIONS

53.     As alleged herein, the Individual Defendants acted with scienter in that the Individual Defendants knew that the public documents and statements issued or disseminated in the name of the Company during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and

knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

54.     As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Credit Suisse, including reports from Credit Suisse's Capital Allocation and Risk Management Committee, their control over, receipt and/or modification of Credit Suisse's allegedly materially misleading statements and omissions, and/or their positions with the Company which made them privy to confidential information concerning Credit Suisse, participated in the fraudulent scheme alleged herein.

## IX.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

55.     At all relevant times, the market for Credit Suisse's ADRs was an efficient market for the following reasons, among others:

  a.  Credit Suisse ADRs met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient market;

  b.  As a regulated foreign issuer, Credit Suisse filed periodic public reports with the SEC;

  c.  Credit Suisse securities were followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace; and

  d.  Credit Suisse regularly issued press releases which were carried by national and international newswires. Each of these releases was publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for Credit Suisse's ADRs promptly digested current information regarding Credit Suisse from all publicly available sources and reflected such information in Credit Suisse's stock price. Under these circumstances, all purchasers of Credit Suisse ADRs during the Class Period suffered similar injury through their purchase of Credit Suisse's ADRs at artificially inflated prices and a presumption of reliance applies.

57.     A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiff's fraud claims are grounded in Defendants' omissions of material fact of which there is a duty to disclose. As this action involves Defendants' failure to disclose material adverse information regarding Credit Suisse's business practices, financial results and condition, and the Company's internal risk and financial controls—information that Defendants were obligated to disclose during the Class Period but did not—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered such information important in the making of investment decisions.

## X.     NO SAFE HARBOR

58.     The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that

could cause actual results to differ materially from those in the purportedly forward-looking statements.

59.     In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Credit Suisse who knew that the statement was false when made.

## XI.     COUNTS AGAINST DEFENDANTS

### COUNT I
### Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein. This claim is asserted against all Defendants.

61.     During the Class Period, Credit Suisse and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Credit Suisse's ADRs; and (iii) cause Plaintiff and the other members of the Class to purchase Credit Suisse's ADRs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

62.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's ADRs in an effort to

19

maintain artificially high market prices for Credit Suisse's ADRs in violation of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued herein as controlling persons of Credit Suisse, as alleged herein.

63.     In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. § 210.01, *et seq*.) and S-K (17 C.F.R. § 229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

64.     Credit Suisse and the Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, operations and future prospects of Credit Suisse as specified herein. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Credit Suisse's value and performance and substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts, and omitting to state material facts necessary in order to make the statements made about Credit Suisse and its business,

20

operations and future prospects, in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business  which operated as a fraud and deceit upon the purchasers of Credit Suisse's ADRs during the Class Period.

65.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company during the Class Period; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's operational and financial projections and/or reports; (iii) the Individual Defendants enjoyed significant personal contact and familiarity with each other, and were advised of and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

66.     These Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Such Defendants' material misrepresentations

67.     and/or omissions were done knowingly or recklessly, and for the purpose and effect of concealing Credit Suisse's operating condition, business practices and future business prospects from the investing public and supporting the artificially inflated price of its common

stock. As demonstrated by their overstatements and misstatements of the Company's financial condition and performance throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

68.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Credit Suisse's ADRs was artificially inflated during the Class Period. In ignorance of the fact that the market price of Credit Suisse ADRs was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by these Defendants during the Class Period, Plaintiff and the other members of the Class acquired Credit Suisse's ADRs during the Class Period at artificially inflated prices and were damaged thereby.

69.     At the time of said misrepresentations and omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the true performance, business practices, future prospects and intrinsic value of Credit Suisse, which were not disclosed by Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired Credit Suisse's ADRs during the Class Period, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

70.     By virtue of the foregoing, Credit Suisse and the Individual Defendants each violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

71.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

72.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

73.     The Individual Defendants were and acted as controlling persons of Credit Suisse during the Class Period within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations, particularly Credit Suisse's CARMC and/or intimate knowledge of the Company's actual performance, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

74.     In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control

or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

75.    As set forth above, Credit Suisse and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's ADRs during the Class Period.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

a.    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding Plaintiff and the other members of the Class damages in an amount which may be proven at trial, together with interest thereon;

c.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

d.    Awarding such other relief as this Court deems appropriate.

## XIII.  JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


DATED: December 22, 2017                    Respectfully Submitted,

**SAXENA WHITE P.A.**

*/s/ Steven B. Singer*
Steven B. Singer
10 Bank Street, 8th Floor
White Plains, New York 10606
Telephone: (914) 437-8551
Facsimile:  (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena
Joseph E. White, III
Lester R. Hooker
150 East Palmetto Park Road
Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile:  (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com

-and-

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z Glancy
Robert V. Prongay
1925 Century Park East,
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 432-1495

***Counsel for Plaintiff City of Birmingham Firemen's and Policemen's Supplemental Pension System***

25

Exhibit A

## CERTIFICATION AND AUTHORIZATION

I, James Love, on behalf of the City of Birmingham Firemen's and Policemen's Supplemental Pension System ("Birmingham Supplemental"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I have reviewed the complaint in this matter and I am authorized in my capacity as Assistant City Attorney to initiate litigation and to execute this Certification on behalf of Birmingham Supplemental.

2. Birmingham Supplemental did not purchase the securities that are the subject of this action at the direction of counsel, or in order to participate in any action arising under the federal securities laws.

3. Birmingham Supplemental is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Birmingham Supplemental's transactions in Credit Suisse ADR securities during the Class Period are set forth in the table below:

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchase | 10/26/15 | 400 | $24.89 |
| Purchase | 10/27/15 | 500 | $24.97 |
| Purchase | 10/28/15 | 400 | $25.17 |
| Purchase | 10/29/15 | 600 | $25.13 |
| Purchase | 10/30/15 | 960 | $25.11 |
| Purchase | 12/15/15 | 870 | $20.89 |

5. Birmingham Supplemental has sought to serve and was appointed as lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *In re BHP Billiton Limited Securities Litigation*, No. 1:16-cv-01445 (S.D. N.Y.)

6. Birmingham Supplemental has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for lead plaintiff, was not appointed lead plaintiff or the lead plaintiff decision is still pending:

    None.

7. Birmingham Supplemental will not accept any payment for serving as a representative party on behalf of the Class beyond Birmingham Supplemental' s pro rata share of any

recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.
Executed this 21st day of December, 2017.

> Birmingham Firemen's and Policemen's
> Supplemental Pension System
>
> James D. Love, Assistant City Attorney