# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF BIRMINGHAM FIREMEN'S AND POLICEMEN'S SUPPLEMENTAL PENSION SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>     v.<br><br>CREDIT SUISSE GROUP AG, BRADY DOUGAN, TIDJANE THIAM, and DAVID MATHERS,<br><br>               Defendants. | Case No.: 1:17-cv-10014-RJS |

## AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND JURY TRIAL DEMAND

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION ...................................................................................1

III.  JURISDICTION AND VENUE ...........................................................................6

IV.   THE PARTIES......................................................................................................7

    A.    Lead Plaintiffs ..........................................................................................7

    B.    Defendants .................................................................................................8

        1.    Credit Suisse .....................................................................................8

        2.    The Individual Defendants................................................................8

V.    OVERVIEW OF THE CREDIT SUISSE FRAUD .........................................11

    A.    Background of the Company ....................................................................11

    B.    Throughout the Class Period, Credit Suisse Touts Its "Comprehensive"
        Risk Controls and "Binding" Risk Limits, Established and Actively
        Monitored by The Most Senior Officers Of The Bank.............................13

    C.    Defendant Thiam Assumes the Role of CEO and Announces a New
        Strategy to Shrink the Investment Bank ..................................................17

    D.    Thiam Touts His Risk-Averse Strategy In Order to Raise $6 Billion in
        Capital From Investors and Complete an $8 Billion Debt Exchange
        Offering As Defendants Continue to Actively Conceal the Outsized
        Positions...................................................................................................22

    E.    The Bank Fails to Disclose Massive and Material Losses From Its
        Outsized Positions as the Truth Continues to Leak Out ..........................24

VI.   THE TRUTH IS FINALLY REVEALED..........................................................25

    A.    Defendants are Forced to Disclose Credit Suisse's Massive Exposure to
        the Illiquid Outsized Positions, Resulting in a Staggering $1 Billion Write-
        Down.........................................................................................................25

    B.    "A Limit That Keeps Moving Is Not a Limit" – Defendant Thiam
        Suddenly Claims Ignorance of the Positions, Then Admits They Resulted
        From Credit Suisse Continually Raising Its Purportedly "Binding" Risk
        Limits .......................................................................................................27

    C.    In Credit Suisse's Publicly Filed Responses to a 2016 SEC Inquiry,
        Defendants Admitted They Knew About the Outsized Positions – and That

The Bank Continually Raised Its Risk Limits as the Risky Exposures Grew .................................................................................................30

D. Former Bank Employees Confirm That Defendants Were Well Aware Of The Positions Throughout The Class Period .........................................................32

VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS ...................................................................................................34

A. Credit Suisse's 2014 Annual Report ...................................................35

B. October 21, 2015 Strategy Update and Financial Results for the Third Quarter of 2015 ...................................................................................39

D. December 2015 Exchange Offering ...................................................40

VIII. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER .............................41

IX. LOSS CAUSATION ...................................................................................51

X. PRESUMPTION OF RELIANCE ...................................................................53

XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE ...........................................................54

XII. CLASS ACTION ALLEGATIONS ...............................................................55

XIII. CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT ...................................57

COUNT I ...................................................................................................57

COUNT II ...............................................................................................59

XIV. PRAYER FOR RELIEF ...............................................................................61

XV. JURY DEMAND ......................................................................................61

## I.    NATURE OF THE ACTION

1.      The City of Birmingham Retirement and Relief System ("Birmingham"), Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Local 60"), Teamsters Local 456 Pension and Annuity Funds ("Local 456"), and the International Brotherhood of Teamsters Local No. 710 Pension Plan ("Local 710" and, together with Birmingham, Local 60 and Local 456, "Lead Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to themselves and their acts, and upon information and belief as to all other matters, based upon the ongoing investigation of their counsel.  Many of the facts related to Lead Plaintiffs' allegations are known only by Defendants, or are exclusively within Defendants' custody or control.   Lead Counsel's investigation included, among other things, review and analysis of: (i) interviews with former employees of Credit Suisse Group AG ("Credit Suisse," the "Bank" or the "Company"); (ii) Credit Suisse's public filings with the Securities and Exchange Commission (the "SEC"); (iii) in-depth research reports by securities and financial analysts; (iv) transcripts of Credit Suisse's conference calls with analysts and investors; (v) presentations, press releases, and reports regarding the Company; (vi) consultations with relevant experts; (vii) news and media reports concerning the Company and other facts related to this action; and (viii) data reflecting the pricing of Credit Suisse American Depositary Receipts ("ADRs").  Lead Plaintiffs believe that substantial additional evidentiary support for their allegations will be developed after a reasonable opportunity for discovery.

2.      Lead Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, against Defendants Credit Suisse, Brady W. Dougan ("Dougan"), Tidjane Thiam ("Thiam") and David R. Mathers

1

("Mathers" and, together with Dougan and Thiam, the "Individual Defendants," and together with Credit Suisse, "Defendants"), and Section 20(a) of the Exchange Act against the Individual Defendants, on behalf of all investors who purchased or otherwise acquired Credit Suisse ADRs on the New York Stock Exchange ("NYSE") between March 20, 2015, and February 3, 2016, inclusive (the "Class Period").

## II.   <u>INTRODUCTION</u>

3.      In the wake of the Great Recession of 2008, Credit Suisse was one of the last major European banks to maintain a full-scale investment bank.  In order to assure the market that Credit Suisse's investments were properly managed for risk and exposure, throughout the Class Period, Defendants repeatedly touted the Bank's rigorous system of "comprehensive" and "sophisticated" risk and trading limits and controls that were "fundamental" to its investment business.

4.      Significantly, the Bank emphasized that these limits were established and enforced with the "strong involvement of senior management."  According to Credit Suisse, these risk limits were "<u>binding</u>," breaches were extremely "rare," and in the unlikely event that a limit breach occurred, it would trigger "immediate" escalation to the Bank's CEO and its Board of Directors.[1]  In addition, the Capital Allocation and Risk Management Committee ("CARMC")—which included Credit Suisse's CEO, CFO and Chief Risk Officer, in addition to each of the CEOs of the Bank's individual divisions—was designated to meet on a monthly basis to set and enforce Credit Suisse's "binding" risk limits.  These statements were highly material, as they reassured investors that, in an increasingly challenging regulatory environment

---

[1] Unless noted otherwise, any emphasis used herein is added.

with volatile credit markets, Credit Suisse had robust controls in place to prevent the over-accumulation of high-risk, illiquid investment instruments on its balance sheet.

5.     The reality, however, was starkly different.  As was ultimately disclosed at the end of the Class Period, Credit Suisse, with the direct knowledge and participation of its most senior officers, had, in violation of its own policies and procedures, repeatedly raised its supposedly "binding" trading and risk limits to allow the Bank to acquire billions of dollars of highly risky, illiquid investments—the very investments that the limits were expressly designed to prevent.  Indeed, during the Class Period, and in direct contravention of Credit Suisse's risk limits and controls, the Bank surreptitiously amassed a staggering $4.3 billion in exposure to collateralized loan obligations ("CLOs") and distressed debt instruments.  These securities, which were notoriously difficult to liquidate and consumed substantial amounts of regulatory capital, made the Bank extremely susceptible to enormous losses in the volatile credit markets. In fact, by the end of the Class Period, these positions resulted in a massive $1 billion write-down against the Bank's earnings for 2015 and the first quarter of 2016, completely wiping out its profits and causing it to record its first full-year loss since the height of the financial crisis in 2008.

6.     Despite this undisclosed massive exposure to highly risky investments, during the Class Period, Credit Suisse repeatedly touted the Bank's investment banking division, and its fixed income franchise in particular (which encompassed its CLOs and distressed debt investments), as key to the Bank's profitability.  However, in June 2015, Defendant Dougan was suddenly replaced as CEO by Defendant Thiam, who promptly directed a months-long, "in-depth" assessment of the Bank's business.  The culmination of Thiam's review was announced on October 21, 2015, when Thiam unveiled a new strategy that was focused on "right-sizing,"

or shrinking, Credit Suisse's investment bank.  Significantly, although Thiam was well aware of the undisclosed magnitude of Credit Suisse's $4.3 billion exposure to CLOs and distressed debt investments, he assured investors that the Bank's exposure to its fixed income franchise was minimal because these investments were consistently profitable and therefore "not a top priority" to aggressively wind down in the near-term.  Notably, at the same time that Thiam was downplaying Credit Suisse's risk exposure to these volatile investments, Credit Suisse tapped investors for approximately $14 billion in capital, conducting a $6 billion rights offering on November 19, 2015, an $8 billion exchange offering on December 15, 2015.

7.     Only after securing the $14 billion in capital did Defendants then stun the market by disclosing, on February 4, 2016, that the Bank had incurred a staggering $633 million loss as a result of highly illiquid CLOs and distressed debt investments—a loss that would soon swell to $1 billion.  On the news of these enormous write-downs, the value of the Bank's ADRs plummeted 11%, falling from $16.69 on February 3, 2016 to $14.89 on February 4, 2016, and wiping out approximately $230 million in market capitalization.

8.     Tellingly, after this disclosure, senior management attempted to feign ignorance of the outsized illiquid positions, claiming that they were blindsided and had no prior knowledge of them.  Indeed, Defendant Thiam went so far as to claim that the "completely unacceptable" write-downs were the result of unauthorized trades by bankers attempting to "generate revenue at all costs."  However, financial media, analysts and Credit Suisse's own bankers rejected this notion, explicitly stating that employees were "shocked" by Thiam's assertion; that it was "inconceivable" that CARMC and senior management could not have been unaware of the outsized, illiquid positions, "which no other major bank has seen"; and that "the notion that people didn't know is simply not believable."  Indeed, as these market participants

4

noted, management's assertions were directly belied by the Bank's own SEC filings, which stated that all of the Individual Defendants—Defendants Dougan and Thiam as the Bank's CEOs during the Class Period and Defendant Mathers as CFO—were members of CARMC, the Executive Board committee directly responsible for setting, monitoring, and approving the Bank's risk limits.

9.     Faced with this direct backlash, Defendant Thiam reversed course and was forced to acknowledge the truth to multiple media outlets, including *The Wall Street Journal* and *The New York Times*—namely, that these "completely unacceptable" losses were driven by senior management's own penchant for "generating revenue at all costs," and that the positions had grown in magnitude precisely because the Bank had systematically disregarded and violated its own purportedly "binding" risk limits by ***continuously raising*** them whenever breaches occurred.   Thus, instead of the Bank's massive exposures to CLOs and distressed debt triggering internal risk limits and immediate remediation procedures as provided at length by the Bank's SEC filings, the opposite occurred.   Credit Suisse routinely raised its risk limits to accommodate larger and larger positions in these highly risky and illiquid securities, rendering the Bank's risk limits utterly meaningless.   As Thiam himself explicitly and pointedly acknowledged to *The Wall Street Journal*: **"*[a] limit that keeps moving is not a limit* . . . *That's really where things went wrong*."**

10.     Defendants' prior rationalizations were also belied by Credit Suisse's responses in late 2016 to an SEC inquiry about these events.   When the SEC pressed the Bank regarding the control violations, Defendants' initial responses to the crisis, and Thiam's ultimate acknowledgement that risk limits were repeatedly raised, Defendants admitted that "[t]he positions that led to the write-downs were fully authorized"; that Credit Suisse had maintained

these outsized and illiquid positions since 2011; that they had materially increased each year from 2011 until the third quarter of 2015; that they were "known to the relevant supervisors and risk management personnel"; and that this information was regularly reviewed by "CRO senior management, the Investment Bank Risk Management Committee, and CARMC," in addition to the Risk Committee of the Board of Directors.  Significantly, Defendants also admitted that the Bank had "redefined" its risk and trading limits multiple times, including as late in the Class Period as November 2015—or contemporaneously with the Bank effectuating approximately $14 billion in investor offerings.

11.     In sum, throughout the Class Period, Defendants orchestrated a subterfuge that materially misrepresented the massive trading risk that had infected Credit Suisse's investment bank.  As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Bank's ADRs, Plaintiffs have suffered significant losses and damages.

## III.     JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.  In addition, the Company's United States offices are located in this District.  Further, Defendants' ADRs are traded on the New York Stock Exchange.

14.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## IV.     THE PARTIES

### A.     Lead Plaintiffs

15.     Lead Plaintiff Birmingham is a public pension system organized for the benefit of current and retired public employees of the City of Birmingham, Alabama.  As of November 3, 2017, Birmingham has pension assets under management of over $1 billion.  As set forth in its certification (*see* ECF No. 23-2), Birmingham purchased Credit Suisse ADRs during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On March 19, 2018, the Court appointed Birmingham as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 36.

16.     Lead Plaintiff Local 60 is a public pension system based in Hawthorne, New York that was established through collective bargaining between the Laborers International Union of North America, Local 60, the Construction Industry Council and various employers.  Plans encompassed under Local 60's benefit system include a Health Benefits Plan, Annuity Plan, Pension Plan, and Legal Services Fund for its members.  As of May 23, 2017, Local 60 oversaw more than $157 million in assets.  As set forth in its certification (*see* ECF No. 23-2), Local 60 purchased Credit Suisse ADRs during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On March 19, 2018, the Court appointed Local 60 as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 36.

17.     Lead Plaintiff Local 456 is a defined contribution plan with a profit-sharing component.  Local 456 currently has approximately 4,000 active participants and over $347 million in total assets.  As set forth in its certification (*see* ECF No. 23-2), Local 456 purchased Credit Suisse ADRs during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On March 19, 2018, the Court appointed Local 456 as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 36

18.     Lead Plaintiff Local 710 is a defined contribution plan.  As of June 7, 2017, Local 710 had approximately 21,000 active participants and over $2.6 billion in plan assets.  As set forth in its certification (*see* ECF No. 23-2), Local 710 purchased Credit Suisse ADRs during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.  On March 19, 2018, the Court appointed Local 710 as Lead Plaintiff for the Class pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  ECF No. 36.

### B.     **Defendants**

#### 1.     **Credit Suisse**

19.     Defendant Credit Suisse Group AG is a Swiss multinational financial services holding company with its headquarters in Zurich, Switzerland and its United States operations located at 11 Madison Avenue, New York, NY 10010.  Credit Suisse's ADRs are traded on the NYSE under the symbol "CS."

#### 2.     **The Individual Defendants**

20.     Defendant Brady W. Dougan served as the Chief Executive Officer ("CEO") of Credit Suisse from 2007 through June 30, 2015.  Dougan was employed at various Credit Suisse divisions prior to serving as CEO.  Dougan joined Credit Suisse First Boston in 1990.  Dougan was the Head of the Equities division for five years before he was appointed the Global Head of

the Securities division in 2001.   From 2002 to July 2004, he was the Co-President of Institutional Securities at Credit Suisse First Boston, and from 2004 until 2005, he was CEO of Credit Suisse First Boston.  After the merger with Credit Suisse in May 2005, Dougan was the CEO of Investment Banking until 2007.  Credit Suisse announced on March 10, 2015 that Dougan resigned and the Company would replace Dougan with Defendant Thiam.  Dougan was previously under pressure to resign from lawmakers since May 2014, after the Bank plead guilty and was fined over $2.6 billion for helping clients evade American taxes.[2]

21.     During the Class Period, Defendant Dougan reviewed, approved, signed and certified Credit Suisse's filings with the SEC, including on March 20, 2015, which contained materially false and misleading statements and omissions.

22.     Defendant Tidjane Thiam has served as the Chief Executive Officer of Credit Suisse since July 1, 2015 and as a member of the Executive Board at Credit Suisse since 2015.

23.     During the Class Period, Defendant Thiam made materially false and misleading statements and omissions in press releases and during earnings calls, investor conferences and industry presentations, including during the earnings call on October 21, 2015.  Defendant Thiam also reviewed, approved, signed and certified Credit Suisse's filings with the SEC, including on December 15, 2015, which contained materially false and misleading statements and omissions.

24.     Defendant David R. Mathers has served as the CFO of Credit Suisse Group and a member of the Executive Board since October 2010.   He was also responsible for the Company's global IT and global Operations functions.  Prior to his appointment as CFO,

---

[2] Joshua Franklin, "Credit Suisse CEO faces more calls to quit in U.S. tax dispute," (REUTERS May 18, 2014) http://www.businessinsider.com/r-credit-suisse-ceo-faces-more-calls-to-quit-in-us-tax-dispute-2014-18

Mathers was the Head of Finance and the COO for Investment Banking in New York and London from 2007 to 2010. In this role, he was responsible for Investment Banking Finance, Operations, Expense Management and Strategy.  Mathers joined Credit Suisse in 1998, working in a number of senior positions in Credit Suisse's Equity business, including the Director of European Research and the Co-Head of European Equities.

25.     During the Class Period, Defendant Mathers reviewed, approved, signed and certified Credit Suisse's filings with the SEC, including on March 20, 2015 and December 15, 2015, which contained materially false and misleading statements and omissions.

26.     Defendants Dougan, Thiam, and Mathers are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, in part because of their positions with the Company, possessed the power and authority to control the contents of Credit Suisse's reports to the SEC, as well as its press releases and presentations to securities analysts, money and portfolio managers and investors, *i.e.*, the market.  Each Individual Defendant was involved in the public statements alleged herein to be false or misleading and had the ability and opportunity to prevent those statements from being disseminated to the market or cause them to be corrected during their tenure with the Company.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public, and that the positive representations which were being made were then materially false and/or misleading.

## V.    OVERVIEW OF THE CREDIT SUISSE FRAUD

### A.    Background of the Company

27.    During the Class Period, Credit Suisse, one of the largest multinational financial institutions in the world, had two main divisions: Private Banking & Wealth Management and Investment Banking.  During Defendant Dougan's tenure as CEO (until June 2015), the Bank emphasized its Investment Banking division as the key part of its strategy, even in the wake of the Great Recession of 2008 ("Recession").  Indeed, beginning in 2009, Defendant Dougan led an effort to not only maintain Credit Suisse's full-scale investment bank in the face of repeated investor and analyst criticism, but to expand it, and in particular its investments in volatile fixed-income markets.

28.    According to Credit Suisse's 2014 Annual Report, the Bank's "Fixed Income" franchise included, among other things, credit and securitized products.  With respect to credit products, the Annual Report did not disclose that the Bank was disproportionately invested in highly illiquid distressed debt investments, nor that it had accumulated a staggering $3 billion exposure to them, as would be revealed at the end of the Class Period.

29.    With respect to securitized products, the 2014 Annual Report stated that they included asset-backed securities (ABS), residential mortgage-backed securities (RMBS), and commercial mortgage-backed securities (CMBS).  However, notably, the Annual Report nowhere disclosed that the Bank's securitized products also consisted of collateralized loan obligations (CLOs), nor was "CLO" included in the long list of abbreviations and definitions provided at the end of the Annual Report.  This omission was significant, as CLOs are specialized financial instruments that mimic collateralized debt obligations, or CDOs, the instruments that fueled the Recession.  Similar to CDOs, CLOs are bundled low-grade loans,

11

with a higher risk of default and a lower chance of recovery in the event of default.   The lack of any mention of CLOs in the 2014 Annual Report was all the more conspicuous because, as the Bank would reveal at the end of the Class Period, it had amassed an enormous $1.3 billion exposure to these highly risky securities.

30.     Significantly, in 2014, the Bank had already been warned by regulators for misconduct with respect to leveraged loans, which comprise CLOs.  Specifically, in 2014, the Company was under fire from U.S. regulators over concerns the Company was "not heeding warnings to stop making loans regulators see as risky."  *The Wall Street Journal* reported that the Bank "received a letter from the Federal Reserve demanding the bank immediately address problems with its underwriting and sale of leveraged loans."[3]   The letter stated that Credit Suisse had "problems with leveraged lending" and warned the Bank to avoid deals that included too much debt or too few protections for the lenders in case of a default.  Yet, despite these regulator warnings, the Bank not only amassed a massive $1.3 billion exposure to CLOs, it failed to include any specific disclosures about these investments at all in the 2014 Annual Report.

31.     In the wake of the Recession and leading up to the Class Period, regulators demanded higher and higher capital requirements for certain types of investments in an effort to avoid a costly government bailout or another financial crisis.  As a result, the Bank's heavy investments in highly risky and illiquid distressed debt and CLOs—which consumed substantial amounts of capital—significantly squeezed its profitability.  The Bank's challenge to meet these increasing capital requirements while still turning a profit reached a fever pitch just prior to the Class Period, when regulators announced that even more stringent capital requirements would

---

[3] https://www.wsj.com/articles/credit-suisse-loans-draw-fed-scrutiny-1410910272

be imposed on the largest Swiss banks—namely, Credit Suisse and its rival, UBS—by the end of 2015.  While UBS had already substantially slashed its investment bank back in 2012, shrinking its fixed income business to a fraction of its original size, Credit Suisse's extensive investment bank still utilized a substantial 60% of its regulatory capital.

32.     Nonetheless, and in spite of repeated investor and analyst criticism, the Bank's response was not to cut its fixed income franchise.  Instead, Defendant Dougan continued to expand it, taking larger and larger positions in highly risky and illiquid distressed debt and CLO investments that exceeded the Bank's predefined risk limits in a desperate effort to maintain profitability as regulatory capital requirements continued to increase.

**B.      Throughout the Class Period, Credit Suisse Touted Its "Comprehensive" Risk Controls and "Binding" Risk Limits, Established and Actively Monitored by The Most Senior Officers Of The Bank**

33.     As a result of Credit Suisse's emphasis on the investment bank and its volatile fixed income franchise, it was critical for the Bank, following the 2008 credit debacle, to convince investors that it had robust and stringent risk controls.  Accordingly, Defendants made numerous false statements throughout the Class Period representing that Credit Suisse had a robust and comprehensive risk management system that utilized "binding" risk limits to prevent the Bank from accumulating too much risk.  Indeed, the Bank represented to investors that under this rigorous risk management framework, limit breaches were extremely "rare," and when they did occur, they triggered "immediate" notification to senior officers including the CEO – such that "98% of all limit excesses" were promptly resolved.  The Bank asserted this strict system of risk controls was "fundamental" to its business, and was directly policed by CARMC, a sub-committee of the Bank's Executive Board consisting wholly of its most senior officers – including the Bank's CEO (Defendants Thiam and Dougan), CFO (Defendant Mathers), and the CEOs of its individual divisions.  However, as would be revealed at the end

of the Class Period – and as the Bank's own CEO would admit – these statements were materially false.  In reality, the Bank's risk limits were illusory, as during the Class Period, the Bank repeatedly raised them at will to accommodate in excess of $4 billion in exposure to highly risky and illiquid CLO and distressed debt securities.

34.     On March 20, 2015, the first day of the Class Period, Credit Suisse filed its 2014 Annual Report with the SEC on Form 20-F (the "2014 Annual Report," the "Annual Report," or the "Report"), which devoted no less than <u>thirty-five pages</u> to touting the Bank's extensive risk protocols.  The Annual Report proclaimed that "the prudent taking of risk in line with our strategic priorities" was "fundamental" to Credit Suisse's business as a leading global bank.  In describing the Bank's "disciplined" risk culture, it stated:

> We base our business operations on conscious and disciplined risk-taking . . . We establish a clear risk appetite that sets out the types and levels of risk we are prepared to take; <u>We actively monitor risks and take mitigating actions where they fall outside accepted levels; Breaches of risk limits are identified, analyzed, and escalated</u>, and large, repeated or unauthorized exceptions may result in disciplinary action.

35.     The 2014 Annual Report emphasized that, to ensure the effectiveness of the Bank's risk controls, there was "strong involvement of senior management and the Board of Directors" in the Bank's risk management procedures.  Indeed, the Annual Report stated the Bank had established a sub-committee of its Executive Board, CARMC, consisting wholly of the Bank's most senior officers.  CARMC met regularly on a monthly basis and included "the chief executive officers (CEOs) of the Group and the divisions, the Chief Financial Officer, the Chief Risk Officer (CRO) and the Treasurer."  Further, the Report stated that CARMC played a central role in the Bank's risk management procedures, as it was responsible for actively monitoring risk at the highest level, recommending overall risk limits for the Bank to the Board, and setting and allocating risk limits among the Bank's different lines of business:

[CARMC] is responsible for supervising and directing our risk profile, recommending risk limits at the Group level to the Risk Committee and the Board, establishing and allocating risk limits among the various businesses, and for developing measures, methodologies and tools to monitor and manage the risk portfolio.

36.     The 2014 Annual Report explained that risk limits were critical to the Bank's risk management procedures, as they were designed "to maintain our risk profile within our overall risk appetite."  The Report explained that "[l]imits are binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs."  The Report also stated that "[w]hile the primary purpose [of risk limits] is risk management, risk limits are also useful tools in the identification of trading misconduct and unauthorized trading activities."

37.     The 2014 Annual Report stated that the Bank had several levels of risk limits within its extensive risk management framework, the breach of any one of which would trigger immediate escalation to senior management followed by remediation procedures.  Specifically, the Report stated that the "overall risk limits" for the Bank were "set by the Board in consultation with the Risk Committee **and are binding**," and that any breach of these limits "would result in an ***immediate notification to the Chairman of the Board's Risk Committee and the Group CEO***, and written notification to the full Board at its next meeting":

The overall risk limits for the Group are set by the Board in consultation with its Risk Committee and are binding. In the rare circumstances where a breach of these limits would occur, it would result in an immediate notification to the Chairman of the Board's Risk Committee and the Group CEO, and written notification to the full Board at its next meeting. Following notification, the Group CRO may approve positions that exceed the Board limits up to a predefined level and any such approval is reported to the full Board. Positions that exceed the Board limits by more than the predefined level may only be approved by the Group CRO and the full Board acting jointly. In 2014 and 2013, no Board limits were exceeded.

15

38.     The next level of risk limits was set by CARMC "[i]n the context of the overall risk appetite of the Group, as defined by the limits set by the Board and its Risk Committee." Specifically, CARMC was "responsible for allocating divisional risk limits and more specific limits deemed necessary to control the concentration of risk within individual lines of business." The Annual Report emphasized that "CARMC limits _**are binding**_ and generally set close to the planned risk profile to ensure that any meaningful increase in risk exposures is promptly escalated."

39.     The final level of limits were set by divisional management, who would "use[] a detailed framework of more than 100 individual risk limits designed to control risk-taking at a granular level by individual businesses and in the aggregate."  These risk controls were intended to, among other things, "trigger senior management discussions with the businesses involved, risk management and governance committees in case of change in the overall risk profile." While "divisional chief risk officers and certain other members of senior management" had authority to "temporarily increase" these more granular limits "by an approved percentage not to exceed 90 days," significantly, any excess was "subject to formal escalation procedures and must be remediated or expressly approved by senior management."  Moreover, even in this circumstance, senior management was required to continuously monitor and renew its approval of any excesses that were not remediated within ten days:

> Senior management approval is valid for a standard period of ten days (or fewer than ten days for certain limit types) and approval has to be renewed for additional standard periods if an excess is not remediated within the initial standard period.`

40.     The Annual Report emphasized that all of the Bank's limits were actively and frequently monitored, stating that "[t]he majority of these limits are _**monitored on a daily basis**_," with smaller subsets monitored on a weekly or monthly basis.

16

41.     As would be revealed at the end of the Class Period, however, these statements were false, and in reality, the Bank's risk controls and limits were fictitious.   Indeed, as Defendant Thiam ultimately admitted, Credit Suisse's multi-billion dollar exposure to CLOs and distressed debt breached risk limits multiple times between 2011 and 2015, including as late as November 2015.   Significantly, however, instead of triggering immediate remediation procedures as the Bank's SEC filings assured investors would occur, Defendants simply raised the risk limits whenever a breach occurred, rendering the risk limits meaningless.   Indeed, as Defendant Thiam would explicitly admit at the end of the Class Period, the Bank's continual raising of its risk limits rendered its public statements about its "binding" risk limits materially false precisely because "[a] limit that keeps moving is not a limit."

**C.     Defendant Thiam Assumes the Role of CEO and Announces a New Strategy to Shrink the Investment Bank**

42.     On July 1, 2015, Defendant Dougan stepped down as CEO of Credit Suisse and was replaced by Defendant Thiam.   Due to the Bank's historical challenges maintaining adequate capital, and the fact that it was about to face even steeper capital requirements by regulators, analysts and investors expected Thiam to substantially scale back the investment bank, as they noted UBS had already done years ago.

43.     In line with these expectations, on the Bank's second quarter July 23, 2015 earnings call, Thiam announced that he would unveil a new strategy for the Bank later in the year, after an "in-depth strategic review" he had already begun.   This "in-depth strategic review" – for which Thiam "work[ed] closely with the leadership team," including Defendants Dougan and Mathers – spanned several months, and involved an exhaustive assessment of each of the Bank's lines of business, its investments, and most significantly, its risk profile in relation to those investments.   Indeed, as Thiam had confirmed to the market on July 23, 2015, the focus

17

of the Bank's new strategy would be to reduce risk and earnings volatility for the Bank by scaling back the Investment Banking division.  Assessing the existing risk on the Bank's books for that division was therefore a primary focus of Thiam's "in-depth" review.

44.     On the Bank's third quarter October 21, 2015 earnings call – after, according to Thiam, "a thorough review of the organization, looking at strategy, cost and capital across geography and business lines" – Thiam announced that going forward the Bank would emphasize its more stable Private Banking & Wealth Management division while "right-sizing," or shrinking, the investment bank to "reduce earnings volatility."  Thiam announced that, to support this strategy, Credit Suisse would be reorganized by region, with the investment bank operating alongside the geographic divisions in two parts:  (i) Global Markets, which would include the Bank's fixed income franchise, and would be headed by Timothy O'Hara, and (ii) Investment Banking & Capital Markets, to be headed by Jim Amine.  Significantly, Thiam also announced that, in addition to these efforts, Credit Suisse would issue a private placement and rights offering to raise an additional CHF 6 billion ($6.1 billion) in much needed external capital from the Bank's investors.  Indeed, according to Thiam's later public comments, this capital raise was critical for the Bank, allowing it "to stay alive" in increasingly challenging markets.

45.     Defendants also announced on the October 21, 2015 call that, to ensure the shrinkage of the investment bank and of the Global Markets division in particular, the Bank had created an entirely separate unit—the "Strategic Resolution Unit," or "SRU"—that was devoted to downsizing prior management's risky investments that did not conform with the Bank's new strategy.  Defendant Mathers described the SRU as a "stand-alone segment with its own governance structure and reporting obligations and clear accountability for its primary

18

objectives," which were the "immediate right-sizing of the Global Markets division, as well as the other exposures that do not fall within the strategic goals of the business divisions." Mathers stated that the SRU would have a "direct reporting line" to him as the Bank's CFO. Notably, Mathers' October 21, 2015 earnings presentation slides showed that fixed income positions—including securitized and credit products, which, as the Bank would ultimately reveal, encompassed outsized positions in CLOs and distressed debt—would be transferred to the SRU.

46.     Credit Suisse also discussed its third quarter results during the October 21, 2015 earnings call, stating that profits had declined 24% and revenue had declined 9%, driven by the underperformance of the fixed income franchise for the second consecutive quarter.   Thiam stated that these results, although disappointing, were a "validation" of the Bank's new strategy to emphasize Private Wealth Management and "de-emphasize fixed income":

> Now, Q3.  It was not a good quarter.  That's obvious, you've seen the numbers . . . All the pressures have been on fixed income.  So we didn't fix this, but it just happens to be a kind of validation of the strategy and the direction of travel that we're taking which is to emphasize Asia, emphasize equity, de-emphasize fixed income.

47.     However, despite these statements, and despite the transfer of securitized and credit products to the SRU, Thiam told investors that the Bank did not plan to aggressively exit those positions in the near-term.  Instead, the Bank planned to aggressively exit its macro and prime positions, resulting in a reduction of risk for the investment bank of only 20%.[4]  Thiam explained this determination was based on the fact that exiting the securitized and credit

---

[4] According to the 2014 Annual Report, the Bank's macro positions mainly consisted of its foreign exchange business.  As Defendant Mathers would admit to investors during the Bank's January 8, 2016 conference call, while this business was encompassed within the fixed income franchise with the Bank's securitized and credit products, it carried far less risk than those products.  The Bank's prime services business consisted of execution, financing, clearing, reporting and advisory services for listed and over-the-counter derivatives and, according to Defendant Mathers, also carried far less risk than the securitized and credit products.

positions would cost the Bank too much money, "destroying" its economics:  "I read a lot, why do we tackle Macro and Prime, well, that's why . . . <u>I've showed you that to go after structured product and credit, it creates a real problem and completely destroys your economics</u>."  Thiam acknowledged the investments were "ugly ducklings nobody likes" because "they consume a lot of capital," but assured investors they were benign because, despite not conforming with the Bank's new strategy, they generated high returns:

> Then you've got the two ugly ducklings that nobody likes, securitized products and credit.  Because they generate a lot of profit, but they consume a lot of capital.  But personally, to generate 35% or 40% of return <u>I don't mind burning some capital . . . 35-40% -- as an incoming CEO in a company that doesn't have enough profit, not enough capital, that's not my top priority to tackle this</u>.

48.     Investors were nonetheless discouraged by the news that the Bank was not aggressively slashing its volatile fixed income franchise.  For example, an October 21, 2015 Morgan Stanley report stated that, while the "announcement to shrink the investment bank" was encouraging, the Bank's fixed income franchise had performed the worst out of its peers.  The report cited the need for reassurance on "[h]ow the remaining FICC [fixed income] unit – which will be skewed to HY, leverage loans and mortgage trading, which were so weak in Q3 – will fare going forward, and why the cuts were not deeper."

49.     A Morningstar report dated the same day similarly commented that Credit Suisse's cuts to the investment bank were less than hoped, which was discouraging in light of the investment bank's poor third quarter performance:

> We're disappointed that new CEO Tidjane Thiam is maintaining Credit Suisse's commitment to having a strong investment bank, as we'd thought UBS-style radical cuts were possible.  The revised strategy, which will significantly cut macro businesses . . . will cut only about 20% of the investment bank's risk-weighted assets . . . . Credit Suisse's performance in the third quarter was disappointing . . . Very bad performance from the investment bank was behind most of the drop—strategic pre-tax income in the unit fell to CHF 282 million from CHF 995 million in the year-ago quarter, as fixed income trading revenue declined significantly.

20

50.     An October 21, 2015 Financial Times article also highlighted analysts' criticisms of Thiam's shrinkage of the investment bank by only 20%, stating "[i]t was a far cry from the speculation immediately after Tidjane Thiam's appointment in March as chief executive, when the bank's shares surged 8 percent on hopes of a big push into Asia, a big wealth management acquisition, and drastic cuts to investment banking."

51.     Notwithstanding Thiam's assurances that the fixed income investments were profitable and not a problem, the Bank's ADRs fell over 6% in response to this news, from $25.96 on October 20, 2015 to $24.37 on October 22.

52.     Significantly, while as a result of these disclosures investors began to understand that the Bank was far more reliant upon, and entrenched in, its fixed income franchise that it had previously let on, investors still did not know the extent of the Bank's exposure to highly risky CLOs and distressed debt instruments.  Specifically, Defendants nowhere disclosed that these positions had amassed to over $4.3 billion in exposure—with $1.3 billion in CLOs and $3 billion in distressed debt—far beyond the Bank's predefined and purportedly "binding" internal risk limits which, rather than triggering remediation, had simply been raised to allow the positions to get larger and larger.  Nor did Defendants disclose that these enormous exposures, which were highly illiquid, eclipsed any effort to shrink the investment bank and reduce earnings volatility.   Indeed, instead, Defendants had given the investors the opposite impression: that the Bank's securitized and credit positions, while not easy to exit and not conforming to the Bank's new strategy, were profitable and entirely benign.  Moreover, as would later be revealed, as of October 2015, Defendants were in fact aggressively attempting to wind down these very material exposures (with limited success due to their extreme illiquidity), knowing that staggering losses from these exposures were not only probable, but inevitable.

**D.    Thiam Touts His Risk-Averse Strategy In Order to Raise $6 Billion in Capital From Investors and Complete an $8 Billion Debt Exchange Offering As Defendants Continue to Actively Conceal the Outsized Positions**

53.    On November 19, 2015, additional information concerning Defendants' fraud was partially revealed.  That day, the Bank issued its previously announced rights offering during an Extraordinary General Meeting following a presentation by Thiam to shareholders.  As a result of this offering, the Bank raised in excess of $6 billion – without acknowledging the highly risky exposures on the Bank's books and instead assuring investors to the contrary.

54.    Indeed, during Thiam's presentation, he emphasized that the Bank's new strategy was reducing volatility and risk, stating:  "We aim to reduce capital consumption in Investment Banking, which is now structured as two divisions – Global Markets and Investment Banking & Capital Markets – through right-sizing this side of our business.  We will withdraw from those activities that produce volatile earnings and are capital intensive."

55.    Thiam further disclosed, for the first time, that the Bank would also do away with external profit targets in its investment banking divisions to curb "overly risky activities" by its bankers, indicating that new management had discovered the Bank's risk culture was not as "disciplined" as previously represented and needed additional controls:

> We have reflected this new approach to Investment Banking by not setting external profit targets for our Global Markets and Investment Bank & Capital Markets divisions.  This is to ensure that our bankers do not have incentives to engage in overly risky activities.  This is an important aspect of our new strategy.

56.    On this news, the Bank's ADR price fell again, from $23.18 on November 19, 2015 to $21.58 on Monday, November 23, or nearly 7%.

57.    Significantly, in the October 21 and November 19 disclosures, Defendants continued to mislead investors, disclosing only a limited picture of the true state of the Bank's balance sheet.  Indeed, while Thiam touted the rights offering to investors by extolling the

Bank's risk-averse strategy to shrink the investment bank, these statements were materially incomplete and misleading because, in reality, Credit Suisse had already built up outsized risky and highly illiquid positions in the new Global Markets division that exceeded the Bank's risk limits and were directly contrary to, and created enormous exposure that wholly eclipsed, the touted strategy.  Moreover, Thiam's assurance to investors that not setting external profit targets would prevent "overly risky activities" by bankers was also misleading, as such activities had already occurred and severely and irrevocably impacted the Bank's risk profile.

58.     On December 3, 2015, the rights offering closed.  The Bank announced that 99% of the rights had been exercised by investors.  Together with the Bank's concurrently issued private placement, the rights offering generated over $6 billion in additional capital for the Bank as planned—without investors ever being made aware of the highly risky outsized illiquid positions or that the Bank's supposedly "binding" risk limits were in fact repeatedly raised to accommodate larger and larger exposures to these positions.

59.     Then, on December 15, 2015, the Bank co-issued $8 billion in long-term debt with its subsidiary, Credit Suisse Group Funding (Guernsey) Limited, in debt exchange offerings (the "Exchange Offering") scheduled to close on January 14, 2016.   In the Registration Statement and Prospectus Credit Suisse filed with the SEC for the Exchange Offering on Form F-4, Defendants again touted the Bank's new strategy of building up its Private Banking & Wealth Management division while shrinking the investment bank, highlighting the SRU and its dedicated objective of winding down investments "that do not fit our strategic direction."  The Registration Statement and Prospectus was signed by Defendants Thiam and Mathers, and explicitly incorporated the 2014 Annual Report—including its exhaustive disclosures about the Bank's "binding" risk limits and strict risk management

framework.  Again, Defendants nowhere disclosed that the Bank had already amassed $4.3 billion in outsized positions to its CLO and distressed debt investments, well beyond its purported limits for highly risky and illiquid fixed income securities, subjecting it to substantial losses that contradicted the new risk-averse strategy.

### E.  The Bank Fails to Disclose Massive and Material Losses From Its Outsized Positions as the Truth Continues to Leak Out

60.     By December 2015—the same month the $6 billion rights offering closed, and a month before the December 15, 2015 Exchange Offering was scheduled to close on January 14, 2016—Defendants knew Credit Suisse would be forced to take a $633 million write-down against its 2015 earnings due to mark-to-market losses on its outsized and highly illiquid CLO and distressed debt positions.  Despite these severe and material losses, which were wholly unexpected by the market and would cause the Bank to turn a loss instead of a profit for 2015, the Bank did not disclose them.

61.     Instead, on January 6, 2016, the Bank announced to the market that it would restate its financials from 2011 through the third quarter of 2015, "to reflect the new divisional reporting structure and management responsibilities announced on October 21, 2015."   On January 8, 2016, the Bank presented the restated financials to investors.  At the outset of the presentation, and despite the grave (but still undisclosed) losses the Bank had already incurred in 2015, Mathers stated that "we are not going to be commenting on the fourth quarter or the full-year earnings results."

62.     However, the truth of the Bank's risky exposures to the outsized illiquid securities, while still not fully disclosed, continued to leak out.  Specifically, Mathers' presentation on the restated financials included a slide on the SRU, showing that several new positions from the fixed income franchise—including positions in securitized and credit

24

products—had been transferred to that unit to be wound down, creating a sizeable surge in the

risk-weighted assets attributed to that unit.  As an analyst commented:

> [Y]ou have actually transferred, it seems, <u>a book of business with a remarkably high risk density [to the SRU]</u>.  It seems <u>you have added about CHF 45 billion of risk-weighted assets and CHF 100 billion of leverage exposure.</u>  And that strikes me as being a bit strange, given that the businesses that should largely account for this are prime booking and macro, but <u>you do mention on slide five or six that there are also some positions from securitized products, equity derivatives, etc.</u>  Is there any way to shed a bit more light on what you have transferred into this [SRU], please?

63.     Mathers responded by agreeing that the increase in risk was not due to the macro

and prime positions, which had "pretty low risk density," but to other positions that had been

transferred to the unit, as the operational risk for those positions were pooled in the SRU under

the new structure rather than in the separate businesses.  Significantly, however, Mathers did

not disclose that these other positions were in highly risky and illiquid CLO and distressed debt

investments, that the Bank had accumulated a massive $4.3 billion exposure to these

investments, or that they had caused the Bank to take a $633 million write-down that wiped out

its 2015 profits.

64.     Nonetheless, on the revelation that the legacy positions transferred to the SRU

carried far more risk than investors had been led to believe, the Bank's ADRs fell from $21.20

on January 5, 2016, to $19.58 on January 8, 2016, or 7.6%.

## VI.     THE TRUTH IS FINALLY REVEALED

### A.     Defendants are Forced to Disclose Credit Suisse's Massive Exposure to the Illiquid Outsized Positions, Resulting in a Staggering $1 Billion Write-Down

65.     Less than two months after the rights offering closed and less than a month after

the Exchange Offering closed, on February 4, 2016, Credit Suisse announced its fourth quarter

and full-year results.  To analysts' and investors' shock, the Bank disclosed, for the first time,

that it had incurred a massive $633 million write-down due to mark-to-market losses from the

Bank's outsized and illiquid distressed debt and CLO positions.  This enormous loss wiped out the Bank's profits for 2015, causing it to incur the first full-year loss since the Recession in 2008.  Even this announcement materially understated the magnitude of the loss – investors would learn four weeks later that the loss was in fact a staggering $1 billion.

66.     During the February 4, 2016 earnings call, Thiam admitted that these outsized positions were "not consistent with our new strategy," and that the Bank had been attempting to "reduce[] [the outsized positions] aggressively since we started implementing the strategy in October."  Similarly, when an analyst asked Thiam why, in light of these highly material losses, Credit Suisse had not "preannounced" them, "given the scale of the miss versus consensus expectations," Thiam responded by again by asserting that "from October, we started cutting those [positions] very aggressively."   However, despite this claim, Defendants had never disclosed the existence of these material exposures to investors in October or any time prior, nor did they disclose any plan to aggressively reduce them.  In fact, Defendants had told investors the exact opposite, stating that these "ugly duckling" positions were benign and profitable, and aggressively reducing them was therefore "not a top priority."

67.     On the news of these massive write-downs, the price of Credit Suisse ADRs declined precipitously, from a close of $16.69 on February 3, 2016, to a close of $14.89 on February 4, 2016—a drop of 11% with extraordinarily heavy trading volume of 5.5 million shares, more than three times the daily average volume, wiping out approximately $230 million in market capitalization.

68.     Days after Credit Suisse announced these losses, on February 7, 2016, Defendant Thiam asked the Bank's board to slash his bonus by up to 50%.  Thiam's extraordinary request was in recognition of his own culpability for the Bank's enormous write-downs, resulting in the

Bank's first full-year loss in nearly a decade.  On this news, the Bank's ADRs plummeted again, by nearly 11%.

69.     In the ensuing weeks, and as detailed further below, the write-downs from the Bank's sale of these illiquid positions grew to an astonishing $1 billion.  Specifically, on March 23, 2016, the Bank announced that an additional $346 million in write-downs would be charged against the Bank's first quarter earnings for 2016, resulting in the Bank recording a loss for the quarter.  In other words, in the span of two months, the Bank had incurred losses that wiped out its full-year profits for 2015 and its profits for the first quarter of 2016.

**B.     "A Limit That Keeps Moving Is Not a Limit" – Defendant Thiam Suddenly Claims Ignorance of the Positions, Then Admits They Resulted From Credit Suisse Continually Raising Its Purportedly "Binding" Risk Limits**

70.     In the wake of the Bank's revelation of the massive write-downs, Defendant Thiam attempted to claim that the outsized illiquid positions were a "surprise" to senior management, and had resulted from unauthorized trades by rogue bankers.  Specifically, on the March 23, 2016 conference call – when the Bank announced that its write-downs had swelled to $1 billion – Thiam stated:

> I think we've been – I have been, I think, relatively clear in February that the development in the distressed book were a surprise.  Clearly, something didn't go right there or something went wrong.  We have since then been looking at that very closely, understanding the unfolding of events because that book had actually been taken down very significantly back to 11% and 12%.  And when we do look at [the] rebuild to the level that we found in Q4 and what we generated was losses.  So we have gone back to that decision-making process, and there have been consequences internally for a number of people.

71.     Analysts and financial reporters were incredulous.  For example, one analyst followed up on these statements by asking Thiam who, if not senior management, was accountable for the $1 billion in losses:  "There was clearly – you [have] seen losses which no other major bank has seen.  So there's clearly an active decision to retain illiquids that CS took

27

which other firms didn't take . . . Who the hell is accountable for that $1 billion of losses?" Thiam responded by reasserting his ignorance of the outsized positions, but admitted that even in that circumstance, the failure of the Bank's systems was to blame:  "I will say that <u>even internally, the scale of those positions was a surprise to a number of people and was not a widely-known fact.  So then you can fault our system</u>."

72.    In a Bloomberg television interview Thiam gave that same day, Thiam condemned the outsized positions and the material write-downs they caused as "<u>completely unacceptable</u>," and again asserted he was blindsided by them, claiming he did not find out about them until January 2016.  When the Bloomberg reporter asked why the size of the positions was "not clear before," Thiam stated:  "Well, as I said on the record, <u>this was not clear to me, this was not clear to my CFO who said it on the record also this morning and to many people inside the bank.</u>"  Thiam then blamed the Bank's undisciplined risk culture and lack of risk controls for the losses, stating unauthorized trades had resulted from "<u>people [] trying to generate revenue at all costs</u>":

> A lot of the problem in the investment bank has been that <u>people are trying to generate revenue at all costs</u>, if I may say so . . . <u>That book had already created problems, had been taken down, and it was ramped up without the understanding of many key decision-makers</u>."

73.    Analysts and the financial press rejected the notion that Defendants did not know about the outsized positions, noting that the Bank's risk management framework, as publicly disclosed in its own SEC filings, made clear that they knew.  According to an article published by the International Financing Review ("IFR"), "two Credit Suisse bankers told IFR the real surprise was that Thiam, installed as chief executive less than a year ago, could claim that the bank's positions were not known about.  The bankers, who asked not to be named, said <u>it was inconceivable that the bank's Capital Allocation and Risk Management Committee (CARMC)</u>

was unaware of the holdings." Indeed, the IFR article quoted one of the bankers as stating: "The COO, the CFO knew about the [positions taken by] these businesses. CARMC happens every month. The notion that people didn't know is simply not believable."

74.     In addition, a former board member of a Credit Suisse investment banking subsidiary directly implicated Defendant Mathers in particular, stating "[i]f the CFO didn't know about it, then sure as hell the chief risk officer would have [], which means everybody would have [] . . . It's hard to imagine nobody knew about this stuff."

75.     The Bank's purported ignorance of the outsized positions was also questioned by market analysts. For instance, a March 24, 2016 Morningstar report stated:

> We're more worried by Thiam's admission that the bank held large illiquid positions that he and other top managers did not know about in October. These positions were behind the $633 million write-downs in the fourth quarter and another $346 million of write-downs in the first quarter. We're most disturbed by his comment that bankers built up these positions supported by a culture that encouraged revenue at any cost. He attributed that pressure to a too-high cost base, but we're less sure; we think culture is very hard to turn around, and investors should brace themselves for continued volatility in results. We plan to maintain our high uncertainty rating.

76.     Similarly, Morgan Stanley's March 24, 2016 report also remarked:

> CS has finally acknowledged that their outsized positions in illiquid credit positions no longer work . . . *__We would be interested to know when mgmt. become aware and why this was not disclosed in the capital raising prospectus in Dec, given markets weakened in Nov.__* Does this create additional litigation risk? We are also keen to hear about changes in risk management.

77.     Faced with this media onslaught, Thiam was forced to change his tune, and admit that the exposures were well known to the Bank's most senior officers. Indeed, in subsequent media interviews—which occurred the same day as the Bloomberg TV interview referenced above, and in fact only hours later—Thiam admitted that the "completely unacceptable" exposures were not attributable to rogue bankers making unauthorized trades, but to senior management's own penchant for "generating revenue at all costs." Specifically,

Thiam stated to both *The Wall Street Journal* and *The New York Times* that the outsized exposures did not result from traders acting improperly, but from Credit Suisse continually raising its internal risk limits every time a breach occurred or was imminent—each time allowing for larger and larger exposures to the highly risky and illiquid CLO and distressed debt investments. In other words, Thiam admitted that the Bank's public statements about its rigorous framework of "binding" risk limits were completely and materially false. Indeed, Thiam explicitly acknowledged as much to *The Wall Street Journal*, stating: "***A limit that keeps moving is not a limit***," and expressly confirming ***"[t]hat's really where things went wrong***." Moreover, the Bank's Chairman of the Board, Urs Rohner, also confirmed at a March 31, 2016 investor conference that this was not a case of unauthorized trades or positions of which management was unaware, stating: "It's not the case that the positions suddenly surfaced that were not previously there. ***The positions we have, we know***."

C.   **In Credit Suisse's Publicly Filed Responses to a 2016 SEC Inquiry, Defendants Admitted They Knew About the Outsized Positions – and That The Bank Continually Raised Its Risk Limits as the Risky Exposures Grew**

78.   In 2016, the SEC launched an inquiry into the events surrounding the Bank's $1 billion write-down and Thiam's inconsistent statements about those events. In Credit Suisse's publicly filed responses to the SEC's questions, the Bank admitted that: (i) senior management, including CARMC, the CRO, and the Risk Committee of the Board of Directors, were well aware of the outsized positions at all relevant times, including throughout the Class Period; (ii) the exposures from these positions had continued to increase throughout the Class Period; and (iii) the risk limits for the outsized positions were, in fact, continually raised by the Bank as the massive exposures grew, including in November 2015, the same period when the Bank tapped investors for $14 billion in additional capital based on a purportedly risk-averse strategy to shrink the investment bank and reduce earnings volatility.

79.     First, the Bank admitted that the outsized positions for the Bank's "Distressed Trading Desk" were fully authorized and known to senior management. Indeed, the Bank stated in its responses to the SEC that "[t]he positions that led to the write-downs were fully authorized" and "subject to CRO risk limits that were established and approved by senior management, [CARMC], and Risk Management Committee and the Board of Directors Risk Committee." While the Bank asserted these limits were put in place "before Mr. Thiam joined Credit Suisse," it admitted there were "regular reviews of the positions" by "CRO senior management, the Investment Bank Risk Management Committee, and CARMC"—of which Defendants Dougan, Thiam, and Mathers were sitting members during the Class Period.

80.     Second, Credit Suisse admitted that the outsized distressed debt positions "did increase during the period from 2011 through the second quarter of 2015," until "a risk reduction strategy began in the third quarter of 2015"—i.e., the positions grew until Thiam announced his new strategy on October 21, 2015. Thus, at the same time Thiam was proclaiming to investors that he would "right-size" the investment bank and assuring them that the Bank's fixed income positions were benign, Defendants knew that those positions had grown far beyond the Bank's risk profile and had created enormous exposures that were certain to result in staggering losses.

81.     Third, the Bank confirmed Thiam's prior statements to the media that the risk limits for the outsized positions had been continually raised by the Bank multiple times as the exposures grew. In the Bank's own words, on July 31, 2013, the limit was "redefined" because "equities were added"; on July 31, 2014, the limit "was increased . . . to accommodate business growth"; and in November 2015—only three months before the end of the Class Period, and at the same time the Bank was raising approximately $14 billion in capital through rights and

exchange offerings—the limit was "retired and replaced" with higher "new limits" that were "designed to better reflect the total exposure of the distressed franchise." In other words, at the exact same time Defendants were telling investors that the Bank was shrinking its investment bank and aggressively winding down risky positions that created earnings volatility in order to raise $14 billion from investors, Defendants were secretly <u>increasing</u> the Bank's risk limits to accommodate its massive exposures to highly risky and illiquid distressed debt positions.

**D.** **Former Bank Employees Confirm That Defendants Were Well Aware Of The Positions Throughout The Class Period**

82.     Plaintiffs' confidential witnesses, all former employees of the Bank during the Class Period, confirmed that it was "inconceivable" that Defendants Thiam and Mathers could have been ignorant of the outsized positions, which consisted of investments that were well known to be highly risky and illiquid.[5]

83.     The confidential witnesses unanimously stated that any notion that Thiam could not have known about the outsized positions was "shocking" and "highly unlikely." CW 1[6] expressed that it was "a little shocking" that Thiam would be "surprised by the risk on the books." CW 1 stated that "anyone who took the time to look over the books" would have been aware of the risk, and it did not "make sense" that Defendants Thiam and Mathers would not have known. CW 1 added, "I'm not sure what they're doing if they're not looking at the risk reports."

---

[5] Former Credit Suisse employees are referred to herein as Confidential Witness "CW __."

[6] CW 1 worked in Credit Suisse's New York office from 1997 to July 2015. CW 1 worked in various positions at the Company, including Managing Director, Credit/Distressed Trading.

84.     CW 2[7] stated that, upon the Bank's announcement of the $1 billion write-down, everyone – from traders to the head of Investment Banking & Capital Markets – was "shocked" by Thiam's claim that he was not aware of the outsized positions.   CW 2 explained that the trading desks "completely disclosed illiquid assets" to senior management, and there would have had to have been a "big lapse" for Thiam to not know about them.   CW 2 added that Bob Franz, who was the head of U.S. credit trading at the Bank, reported directly to Timothy O'Hara, the head of the new Global Markets division.   CW 2 stated that O'Hara not telling Thiam about the outsized illiquid positions was "highly unlikely."   CW 2 also commented that, as to Thiam, "[y]ou can't say you didn't know."

85.     The confidential witnesses stated the same about Defendant Mathers.   CW 3[8], who worked in the Bank's Fixed Income franchise in the New York office, stated that the Bank's risk management team and Defendant Mathers "definitely" would have known about the size of the positions.   CW 4[9] likewise asserted Mathers "definitely would have known."

86.     The confidential witnesses also confirmed that, through CARMC, senior management had to have been aware of the outsized positions.   CW 5[10] asserted that CARMC

---

[7] CW 2 worked in Credit Suisse's New York office from June 2011 to May 2017.  CW 2 served as an Assistant Vice President in Leveraged Loans and Distressed Debt in the Global Markets Division.

[8] CW 3 worked in the Bank's New York office from 2008 to June 2016. CW 3 worked in various positions at the Company including as an analyst.  CW 3 worked in the Fixed Income group and later became an AVP, first in Structured Credit and then as a Project and Relationship Manager.

[9] CW 4 worked in Credit Suisse's New York office from 2014 to 2016.  CW 4 worked in Structured Credit; specifically, middle market loan and illiquid credit asset financing solutions.

[10] CW 5 was a Managing Director in Credit Suisse's New York office from June 2007 to June 2017. CW 5's final title, which CW 5 held from December 2015 to July 2017, was Head of Investment Banking Capital Markets and Global Markets Operations. CW 5's previous title, which she held from September 2012 to November 2015, was Global Head of Trade Validation & Control.

met at least monthly. "These positions were known," CW 5 said, stating "[n]othing was hidden. Nothing was untoward. People chose not to pay attention." CW 6[11] described CARMC as "an extension of the Board of Directors responsible for assessing risk." CW 6 said CARMC was chaired by the Chief Risk Officer, and that the CFO was "represented" in CARMC meetings. When asked about who was responsible for setting and raising risk limits, CW 6 stated the decision would have gone "all the way to the CRO and Tidjane [Defendant Thiam]." CW 2 likewise stated that CARMC met monthly and would have been "well aware of the positions."

## VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

87.    Defendants made false and misleading statements and material omissions during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder. Throughout the Class Period, Credit Suisse's press releases, investor presentations, and public filings made with the SEC included material misstatements and/or omissions concerning the Company's risk controls and trading limits, failing to disclose that Defendants had been continuously raising risk limits with respect to the Bank's illiquid investments—so much so that its risk management processes were wholly illusory.

88.    As detailed above, Defendants failed to disclose that Credit Suisse's trading and risk limits were not actually binding, and were routinely increased to allow the Bank to accumulate billions of dollars in extremely risky, highly illiquid investments. Indeed, Defendants' scheme enabled the Bank to surreptitiously accumulate nearly $4.3 billion in distressed debt and CLOs, which were notoriously difficult to liquidate and required significant

---

[11] CW 6 worked in the Bank's New York office from 2008 through 2016. CW 6's final title, which CW 6 held from 2016 to CW 6's departure, was Global Head Strategic Legal Entity Financial Planning and Analysis. CW 6's previous titles, which she held from 2008 to 2016, were Global Product Control Head of Commodities and Americas Head of US Macro, EMG Brazil and Treasury.

capital investments. These outsized investment positions—which were undisclosed to ADR purchasers—violated Credit Suisse's purported "binding" risk limits and rendered the Bank highly susceptible to losses in the volatile credit markets.

### A.      Credit Suisse's 2014 Annual Report

89.      On March 20, 2015, the first day of the Class Period, Credit Suisse filed its 2014 Annual Report with the SEC on Form 20-F (the "2014 Annual Report", "Annual Report" or  the "Report"), which devoted no less than thirty-five pages to touting the Bank's extensive risk protocols.   The Annual Report proclaimed that Credit Suisse had "comprehensive risk management processes and sophisticated control systems," and that "the prudent taking of risk in line with our strategic priorities" was "fundamental" to Credit Suisse's business.

90.      The 2014 Annual Report explained that risk limits were critical to the Bank's risk management procedures, as they were designed "to maintain our risk profile within our overall risk appetite."   The Report explained that "[l]imits are binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs."   The Report also stated that "[w]hile the primary purpose [of risk limits] is risk management, risk limits are also useful tools in the identification of trading misconduct and unauthorized trading activities."

91.      The 2014 Annual Report stated that the Bank had several levels of risk limits, the breach of any one of which would trigger immediate escalation and remediation.   Specifically, the Report stated that the "overall risk limits" for the Bank were "set by the Board in consultation with the Risk Committee **_and are binding_**," and that any breach of these limits "would result in an immediate notification to the Chairman of the Board's Risk Committee and the Group CEO, and written notification to the full Board at its next meeting":

The overall risk limits for the Group are set by the Board in consultation with its Risk Committee <u>and are binding</u>. In the rare circumstances where a breach of these limits would occur, it would result in an immediate notification to the Chairman of the Board's Risk Committee and the Group CEO, and written notification to the full Board at its next meeting. Following notification, the Group CRO may approve positions that exceed the Board limits up to a predefined level and any such approval is reported to the full Board. Positions that exceed the Board limits by more than the predefined level may only be approved by the Group CRO and the full Board acting jointly. <u>In 2014 and 2013, no Board limits were exceeded</u>.

92.     The next level of risk limits was set by CARMC and were also "binding." Specifically, CARMC was "responsible for allocating divisional risk limits and more specific limits deemed necessary to control the concentration of risk within individual lines of business." The Annual Report emphasized that "<u>CARMC limits **are binding** and generally set close to the planned risk profile to ensure that any meaningful increase in risk exposures is promptly escalated</u>." The final level of risk limits was set by divisional management, who would "use[] a detailed framework of more than 100 individual risk limits designed to control risk-taking at a granular level by individual businesses and in the aggregate." The Annual Report assured investors that "[i]n 2014, 98% of all limit excesses were resolved within the approved standard period" of ten days.

93.     The statements in paragraphs 89-92 above were materially false and misleading, and omitted material facts when made. Credit Suisse did not have "binding" risk limits that were "rare[ly]" breached," and if breached, resulted in prompt remediation. Rather, in reality, Defendants had been amassing large exposures to highly risky and illiquid CLO and distressed debt investments in repeated breach of these purportedly "binding" limits. Instead of enforcing the "binding" limits and remediating the excesses, Defendants continuously raised the limits every time a breach occurred or was imminent—meaning the Bank's risk limits were illusory. Indeed, Defendant Thiam explicitly admitted that the Bank's public statements about its

36

"binding" risk limits were materially false, stating that "[a] limit that keeps moving is not a limit," and "[t]hat's really where things went wrong."  The risk limits also did not ensure the Bank adhered to its predefined "risk profile," as Defendant Thiam admitted that the $4.3 billion the Bank accumulated in CLO and distressed debt exposures was "completely unacceptable." Finally, the Bank's claim that no "binding" Board risk limits were breached in 2013 or 2014 was also false.  Rather, as Defendants admitted, the risk limits for CLO and distressed debt investments were repeatedly raised as breaches occurred to accommodate larger and larger exposures to those securities.

94.     In describing the Bank's "disciplined" risk culture, the 2014 Annual Report stated that Credit Suisse "base[d] [its] business operations on conscious and disciplined risk-taking," as "independent risk management, compliance and audit processes with proper management accountability are critical to the interests and concerns of our stakeholders."  The Bank added that it would "establish a clear risk appetite that sets out the types and levels of risk we are prepared to take," and would "actively monitor risks and take mitigating actions where they fall outside accepted levels."  The Bank further stated that "[b]reaches of risk limits are identified, analyzed and escalated, and large, repeated or unauthorized exceptions may result in disciplinary action."  Furthermore, "businesses are held accountable for managing all of the risks they generate."

95.     The statements in paragraph 94 above were materially false and misleading, and omitted material facts when made.  First, the statements declaring that Credit Suisse "base[d] [its] business operations on conscious and disciplined risk-taking" were materially false and misleading as the truth was exactly the opposite.  In reality, as admitted by Defendant Thiam, the Bank was focused on a "revenue-driven strategy," was "generat[ing] revenue at all costs,"

and had an "attitude to risk that ha[d] to change."  Second, the Bank took no "mitigating actions" when risks "f[e]ll outside accepted levels."  Rather, Defendants allowed the Bank to accumulate $4.3 billion in exposure to distressed debt and CLOs by continually raising the risk limits for those investments every time a breach occurred or was imminent.  As Thiam admitted, the Bank's risk limits were fictitious, aptly stating:  "[a] limit that keeps moving is not a limit."  Finally, rather than hold employees accountable for risk limit breaches, the Bank condoned them, repeatedly raising internal risk limits to accommodate excessively outsized and illiquid exposures.

96.     In regard to the Company's "risk appetite," the 2014 Annual Report claimed that it "maintain[ed] a comprehensive Group-wide risk appetite framework, providing a robust foundation for risk appetite setting and management across the Group."  Further, the size of Credit Suisse's risk profile was stated to be "restricted to the planned level of our risk appetite through the use of risk controls, such as limits, guidelines, tolerances and targets."

97.     The statements in paragraph 96 above were materially false and misleading, and omitted material facts when made.  In reality, the Company did not follow its risk appetite framework, instead going beyond the maximum level of risk by breaching liquidity requirements and violating shareholder expectations.  Indeed, Thiam admitted that the Bank's risk limits meant to control risk appetite were completely fictitious, stating the Bank had continually raised its purportedly "binding" internal risk limits to create "unacceptable" exposures, and "[a] limit that keeps moving is not a limit."  Further, the Company did not have a "robust foundation for risk appetite setting and management," as the Bank had created instead a culture of "generating revenue at all costs," causing traders to rack up a sizable $4.3 billion position in illiquid securities.  As admitted by Defendant Thiam, the outsized illiquid positions

were "completely unacceptable" and "indicative of an attitude to risk that has to change." Thus, Credit Suisse's risk profile clearly was not "restricted to the planned level."

### B. October 21, 2015 Strategy Update and Financial Results for the Third Quarter of 2015

98.     On October 21, 2015, Credit Suisse reported its financial results for the third quarter of 2015 ended September 30, 2015 ("Q3 2015") and filed with the SEC a Form 6-K, which was signed by Defendants Thiam and Mathers, and reiterated the financial results for Q3 2015 contained in the press release.  Further, the Bank announced a proposal for two share capital increases to further strengthen the Group's capital base: first, a capital increase through the issuing of new registered shares to a number of qualified investors, and a second capital increase through a rights offering for existing shareholders.  In addition, the Company announced its "comprehensive package of measures setting the new strategic direction, structure and organization of Credit Suisse."

99.     In the Company's media release regarding Credit Suisse's plans to grow profits and capital generation, the Bank announced to investors: "Today, we are also <u>taking decisive action to strengthen our balance sheet and capital position to the point where it will not be any more a source of concern for our clients, our investors or our regulators</u>."

100.     On the Bank's October 21, 2015 third quarter earnings call, Defendant Thiam reiterated these points and unveiled his new strategy for the Bank, which was to emphasize the Private Banking & Wealth Management Division while reducing earnings volatility by shrinking the investment bank.  However, Thiam told investors that the Bank did not plan to aggressively exit its existing securitized and credit positions in the volatile fixed income franchise because, while they were "ugly ducklings" that "consume[d] a lot of capital," they were benign and not a problem for the Bank because they generated high returns:

39

Then you've got the two ugly ducklings that nobody likes, securitized products and credit.  Because they generate a lot of profit, but they consume a lot of capital.  But personally, to generate 35% or 40% of return I don't mind burning some capital . . . 35-40% -- as an incoming CEO in a company that doesn't have enough profit, not enough capital, that's not my top priority to tackle this.

101.    The statements in paragraph 100 above were materially false and misleading, and omitted material facts when made.  The Bank's securitized and credit products, which, at this time, contained massive undisclosed exposures to highly risky and illiquid CLO and distressed debt investments, were not benign.  Indeed, the Bank had amassed $4.3 billion in exposure to these investments—with $1.3 billion in CLOs and $3 billion in distressed debt—far beyond the Bank's predefined and purportedly "binding" internal risk limits which, rather than triggering remediation, had simply been raised to allow these positions to get larger and larger.  Nor did Defendants disclose that these enormous exposures, which were highly illiquid, were certain to result in profound losses and therefore eclipsed any effort to reduce earnings volatility by shrinking the investment bank.  Instead, Defendants gave investors the exact opposite impression: that these positions were entirely benign and did not require an aggressive wind down.  Additionally, Thiam's statement that these positions were not a "top priority" for the Bank to wind down was also false.  As Thiam would admit on February 4, 2016, the Bank had in fact recognized the obvious materiality of the exposures these positions created as of his statements on October 21, 2015, and was "aggressively" attempting to reduce them – but was unable to do so without incurring massive losses due to their extreme illiquidity.

### C.    December 2015 Exchange Offering

102.    On December 15, 2015, Credit Suisse co-issued $8 billion in long term debt with its subsidiary, Credit Suisse Group Funding (Guernsey) Limited in a debt exchange offering (the "Exchange Offering").  Credit Suisse also guaranteed the Exchange Offering.  In connection with the Exchange Offering, Credit Suisse filed a Registration Statement with the

SEC on Form F-4 and Prospectus on Form 424B3.  The Registration Statement and Prospectus for the Exchange Offering were signed by Defendants Thiam and Mathers, and explicitly incorporated the 2014 Annual Report by reference.  Accordingly, the false and misleading statements and omissions included in Credit Suisse's 2014 Annual Report were incorporated by reference therein.  These statements continued to be false and misleading and to omit material facts for the same reasons as described above in ¶¶ 93, 95 and 97.

## VIII.  ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

103.    As alleged above, numerous facts raise a strong inference that Defendants knew, or at a minimum, were reckless in disregarding, the true facts regarding Credit Suisse's ever-growing position in the illiquid investments violating the Company's publicly-touted risk policies.  Specifically, Defendants were well aware that Credit Suisse artificially inflated its profitability by building up outsized positions of high risk distressed credit and collateralized loan obligations in violation of the Company's trading limits.  These facts include, in addition to the allegations set forth above, the following.

104.    ***Thiam Admitted that Risk Limits were Repeatedly Raised as Credit Suisse's Investment Bank was "Trying to Generate Revenue At All Costs"***:  On March 23, 2016, in addition to disclosing the additional $346 million write-down, Defendant Thiam admitted that "clearly, something didn't go right there or something went wrong."  Specifically, Defendant Thiam admitted that the $4.3 billion in exposure to highly risky and illiquid CLO and distressed debt investments occurred because the Bank repeatedly raised its internal risk limits.  Thiam therefore acknowledged that, contrary to Credit Suisse's public statements, the Bank's risk limits were not "binding" and were in fact illusory because "a limit that keeps moving is not a limit," explaining "[t]hat's really where things went wrong."  In a Bloomberg News interview

41

the same day, Thiam also admitted that the problematic positions were "completely unacceptable" and "indicative of an attitude to risk that has to change." Additionally, in response to a question regarding whether people at the Company were trying to withhold information, Thiam stated that the issue was Credit Suisse's "revenue-driven strategy." Thiam further elaborated that "[a] lot of the problem in the investment bank is that people have been trying to generate revenue at all costs if I may say so..."

105.    Defendant Thiam's multiple, explicit admissions that the Bank did not follow its own publicly touted risk limits, and that there was an "unacceptable" "revenue-driven strategy" at the Bank, provide strong support for scienter.

106.    ***The Bank Admitted in Its Publicly Filed Responses to a 2016 SEC Inquiry that the Outsized Illiquid Positions Were Known to Senior Management, that the Positions Grew During the Class Period, and that the Bank Continually Raised the Limits for Those Positions***: In the Bank's responses to a 2016 SEC inquiry about the Bank's $1 billion write-down and Thiam's inconsistent public statements about the cause for the write-down, the Bank admitted that "[t]he positions that led to the write-downs were fully authorized" and "known" by senior management, and were subject to "CRO risk limits that were established and approved by senior management, [CARMC], and Risk Management Committee and the Board of Directors Risk Committee." The positions were also subject to "regular review" by the CRO, the Investment Bank Risk Management Committee, and CARMC, of which Defendants Thiam and Mathers were sitting members, in addition to being subject to "periodic review" by the Risk Committee of the Board of Directors. The Bank further admitted that the outsized positions "did increase" from 2011 through the second quarter of 2015, until a "risk reduction strategy began in the third quarter of 2015." Finally, the Bank admitted that the risk limits for the

outsized positions were raised continuously, and, at minimum, were raised every year from 2013 through 2015.

107.    Tellingly, the last of these limit raises occurred in November 2015, the same month the Bank issued a rights offering to raise $6 billion in additional capital form investors and less than a month before the Bank issued an $8 billion exchange offering.  This limit raise was directly reviewed and approved by CARMC and senior management, meaning Defendants Thiam and Mathers, who were members of CARMC at this time, themselves raised the risk limit to accommodate the massive exposures of the outsized positions.  They did so while at the same time touting the Bank's purportedly risk-averse strategy to shrink the investment bank and reduce earnings volatility as part of pitching the rights and exchange offerings to investors.

108.    Defendants' admissions about their knowledge and authorization of the size of the outsized positions, and their direct involvement in the setting and raising of the Bank's internal risk limits for those positions, raise a compelling inference of Defendants' scienter.

109.    ***As Members of the CARMC, the Individual Defendants Directly Participated in Credit Suisse's Reviews and Setting of the Risk Limits***:  As described in detail above, CARMC is the Company's "committee that includes the chief executive officers (CEOs) of the Group and the divisions, the Chief Financial Officer, the Chief Risk Officer (CRO) and the Treasurer."  Thus, during the Class Period, the Individual Defendants were all members of the CARMC, the group responsible for "defin[ing] and monitor[ing] adherence to internal risk limits," overseeing liquidity, establishing and allocating appropriate trading and risk limits for the Bank's various businesses. Because of their personal participation in internal processes evaluating Credit Suisse's risk exposure and in setting risk limits, the Individual Defendants

knew, or were severely reckless in not knowing, of the Company's outsized illiquid CLO and distressed debt positions.

110.     ***Defendants Boasted About the Company's "Comprehensive Risk Management Processes and Sophisticated Control Systems" and "Binding" Risk Limits***: Credit Suisse allayed investors' concerns about its reliance on the volatile fixed income franchise by repeatedly touting in its SEC filings that the Bank maintained "comprehensive risk management processes and sophisticated control systems," and stating that "the prudent taking of risk" was "fundamental" to the Bank's business.  The Company's 2014 Annual Report devoted no less than <u>thirty-five pages</u> to touting the Bank's stringent risk management, risk culture, risk controls and risk appetite.  Also during the Class Period, Thiam claimed the Bank was enhancing its already comprehensive risk controls – including by removing profit targets to prevent bankers from engaging in "overly risky activities."

111.     These statements demonstrate that Defendants closely monitored the Bank's risk levels, limits and exposure, and believed them to be critical to the Company's success. Defendants' strong, emphatic and repeated statements about Credit Suisse's rigorous risk limits, while at the same time knowing that those limits were not actually "binding," and were routinely increased to allow the Bank to accumulate billions of dollars in extremely risky and highly illiquid CLO and distressed debt investments, are indicative of a strong inference of scienter.

112.     ***Financial Press Articles and Industry Insiders Made Clear that Credit Suisse's Senior Executives Were Directly Involved in the Fraud***:  Numerous reports revealed several facts that made clear that Credit Suisse's senior executives were aware of, and in fact orchestrators of, the fraud.

113.    According to an article published by the International Financing Review ("IFR"), "two Credit Suisse bankers told IFR the real surprise was that Thiam, installed as chief executive less than a year ago, could claim that the bank's positions were not known about.  The bankers…said it was inconceivable that the bank's Capital Allocation and Risk Management Committee (CARMC) was unaware of the holdings."  The IFR article continued, "The COO, the CFO knew about the [positions taken by] these businesses. CARMC happens every month.  The notion that people didn't know is simply not believable."  In addition, a former board member of a Credit Suisse investment banking subsidiary directly implicated Defendant Mathers in particular, saying "[i]f the CFO didn't know about it, then sure as hell the chief risk officer would have [], which means everybody would have [] . . .It's hard to imagine that nobody knew about this stuff."

114.    Furthermore, Credit Suisse was closely followed by many securities analysts, including Morningstar and Morgan Stanley, who spoke with the Company regularly.  In the wake of the Company's stunning disclosures at the end of the Class Period, these analysts, among others, questioned the credibility of Credit Suisse's management, including the Individual Defendants.

115.    For example, analysts at Morningstar, who followed the Company for years and regularly spoke with management, issued an analyst report maintaining their high uncertainty rating and explaining that they were "more worried by Thiam's admission that the bank held large illiquid positions that he and other top managers did not know about in October."  Morningstar's March 24, 2016 "Credit Suisse's Deeper Cuts Are Welcome, but Questions about Risk Controls Are Troubling" report added that "[w]e're most disturbed by his comment that bankers built up these positions supported by a culture that encouraged revenue at any cost."

Analysts at Morgan Stanley, who had also been following the Company for years, questioned the Company's risk management and accountability for the $1 billion of losses on illiquid positions, stating "[w]e would be interested to know when mgmt became aware and why this was not disclosed in the capital raising prospectus in Dec, given markets weakened in Nov."

116.   These reports all confirm that the Individual Defendants knew or recklessly disregarded knowledge of the Bank's ever-growing position in the illiquid investments.

117.   ***Thiam's Discredited Attempts to Claim that the Outsized Positions Were a "Surprise" to Him and Senior Officers is Compelling Evidence of Scienter***:   Defendant Thiam's own initial reaction to the disclosures about the Bank's massive $1 billion loss establishes his scienter.   As set forth above, Thiam initially claimed the positions were a "surprise" to him and other senior officers.   It was only when the financial media and Credit Suisse's own employees excoriated him for that assertion, stating it was "inconceivable" and "troubling" that he would pretend not to know about such large-scale holdings, that he reversed course and admitted that the positions were well-known to the Bank's senior management.

118.   ***Defendants' In-Depth Review Put Them On Notice of Credit Suisse's Outsized Illiquid Investments***:   On July 1, 2015, Defendant Dougan stepped down as CEO of Credit Suisse and was replaced by Defendant Thiam.   Thiam took over after months of investor criticism of Defendant Dougan for failing to reform the Bank and scale back its risky investment banking business fast enough in the wake of the global regulations implemented after the worldwide recession in 2008 requiring banks to hold more capital.   Almost immediately upon taking control, Thiam began an "in-depth" internal review of each of Credit Suisse's business lines, with the stated goal of reducing the size of Credit Suisse's investment bank.

119.    On October 21, 2015, Defendant Thiam outlined his new strategy for the Bank—
"the biggest overhaul of the Swiss bank in almost a decade."[12]  Thiam himself understood the
importance of this undertaking, calling it the "beginning of an exciting chapter in the evolution
of this historic and important institution for Switzerland."  During the presentation of the new
organizational structure, Urs Rohner, Chairman of the Board at Credit Suisse, stated that "[t]he
management team [] worked extremely hard and closely over the subsequent months to be able
to present the strategy here today in close collaboration with the Board."  Thiam himself stated
that "over the past few months… our management team" – which included Defendant Mathers
– "has undertaken a thorough review of the organization, looking at strategy, cost and capital
across geographies and business lines."  Thus, any notion that Thiam was unaware of what was
going on at the Bank, or that the outsized positions in highly risky and illiquid investments were
a "surprise" to him, is belied by the Chairman's and Thiam's own statements.  Indeed, Thiam
either knew or was reckless in not knowing about the $4.3 billion in exposures to CLO and
distressed debt investments on the Bank's books, considering he spent months completely
restructuring the Bank for the purpose of scaling back the volatility in its investment bank.

120.    Furthermore, Thiam announced on October 21, 2015 that, to support this new
strategy, the Bank announced the creation of an entirely separate unit—the "Strategic
Resolution Unit," or "SRU"— which would be devoted to downsizing prior management's
risky investments that did not conform with the Bank's new strategy.  Defendant Mathers
described the SRU as a "stand-alone segment with its own governance structure and reporting
obligations and clear accountability for its primary objectives," which were the "immediate

---

[12] Joshua Franklin, "Credit Suisse to raise $6 bln as new CEO shows his hand," (REUTERS Oct.
21, 2015), https://www.reuters.com/article/credit-suisse-gp-strategy/update-5-credit-suisse-to-
raise-6-bln-as-new-ceo-shows-his-hand-idUSL8N12L09920151021

right-sizing of the Global Markets division, as well as the other exposures that do not fall within the strategic goals of the business divisions."  Mathers stated that the SRU would have a "direct reporting line" to him as the Bank's CFO.  Notably, Mathers' October 21, 2015 earnings presentation slides showed that fixed income positions—including securitized and credit products, which encompassed CLOs and distressed debt—would be transferred to the SRU.

121.    Thus, Defendant Mathers, as the head of the SRU – a unit dedicated to winding down the fixed income franchise and the securitized and credit products in particular – directly knew or was reckless in not knowing about the outsized illiquid positions.  Moreover, Mathers had decades of experience at Credit Suisse, including with respect to the fixed income franchise, in addition to his direct participation in the months-long "in-depth" review of the Bank's businesses to support Thiam's new strategy to "right size" the investment bank.

122.    Finally, when Defendant Thiam outlined his new strategy for the Bank on October 21, 2015, he specifically referred to the securitized and credit products – which contained the outsized distressed debt and CLO investments – as "ugly ducklings" because they consumed large amounts of capital but were very profitable.  Thiam's public discussion of the positions at issue demonstrates that he was knowledgeable about them and believed them to be important to the Company's financial success, thus indicative of a strong inference of scienter.

123.    ***Defendants Were Incentivized to Conceal the Truth About Credit Suisse's Outsized Illiquid Investments In Order to Complete Its $6 Billion Rights Offering***:  Thiam's plan for Credit Suisse focused on deleveraging and increasing the Bank's capital cushion.  As a result, and as announced by Thiam on October 21, 2015, the Bank sought to raise 6 billion CHF ($6.1 billion) in capital through the November 19, 2015 rights offering and private placement.  The Bank sought to raise additional capital through an $8 billion exchange offering to be issued

soon after, on December 15, 2015.  During the October 21, 2015 third quarter earnings call, Thiam boasted that "[w]hen I said I'll certainly recommend a capital raise I could hear the sigh of relief. The temperature went up two or three degrees in the room."[13]  Indeed, as Thiam himself stated in public comments to investors, he needed to bolster the Bank's capital position, which analysts called one of the weakest in the sector, "to stay alive."  Defendants were therefore highly incentivized to conceal the material exposures on the Bank's books caused by the outsized illiquid positions in CLOs and distressed debt investments until after the closure of the rights offering on December 3, 2015 and the exchange offering on January 14, 2016. Indeed, to entice investors to participate in the rights and exchange offerings, Defendants touted the Bank's rigorous risk controls and its new strategy to shrink the investment bank, concealing the Bank's massive exposures to highly risky and illiquid investments and the resulting $1 billion in mark-to-market losses from those exposures.  All of these facts are highly probative of Defendants' scienter.

124.    ***Former Credit Suisse Employees Confirm that Defendants Were Directly Involved in the Company's Scheme to Accumulate Billions of Dollars in Extremely Risky, Highly Illiquid Investments***:  Former employees corroborated the numerous media reports stating that Credit Suisse executive management, including Defendants Thiam and Mathers, were directly involved in implementing the fraudulent scheme through their decision-making in setting and raising risk limits.

125.    In regard to Defendant Thiam's awareness of the positions, CW 3 stated: "How would you not know?," stating that there would be emails about the outsized positions from the risk management team to the CFO and CEO.  CW 5, formerly Head of Investment Banking

---

[13] *Id.*

Capital Markets and Global Markets Operations at the Bank, said that Defendant Thiam's explanations of the losses in early 2016 were "convenient," describing Thiam's conduct as "dereliction of duty."  CW 5 added that "[t]hese positions are known…Nothing was hidden. Nothing was untoward. People chose not to pay attention."  CW 2, an Assistant Vice President in Leveraged Loans and Distressed Debt, likewise stated that the illiquid distressed debt positions were "completely disclosed" to senior  management, making it "highly unlikely" that Thiam did not know about the positions.  As CW 2 stated with regard to Thiam, "[y]ou can't say you didn't know."

126.    CW 1, a former Managing Director - Credit/Distressed Trading, corroborated these former employee accounts, stating that it was "a little shocking" that Thiam would be "surprised by the risk on the books."  CW 1 stated that it "doesn't make sense" that Defendants Thiam and Mathers would not have known, adding "I'm not sure what they're doing if they're not looking at the risk reports."

127.    With respect to Defendant Mathers, CW 3, who worked at the Company for over eight years, including in the Fixed Income Group and as an AVP, confirmed that in addition to the risk people who were "definitely aware of everything about the deals"—how a CLO was structured, how it was priced, etc. – Defendant Mathers "definitely" would have known about Credit Suisse's problematic positions.  CW 4, formerly a VP in Structured Credit until late-2016, also stated that Mathers "definitely would have known."

128.    The confidential witnesses also confirmed that, as members of CARMC, the Individual Defendants had to have known about the outsized positions.  CW 6, formerly Global Head Strategic Legal Entity Financial Planning and Analysis at the Bank, described Defendants' roles in CARMC, stating that CARMC as "an extension of the board of directors

responsible for assessing risk," that the committee was chaired by the Chief Risk Officer, and that the CFO "was represented" in those meetings.  CW 2 also stated CARMC would have been "well aware of the positions."   Additionally, when asked about who would have been responsible for setting and raising risk limits, CW 6 said that it would have been "market risk in consultation with the business," and that the decision making would have gone "all the way to the CRO and Tidjane."  Thus, the notion that Thiam and other senior executives were unaware of the massive illiquid position is belied by unanimous accounts of multiple Credit Suisse employees.

## IX.   LOSS CAUSATION

129.   During the Class Period, Credit Suisse's publicly traded ADRs traded on the NYSE.  The market for Credit Suisse's ADRs was open, well-developed and efficient at all relevant times.

130.   Throughout the Class Period, the price of Credit Suisse ADRs was artificially inflated as a result of Defendants' materially false and misleading statements and omissions identified above.  Defendants engaged in a scheme to deceive the market, and a course of conduct that operated as a fraud or deceit on Class Period purchasers of Credit Suisse ADRs, by failing to disclose and misrepresenting the adverse facts detailed herein.  When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Credit Suisse ADRs fell precipitously as the prior artificial inflation dissipated.  As a result of their purchases of Credit Suisse ADRs during the Class Period, Lead Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

131.    By issuing materially false and misleading financial statements, among other adverse facts detailed herein, Defendants presented a misleading picture of Credit Suisse's business.  Defendants' false and misleading statements had the intended effect, and caused Credit Suisse ADRs to trade at artificially inflated levels throughout the Class Period, with Credit Suisse ADRs reaching as high as $29.69 on July 23, 2015.

132.    For example, on October 21, 2015, Credit Suisse announced a new organizational structure and overall new strategy for the Company.  Defendants announced that they had to "right-size" the investment bank, i.e., wind down outsized risky positions, in order to "approach[] this period of uncertainty with prudence and conservatism."  The Bank also announced that the third quarter was "not a good quarter" because of "pressures" on "fixed income" (i.e., securitized and credit products).  However, Defendants announced that they remained committed to the Company's securitized and credit products, touting the profits from those risky positions.

133.    On the news that Thiam was not aggressively scaling back the Bank's volatile fixed income securities franchise, which had underperformed for the second consecutive quarter, Credit Suisse's ADR price dropped $1.69 per ADR, over 6% from $25.96 per ADR on October 20, 2015 to $24.37 on October 22, 2015 on unusually heavy volume, wiping out approximately $220 million of the Company's market capitalization.

134.    Defendants' disclosures on February 4, 2016 revealed to the market the false and misleading nature of Defendants' statements and omissions and the materialization of the risks of their true risky illiquid investment practices.  On that day, Defendants revealed several facts as described above, including Credit Suisse's loss of $633 million from mark-to-market losses

that were the direct result of the Bank's violation of its own policies regarding "binding" risk limits.

135.    In response to the Company's disclosures, the price of Credit Suisse's ADRs declined.  On February 4, 2016, Credit Suisse ADR price dropped $1.80, or 11%, from $16.69 to $14.89, which amounted to approximately $234 million in market capitalization decline.

136.    The drastic and continuing decline in Credit Suisse's stock price was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the decline in the Company's ADR price negates any inference that the loss suffered by Lead Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## X.    <u>PRESUMPTION OF RELIANCE</u>

137.    At all relevant times, the market for Credit Suisse's ADRs was efficient for the following reasons, among others:

> a.    Credit Suisse's ADRs met the requirements for listing, and was listed and actively traded with daily average trading volume of over 1.5 million shares during the Class Period on the New York Stock Exchange, a highly efficient and automated market;
>
> b.    As a regulated issuer, Credit Suisse filed periodic reports with the SEC and the New York Stock Exchange;
>
> c.    Credit Suisse regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and
>
> d.    Credit Suisse was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public market place.

138.    As a result of the foregoing, the market for Credit Suisse's ADRs reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Credit Suisse's ADRs.  All purchasers of the Company's ADRs during the Class Period suffered similar injury through their purchase of Credit Suisse stock at artificially inflated prices, and a presumption of reliance applies.

139.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Credit Suisse's business and operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

140.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  None of the statements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made, including statements about Credit Suisse's present business and operations, its present financial condition, and its internal controls, among others.

141.   To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.   As set forth above in detail, then-existing facts contradicted Defendants' statements regarding Credit Suisse's risk controls and limits, among others.   Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Credit Suisse were not sufficient to insulate Defendants from liability for their materially false and misleading statements.

142.   To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Credit Suisse who knew that the statement was false when made.

## XII.   CLASS ACTION ALLEGATIONS

143.   Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased, or otherwise acquired, the ADRs of Credit Suisse between March 20, 2015, and February 3, 2016, inclusive (the "Class"), and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of Credit Suisse at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

144.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Credit Suisse ADRs were actively traded on the New York Stock Exchange.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members of the proposed Class.  Class members who purchased Credit Suisse ADRs may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

145.    Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws, as complained of herein.

146.    Lead Plaintiffs will fairly and adequately protect Class members' interests, and have retained competent counsel experienced in class actions and securities litigation.

147.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.   Among the questions of fact and law common to the Class are:

  a.     whether the federal securities laws were violated by Defendants' acts, as alleged herein;

  b.     whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

  c.     whether Defendants acted with scienter; and

  d.     the proper way to measure damages.

148.    A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable.  Additionally, the damage suffered by some individual Class members may be relatively small so that the

56

burden and expense of individual litigation make it impossible for such members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violations of Section 10(b) of the Exchange Act,
and SEC Rule 10b-5 Promulgated Thereunder
(Against All Defendants)**

149.   Lead Plaintiffs repeats and re-allege each and every allegation set forth above as if fully set forth herein.

150.   This Count is asserted on behalf of all members of the Class against Defendants Credit Suisse, Dougan, Thiam, and Mathers for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

151.   During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they recklessly disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

152.   Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and other investors similarly situated in connection with their purchases of Credit Suisse ADRs during the Class Period.

57

153.     Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Credit Suisse ADRs, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the other members of the Class, regarding, among other things, Credit Suisse's business and operations; (b) artificially inflate and maintain the market price of Credit Suisse ADRs; and (c) cause Lead Plaintiffs and the other members of the Class to purchase the Company's ADRs at artificially inflated prices, and to suffer losses when the true facts became known.

154.     Defendants Credit Suisse, Dougan, Thiam, and Mathers are liable for all materially false and misleading statements made during the Class Period, as alleged above.

155.     As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Credit Suisse ADRs, were either known to the Defendants, or were so obvious that the Defendants should have been aware of them.

156.     Lead Plaintiffs and the other members of the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Credit Suisse ADRs, which inflation was removed from its price when the true facts became

known.  Lead Plaintiffs and the other members of the Class would not have purchased Credit Suisse ADRs at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

157.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Credit Suisse ADRs during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Dougan, Thiam, and Mathers)

158.    Lead Plaintiffs repeat and re-allege each and every allegation set forth above as if fully set forth herein.

159.    This Count is asserted on behalf of all members of the Class against Defendants Dougan, Thiam, and Mathers for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

160.    During their tenures as officers and/or directors of Credit Suisse, each of these Defendants was a controlling person of the Company, within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶20-26.  By reason of their positions of control and authority as officers and/or directors of Credit Suisse, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Credit Suisse during the Class Period, including its materially misleading statements, thereby

causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

161.   In their capacities as senior corporate officers of the Company, and as more fully described above, Defendants Dougan, Thiam, and Mathers had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its accounting and reporting functions.   Defendants Dougan, Thiam, and Mathers signed the Company's SEC filings during the Class Period, and were directly involved in providing false information, and in certifying and approving the false statements disseminated by Credit Suisse during the Class Period.   Defendants Dougan, Thiam, and Mathers were also directly involved in providing false information, and Defendants Dougan, Thiam, and Mathers certified and approved the false statements disseminated by Credit Suisse during the Class Period.   As a result of the foregoing, Defendants Dougan, Thiam, and Mathers, together and individually, were controlling persons of Credit Suisse within the meaning of Section 20(a) of the Exchange Act.

162.   As set forth above, Credit Suisse violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

163.   By virtue of their positions as controlling persons of Credit Suisse, and as a result of their own aforementioned conduct, Defendants Dougan, Thiam, and Mathers are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs, and the other members of the Class, who purchased or otherwise acquired Credit Suisse ADRs.   As detailed above in ¶¶20-26, during the respective

times these Defendants served as officers and/or directors of Credit Suisse, each of these Defendants was culpable for the material misstatements and omissions made by the Company.

164.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or other acquisition of Credit Suisse ADRs.

## XIV.  <u>PRAYER FOR RELIEF</u>

165.    WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c.    Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.    Such other and further relief as the Court may deem just and proper.

## XV.  <u>JURY DEMAND</u>

166.    Lead Plaintiffs hereby demand a trial by jury.

Dated:  April 18, 2018                     Respectfully Submitted,

                                           **SAXENA WHITE P.A.**

                                           <u>*/s/ Steven B. Singer*</u>
                                           Steven B. Singer (SS-5212)
                                           Kyla Grant (KS-9961)
                                           10 Bank Street, 8th Floor
                                           White Plains, New York 10606
                                           Telephone: (914) 437-8551
                                           Facsimile: (888) 631-3611
                                           ssinger@saxenawhite.com
                                           kgrant@saxenawhite.com

Maya Saxena (*pro hac vice* forthcoming)
Joseph E. White, III (JW-9598)
Lester R. Hooker (*pro hac vice* forthcoming)
Kenneth M. Rehns (KR-9822)
Dianne M. Anderson (*pro hac vice* forthcoming)
150 East Palmetto Park Road
Suite 600
Boca Raton, FL 33432
Telephone: (561) 394-3399
Facsimile: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
krehns@saxenawhite.com
danderson@saxenawhite.com

and

**COHEN MILSTEIN SELLERS
& TOLL PLLC**

Carol V. Gilden (*pro hac vice*)
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
Telephone: (312) 357-0370
Facsimile:  (312) 357-0369
cgilden@cohenmilstein.com

Daniel S. Sommers (*pro hac vice*)
Adam H. Farra (*pro hac vice*)
Eric S. Berelovich (EB7243)
1100 New York Ave NW, Suite 500 West
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
dsommers@cohenmilstein.com
afarra@cohenmilstein.com
eberelovich@cohenmilstein.com

*Counsel for Lead Plaintiffs and Co-Lead Counsel
for the Class*

## CERTIFICATE OF SERVICE

I, Steven B. Singer, hereby certify that, on April 18, 2018, I caused the foregoing document to be filed with the Court via the Southern District of New York's Electronic Filing System.  All Counsel of Record are required to be registered with the ECF System and will receive electronic notification of this filing.

*/s/  Steven B. Singer*
Steven B. Singer