**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF BIRMINGHAM RETIREMENT AND RELIEF
SYSTEM, et al.,

                                        Plaintiffs,

                    - *against* -                              No.: 1:17-CV-10014-RJS

CREDIT SUISSE GROUP AG, BRADY DOUGAN,
TIDJANE THIAM and DAVID MATHERS,

                                        Defendants.


**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO**
**DISMISS THE AMENDED CLASS ACTION COMPLAINT**

                              Herbert S. Washer
                              David G. Januszewski
                              S. Penny Windle
                              CAHILL GORDON & REINDEL LLP
                              80 Pine Street
                              New York, New York 10005
                              (212) 701-3000


                              *Attorneys for Defendants*
                              *Credit Suisse Group AG, Brady*
                              *Dougan, Tidjane Thiam, and David*
                              *Mathers*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ...............................................................................................................4

     A.    The Alleged Misstatements Concerning Risk Limits, Risk Management Practices and Controls.........................................................................................4

     B.    CS's Public Disclosures Concerning its Positions in Securitized Products and Credit ......................................................................................................6

     C.    CS Announces Fourth Quarter 2015 Write-Downs, Including in Securitized Products and Distressed Credit ..................................................9

LEGAL STANDARD .....................................................................................................11

ARGUMENT .................................................................................................................12

I.     PLAINTIFFS FAIL TO STATE A CLAIM AGAINST DEFENDANTS UNDER SECTION 10(B) AND RULE 10B-5 ..................................12

     A.    Plaintiffs Fail to Allege an Actionable Misrepresentation or Omission by Defendants ................................................................................................12

          1.    No Facts Are Alleged Showing That the Statements About Risk Limits Were False .......................................................................... 13

          2.    CS's General Statements About Risk Management Practices are Not Actionable .......................................................................... 14

          3.    CS's October 21, 2015 Statements About the Distressed Positions Were Not False or Misleading ................................... 16

     B.    Plaintiffs Fail to Adequately Allege Scienter ........................................16

          1.    Plaintiffs Fail to Plead Any Motive ........................................... 17

          2.    Plaintiffs Do Not Adequately Allege Any Individual Was Reckless or Engaged in Conscious Misbehavior ...................... 18

     C.    Plaintiffs Fail to Adequately Allege Loss Causation ............................22

II.    PLAINTIFFS FAIL TO PLEAD SPECIFIC CLAIMS AGAINST EACH OF THE INDIVIDUAL DEFENDANTS ..............................................24

     D.    Dougan and Mathers ...........................................................................25

     E.    Thiam .................................................................................................26

III.   PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM AGAINST ANY OF THE INDIVIDUAL DEFENDANTS ...........................27

CONCLUSION ...............................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)..............................................................................................11

*ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)..........................................................................1n, 27

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)....................................................................20

*Bell Atlantic Corp.* v. *Twombly*,
550 U.S. 544 (2007)..............................................................................................11

*City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG*, 752 F.3d (May 6,
2014) ................................................................................................................*passim*

*DeBlasio* v. *Merrill Lynch & Co., Inc.*,
2009 WL 2242605 (S.D.N.Y. July 27, 2009) ........................................................25

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...........................................................................2, 15

*Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*,
551 F. Supp. 2d 210 (S.D.N.Y. 2008)............................................................17, 25

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ...............................................13, 15

*Filler* v. *Hanvit Bank*,
2003 WL 22110773 (S.D.N.Y. Sept. 12, 2003)......................................................25

*In re Francesca's Holding Corp. Sec. Litig.*,
2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) .........................................12, 23, 24

*Glickman* v. *Alexander & Alexander Serv., Inc.*,
1996 WL 88570 (S.D.N.Y. Feb. 29, 1996)..............................................................17

*Goplen* v. *51job, Inc.*,
453 F.Supp.2d 759 (S.D.N.Y. 2006)......................................................................22

*Gordon* v. *Barr*,
506 F.2d 1080 (2d Cir. 1974).................................................................................27

*Harris* v. *Mills*,
    572 F.3d 66 (2d Cir. 2009)..................................................................11

*Hirsch* v. *Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995)..............................................................11

*Kalnit* v. *Eichler*,
    264 F.3d 131 (2d Cir. 2001)..............................................................17

*Lentell* v. *Merrill Lynch & Co., Inc*,
    396 F.3d 161 (2d Cir. 2005)..............................................................23

*Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*,
    2013 WL 4405538 (S.D.N.Y. Aug. 5, 2013), *aff'd sub nom. IBEW Local Union No. 58
    Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d
    Cir. 2015)....................................................................................21, 24

*Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *American Express. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010), *aff'd* 430 F. App'x 63 (2d Cir. 2011)........................21

*Louisiana Stadium & Exposition District* v. *Financial Guaranty Insurance Co.*,
    701 F.3d 39 (2d Cir. 2012)..................................................................11

*In re MBIA, Inc. Sec. Litig.*,
    700 F. Supp. 2d 566 (S.D.N.Y. 2010)................................................... 26

*N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n* v.
    *MDC Partners, Inc.*,
    2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)..............................................18

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir.2010)................................................................23

*In re Optionable Sec. Litig.*,
    577 F.Supp.2d 681 (S.D.N.Y.2008)........................................................11

*In re PXRE Group, Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) (Sullivan, J.), *aff'd sub nom. Condra* v. *PXRE Grp.
    Ltd.*, 357 F. App'x 393 (2d Cir. 2009) ........................................................ *passim*

*In re Rockwell Med., Inc. Sec. Litig.*,
    2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ............................................20n, 25

*Rombach* v. *Chang*,
    355 F.3d 164 (2d Cir. 2004)..............................................................12

*In re Royal Bank of Scotland Grp. plc Sec. Litig.*,
    2012 WL 3826261 (S.D.N.Y. Sept. 4, 2012) ...........................................15

*S. Cherry St., LLC* v. *Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)...................................................................................22

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F.Supp.2d 365 (S.D.N.Y. 2007)...................................................................15n

*In re Silvercorp Metals, Inc. Sec. Litig.*,
    26 F. Supp. 3d 266 (S.D.N.Y. 2014).....................................................................26

*Stoneridge Inv. Partners, LLC* v. *Scientific–Atlanta*,
    552 U.S. 148 (2008)...............................................................................................12

*Stratte-McClure* v. *Morgan Stanley*,
    784 F. Supp. 2d 373 (S.D.N.Y. 2011), *aff'd*, 776 F.3d 94 (2d Cir. 2015) ........................12, 15

*Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008)................................................................16, 17, 19, 22

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ..............................................................................................16

*In re Tower Grp. Int'l, Ltd. Sec. Litig.*,
    2015 WL 5813393 (S.D.N.Y. Sept. 18, 2015)................................................16, 20

*In re UBS AG Sec. Litig.*,
    2012 WL 4471265 (S.D.N.Y. Sept. 8, 2012) (Sullivan, J.), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014)................ *passim*

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011).......................................................... *passim*

*Wilamowsky* v. *Take-Two Interactive Software, Inc.*,
    818 F. Supp. 2d 744 (S.D.N.Y. 2011)...................................................................22

*Wilson* v. *Merrill Lynch & Co.*,
    671 F.3d 120 (2d Cir. 2011)..................................................................................27

Defendants Credit Suisse Group AG ("CS"), Brady Dougan, Tidjane Thiam, and David Mathers respectfully submit this Memorandum of Law in support of their motion, pursuant to the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(a)(3)(B) ("PSLRA"), and Federal Rules of Civil Procedure 9(b) and 12(b)(6), to dismiss Plaintiffs' Amended Class Action Complaint (the "AC").[1]

## PRELIMINARY STATEMENT

In the second half of 2015 and early 2016, financial institutions across Wall Street faced challenging and volatile conditions in the credit markets, which had a negative impact on the market for, and pricing of, financial products tied to those markets, including collateralized loan obligations, and other similar financial products.  Like many institutions, CS had a portfolio of such products (the "Distressed Portfolio") and, on February 4, 2016, CS announced that it had incurred $633 million in mark-to-market losses on that portfolio.

Nearly two years later, Plaintiffs filed this action on behalf of a purported class of those who purchased or acquired CS American Depositary Receipts ("CS ADRs") between March 20, 2015 and February 3, 2016 (the "Class Period"), alleging securities fraud under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  The basic claim is that: (1) CS made statements in its 2014 Annual Report filed with the SEC on Form 20-F on March 20, 2015 (the "2014 Annual Report" or the "Report") effectively guaranteeing investors that CS's risk management policies would prevent the purchase of the types of products found in the Distressed

---

[1]   The facts alleged by Plaintiffs are taken as true for purposes of this motion only.  *See ATSI Commc'ns, Inc.* v. *Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 523 (S.D.N.Y. 2009) (Sullivan, J.), *aff'd sub nom. Condra* v. *PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009).

Portfolio; and (2) that senior management at CS knew that those risk management policies were not being enforced.

As discussed below, however, the 2014 Annual Report provided no such guarantees. Instead, the document simply described CS's risk management policies in the way that many banks' annual reports do. Courts have consistently held that such descriptions do not amount to an assurance that a bank will not take on risks and suffer losses and, accordingly, do not constitute misrepresentations that would support an action under Section 10(b). *See, e.g., City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG*, 752 F.3d at 185-86 & n.58 (May 6, 2014); *ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 205-206 (2d Cir. 2009); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 354 (S.D.N.Y. 2011) (Sullivan, J.).

Perhaps recognizing the potential futility of their primary allegation, Plaintiffs also allege that CS made a material omission when it failed to disclose that it had repeatedly breached its risk limits in order to secretly accumulate a hidden portfolio of distressed assets. This allegation – which Plaintiffs first added when they amended their complaint – suffers from several fatal defects. First, documents relied upon by Plaintiffs in the AC conclusively demonstrate that the assets were neither hidden nor in breach of any applicable limit. Second, even if the allegation was not demonstrably false, it lacks any of the requisite specificity that would be required to satisfy Plaintiffs' pleading burden. For example, the AC alleges that breaches occurred, but offers no facts in support. The AC does not identify even a single trading position that breached any specific trading limit at any particular time.

Plaintiffs also fail to adequately allege scienter. The only motive pled is that CS concealed the truth about its risk management systems and risk limits in order to raise capital.

But this type of motive is common to all corporate officers, and courts (including this Court) have uniformly found this to be insufficient.  *See, e.g.*, *PXRE*, 600 F. Supp. 2d at 532.  Plaintiffs attempt to bolster their position on scienter with a detailed explanation of the flows of information to CS senior management that purportedly demonstrate that they knew or should have known of the Distressed Portfolio.  But that effort misses the point entirely.  To establish scienter, Plaintiffs are required to identify specific statements, made by specific defendants, which the relevant defendant knew to be false at the time the statement was made.  Even if Plaintiffs can establish that management was aware of the Distressed Portfolio, the AC does not explain how this knowledge conflicts with any specific statement made by any particular defendant.

Plaintiffs have failed to adequately allege loss causation for similar reasons.  To satisfy this burden, Plaintiffs must show that they suffered losses caused by either a corrective disclosure or a concealed risk.  Plaintiffs describe no corrective disclosure, and instead allege that they suffered harm when the losses suffered on the "hidden" Distressed Portfolio were revealed.  But the Portfolio was not hidden – the AC itself cites to documents in which CS reveals, during the Class Period, the nature of, and risks associated with, the Distressed Portfolio.

In addition to the arguments above, which apply to all of the corporate and individual defendants equally, there are additional reasons why the claims against the individual defendants are insufficient.  First, the AC fails to plead scienter with respect to any statement or omission purportedly attributable to any specific individual defendant.  *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *9 (S.D.N.Y. Sept. 8, 2012) (Sullivan, J.), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173 (2d Cir. 2014).  Second, with respect to loss causation, the individual defendants cannot be held liable for alleged losses

resulting from statements when they were not employed by CS.  *See generally id.* at *22 & n.20. Finally, Plaintiffs' allegation that Thiam falsely described CS's investments in the Distressed Portfolio as "benign" and riskless (yet highly profitable) is flatly contradicted by Thiam's actual statements.

## BACKGROUND

### A.    The Alleged Misstatements Concerning Risk Limits, Risk Management Practices and Controls

The alleged misstatements at issue in this action fall into three categories: (1) statements that CS imposed "binding" risk limits, (2) statements about CS's "disciplined risk culture" and (3) CS's disclosures about the positions in the Distressed Portfolio in October 2015.  AC ¶¶ 87-101.

As to risk limits, the AC selectively quotes from the 2014 Annual Report, in which CS refers to "binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs."  AC ¶ 90.  The AC also excerpts sections of the Report that identify various limits and sub-limits CS applied to its trading portfolios, including those set by CS's Capital Allocation Risk Management Committee ("CARMC"),[2] and points to statements about the reporting, remediation, and escalation of breaches (which CS described as "rare") to CS senior management.  AC ¶¶ 89-92.

Importantly, and contrary to Plaintiffs' suggestion, even these carefully selected passages do not support Plaintiffs' contention that CS had promised that it would not breach trading limits. Rather, these statements specifically contemplate the possibility that limits may be breached, and outline the procedures that CS is to follow in the event of a breach.  AC ¶¶ 90-92.  The AC does

---

[2]   CARMC included CS's CEO, CFO, and Chief Risk Officer, met monthly (AC ¶ 4), and was a sub-committee of CS's Executive Board.  AC ¶ 33.

not contain a single allegation that CS did not follow its stated protocol in response to any breach.

Regarding CS's "disciplined risk culture," Plaintiffs point to a statement in the Report that CS "base[d] [its] business operations on conscious and disciplined risk taking."  AC ¶ 94. Plaintiffs also note statements indicating that breaches of risk limits "are identified, analyzed and escalated" and that "large, repeated or unauthorized exceptions may result in disciplinary action."  *Id*.  Again, these statements do not support the notion that limits will not be breached and/or that risks will not be taken.

Indeed, sections of the Report that Plaintiffs fail to quote state the opposite.  For example, the Annual Report warned investors that CS "continue[s] to maintain large trading and investment positions" (Declaration of David G. Januszewski, dated July 2, 2018 ("Januszewski Decl.") Ex. 1 (CS 2014 Annual Report) at 39) that "market fluctuations and volatility" could lead to "significant losses on our trading and investment activities," (*id.*), and that "no risk management procedures can anticipate every market development or event, and our risk management procedures and hedging strategies, and the judgments behind them, may not fully mitigate our risk exposure in all markets or against all types of risk" (*id*. at 43).  The Report also stated that CS's risk management practices "may not always be effective, particularly in highly volatile markets."  *Id*. at 39.

Finally, and somewhat oddly, Plaintiffs allege that CS's *disclosure* of the positions at issue was itself a misstatement.  During an October 21, 2015 earnings call, CS explained that it was not planning to exit its positions in securitized products and credit (*i.e.*, the positions in the Distressed Portfolio) even though they required significant capital (an indication of risk), because of their potential profitability:

> Then you've got the two ugly ducklings that nobody likes, securitized products and credit. Because they generate a lot of profit, but they consume a lot of capital. But personally, to generate 35% or 40% of return I don't mind burning some capital . . . 35% or 40% -- as incoming CEO in a company that does not have enough profit, not enough capital, that's not my top priority to tackle this.

AC ¶ 100; *see also* Januszewski Decl. Ex. 2 (CS 3Q 2015 Call Tr. ("Oct. 21 Call") at 9).[3]

Plaintiffs' claim that these disclosures were misleading is predicated on the notion that they suggest that the positions were "benign." AC ¶ 100. The disclosures, however, say no such thing. As discussed in more detail below, the claim is both inconsistent with the facts and unreasonable as a matter of law.

  **B.**  **CS's Public Disclosures Concerning its Positions in Securitized Products and Credit**

  Although the AC claims that CS hid its Distressed Portfolio, documents cited by Plaintiffs squarely refute that notion. As detailed below, CS acquired and managed its securitized products and credit positions in accordance with all applicable risk limits, and disclosed its strategy with respect to those positions to the market.

  As disclosed in the 2014 Annual Report, CS's fixed income franchise included, among other things, trading positions in credit and securitized products. AC ¶ 28. Securitized products, in turn included CLOs, which are "bundled low-grade loans, with a higher risk of default and a lower chance of recovery in the event of default," similar to collateralized debt obligations ("CDOs"). AC ¶ 29. These disclosures were supplemented following the arrival of the new CEO, Thiam, on July 1, 2015. AC ¶ 42. Upon taking the helm, Thiam undertook a review of each of CS's business lines, its investments, and the risk profile of its investments. AC ¶ 43. This effort culminated in CS's announcement on October 21, 2015, during its third quarter

---

3 Plaintiffs further allege that these same disclosures were also incorporated by reference in CS's December 2015 Exchange Offering Registration Statement. AC ¶ 102.

earnings call and Investor Day presentation, of a new "right-sizing" strategy, which involved

reducing the size of the Investment Bank and focusing on CS's Wealth Management division

("Wealth Management").  AC ¶ 44.

CS explained that in determining which businesses to exit or reduce, it considered three

factors: (1) connection with or relevance to the Wealth Management business; (2) capital and

leverage usage; and (3) profitability.  Januszewski Decl. Ex. 2 (Oct. 21 Call) at 39.  Applying

those factors, CS announced plans to exit its macro and prime positions in its fixed income

franchise, but to maintain its positions in securitized products and credit.  AC ¶ 47.  To illustrate,

CS provided the following charts during the Oct. 21 Call, which show the risk-weighted size of

the positions — including the securitized products and credit positions — as well as their return

on capital:



Januszewski Decl. Ex. 3 (CS Strategy Presentation, dated Oct. 21, 2015 ("Oct. 21 Presentation"))

at 34.

CS explained that while securitized products and credit were not relevant to CS's Wealth

Management business, and consumed a large amount of capital, they had historically high

returns.  Januszewski Decl. Ex. 2 (Oct. 21 Call) at 9.  As the AC acknowledges, CS described the

securitized products and credit positions as "ugly ducklings that nobody likes . . . because they

generate a lot of profit, but they consume a lot of capital" but were not a "top priority" in the

right-sizing effort.  *Id*; AC ¶ 100 (quoting Januszewski Decl. Ex. 2 (Oct. 21 Call) at 9).  Again,

CS provided a chart to investors showing the analysis and conclusions:

## Right-size the Investment Bank: WM connectivity, capital usage and profitability

|  | Right-sizing focus | ✓ Pass | ✗ Non-acceptable |
| --- | :---: | :---: | :---: |
|  | **1** Connection with WM | **2** Capital usage (FY2014) | **3** Profitability[1] (FY2014) |
| IBD | ✓ | ✓ | ✓ |
| Equity Derivatives | ✓ | ✓ | ✓ |
| Cash Equity | ✓ | ✓ | ✓ |
| Emerging Markets Group | ✓ | ✓ | ✗ |
| Securitized Products | ✗ | ✗ | ✓ |
| Credit | ✗ | ✗ | ✓ |
| Prime Services | ✓ | ✗ | ✗ |
| Macro | ✓ | ✗ | ✗ |

1) RoC calculated using income after tax, assuming tax rate of 30% and capital allocated on the highest of 10% Basel III risk-weighted assets or 3.5% end of 2014 leverage exposure  Note: This slide presents financial information based on results under our current structure prior to our re-segmentation announcement on October 21, 2015

Januszewski Decl. Ex. 3 (Oct. 21 Presentation) at 35.

Far from describing its securitized products and credit positions as "benign" and immune

to risk, as Plaintiffs contend, the very presentation they cite made clear — with large red X's no

less — that the positions were "non-acceptable" from a capital usage perspective, did not have the desired connection with CS's Wealth Management business, but were not part of the "right-sizing" focus due to their profitability.  No reasonable investor could have interpreted these disclosures as assurances that the positions were "benign" and presented no risk.

**C.     CS Announces Fourth Quarter 2015 Write-Downs, Including in Securitized Products and Distressed Credit**

On February 4, 2016, during its fourth quarter 2015 and full year earnings call, CS announced that it suffered $633 million in mark-to-market losses, a portion of which was attributable to losses in the Distressed Portfolio.  AC ¶ 65.  CS identified a number of external market factors that contributed to the write-downs, including that its securitized products business "was impacted by the widening of U.S. high-yield spreads and the tightening in swap note spreads, resulting in mark-to-market losses in CLO agency, CMBS agency and non-agency trading."  Januszewski Decl. Ex. 4 (CS Q4 2015 Call Tr.) at 11; *see also* Januszewski Decl. Ex. 5 (CS 2015 Annual Report) at 87 ("During the second half of 2015, a significant widening in US high yield spreads, comparable to peak 2011 levels, resulted in reduced client activity and low levels of market liquidity.").  CS also noted that mark-to-market losses, particularly in US distressed high yield assets were "exacerbated by [an] energy sell off."  Januszewski Decl. Ex. 6 (CS 4Q and FY2015 Presentation) at 51.

Notably, CS was not the only investment bank to write-down losses in the second half of 2015 and the first quarter of 2016 as a result of negative market trends, including the widening of credit spreads and deterioration in the energy sector, which impacted fixed income divisions across Wall Street.  *See, e.g.*, Januszewski Decl. Ex. 7 (Feb. 21 Business Insider Article) ("The numbers are in, and it's official: Wall Street had a horrible 2015.  Poor trading results and low client activity in the second half of the year led to an overall drop in revenues for Wall Street

– 9 –

banks . . . Credit was the worst performing product in fixed income.  Coalition said it was impacted by poor client activity, trading underperformance, and widening spreads.  Distressed credit and CLOs performed the worst."); Januszewski Decl. Ex. 8 (Feb. 21 Wall Street Journal Article) ("Stocks at all U.S. banks, including Bank of America, were walloped Friday on concerns about their exposure to low oil prices and troubles in China.")

As referenced in the AC, CS responded to questions from the Corporate Finance Division of the Securities Exchange Commission concerning the write-downs in December 2016. Plaintiffs' mischaracterization of that response, however, is egregious.  Plaintiffs claim that, in its response, CS "admitted" that the Distressed Portfolio "had continued to increase throughout the Class Period" and that the limits had been "continuously" raised.  AC ¶¶ 78-81.  Plaintiffs go so far as to claim that the response states that the positions had grown "far beyond the Bank's risk profile."  *Id.* ¶ 80.

The actual response, which was publicly filed with the SEC and is submitted herewith in its entirety, states the opposite:  ***"[T]he positions that led to the 4Q15 and 1Q16 write-downs have been subject to trading and/or risk limits that were established and approved by appropriate personnel, and were in compliance with all such limits."***  Januszewski Decl. Ex. 9 (CS AG Response to Corp. Fin. ("Corp. Fin. Response")) at 4 (emphasis added).  In other words, there was ***no breach of any risk limit***.  This, of course, contradicts the core, but unsupported, allegation in the AC that CS's risk limits were "fictitious" because they were increased whenever a breach occurred.

Nor does the letter support Plaintiffs' assertion that the risk limits, and thus the positions, were "continuously" increased throughout the purported Class Period.  *See, e.g.*, AC ¶ 81.  The letter affirmatively states, to the contrary, that the relevant positions "decreased in every month

between June 2015 and March 2016." Januszewski Decl. Ex. 9 (Corp. Fin. Response) at 4. The letter further states that only one change to relevant risk limits occurred during 2015, in which an aggregate limit relating to the Distressed Portfolio was replaced with several smaller, more specific limits, but which resulted in "*[n]o new net capacity*," (*id.*) meaning that the aggregate of the new limits did not exceed the total aggregate limit that they replaced. The letter also describes increases to certain limits that were duly approved prior to the Class Period, but does not suggest in any way that the limits were increased without the necessary approval, or in contravention of any of CS's risk management practices or controls.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). While the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff, this requirement does not apply to "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Louisiana Stadium & Exposition District* v. *Financial Guaranty Insurance Co.*, 701 F.3d 39, 43 (2d Cir. 2012) (quoting *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009)). The Court need not credit claims that are contradicted by documents incorporated in the complaint or publicly filed with the SEC. *See Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995); *In re Optionable Sec. Litig.*, 577 F.Supp.2d 681, 692 (S.D.N.Y.2008) ("If allegations conflict with the plain language of the publicly filed disclosure documents, the disclosure documents control, and the court need not accept the allegations as true.").

– 11 –

## ARGUMENT

I. **PLAINTIFFS FAIL TO STATE A CLAIM AGAINST DEFENDANTS UNDER SECTION 10(B) AND RULE 10B-5**

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must adequately plead: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *UBS*, 2012 WL 4471265, at *8 (quoting *Stoneridge Inv. Partners, LLC* v. *Scientific–Atlanta*, 552 U.S. 148, 157 (2008)). The AC must be dismissed because it fails to adequately plead a number of these required elements, including a material misstatement or omission, scienter on the part of any defendant, and loss causation.

### A. Plaintiffs Fail to Allege an Actionable Misrepresentation or Omission by Defendants

To allege an actionable misrepresentation or omission under Section 10(b) and Rule 10b-5, a plaintiff must plead with particularity that the defendant either made a material misrepresentation, or made a material omission as to which he had a duty to speak. *In re Francesca's Holding Corp. Sec. Litig.*, 2015 WL 1600464, at *10 (S.D.N.Y. Mar. 31, 2015) (Sullivan, J.). The Second Circuit has explained that it is not enough for plaintiffs to merely say that the statements were false or misleading; a plaintiff must also "demonstrate with specificity why and how that is so." *Rombach* v. *Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Further, under the PSLRA, a complaint must both specify each statement that is alleged to have been misleading, and explain why the statement is misleading. *Stratte-McClure* v. *Morgan Stanley*, 784 F. Supp. 2d 373, 383 (S.D.N.Y. 2011), *aff'd*, 776 F.3d 94 (2d Cir. 2015), and *aff'd*, 598 F. App'x 25 (2d Cir. 2015). In other words, plaintiffs seeking to assert a Section 10(b) claim must set forth in their complaint the specific who, what, when and how of each statement they claim

was false or misleading.  Plaintiffs here do not come close to meeting this standard with respect to any of the statements that they challenge in this action.

> ### 1.    No Facts Are Alleged Showing That the Statements About Risk Limits Were False

First, with respect to the statements asserting that CS had "binding" risk limits (AC ¶¶ 89-92), Plaintiffs claim that the statements were false and misleading because "in reality, Defendants had been amassing large exposures to highly risky and illiquid CLO and distressed debt investments in repeated breach of these purportedly 'binding' limits."  AC ¶ 93.  Although the AC boldly pronounces that CS engaged in "repeated breach[es]" (*id.*) of limits, the AC actually does not contain a single allegation of any actual breach of any specific limit.  *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.) (plaintiffs' "repetition thought [their] submission" of a "conclusory" allegation "does not alter the PSLRA's requirement that if a plaintiff's 'allegation regarding the statement or omission is made on information and belief, ... [Plaintiff must] state with particularity all facts on which that belief is formed.'").

To the contrary, documents cited by Plaintiffs in the AC state unequivocally that ***"the positions that led to the 4Q15 and 1Q16 write-downs have been subject to trading and/or risk limits that were established and approved by appropriate personnel, and were in compliance with all such limits."***  Januszewski Decl. Ex. 9 (Corp. Fin. Response) at 4 (emphasis added). There was, in other words, ***no breach***. [4]

---

[4]   It is also worth noting that even an actual breach of a specific limit would not render statements that risk limits were "binding" to be false.  As reflected in the same statements that Plaintiffs cite, breaches can occur and there are procedures around how to address such breaches.  *See* AC ¶¶ 90-92.

Without any specific facts describing how and when a specific risk limit was breached, CS's statements concerning the "binding" nature of its risk limits are too general to be actionable under Section 10(b).  In *City of Pontiac Policemen's and Firemen's Retirement System* v. *UBS AG*, the Second Circuit affirmed this Court's dismissal of Section 10(b) fraud claims against UBS based on statements by UBS that it "avoided 'concentrated positions' of assets" and "implemented asset portfolio limits."  752 F.3d at 185.  Plaintiffs claimed that the statements were false when made because UBS and certain corporate officer defendants knew that UBS actually had accumulated a $100 billion portfolio of mortgage-related securities.  *Id.*  The Second Circuit held that the statements were "too general to act as a guarantee that UBS would not amass such a portfolio" particularly where plaintiffs failed to allege "that UBS represented that it had *specific* risk limits on its acquisition of mortgage-related securities, that the $100 billion portfolio contravened."  *Id.* at 186 & n.58 (emphasis in original).  Here, the result is even clearer than in *City of Pontiac*, because the materials that the AC incorporates by reference affirmatively establish that the challenged positions complied with all applicable limits.

> ### 2.  CS's General Statements About Risk Management Practices are Not Actionable

Plaintiffs' claim that CS's general statements about its risk management practices and controls were materially false and misleading is similarly unavailing.  The AC alleges that CS continuously raised its trading limits, and that such a course of conduct was inconsistent with CS's assurances regarding its risk controls.  AC ¶ 93.  The AC, however, does not explain how the raising of limits would have been inconsistent with any of CS's representations regarding its risk management practices.  In fact, there is nothing in the 2014 Annual Report, or anything else cited by Plaintiffs, that promises investors that limits will not be raised in appropriate circumstances.

Absent any allegations that a specific representation regarding CS's risk management controls was false when made, the AC must be dismissed.  *See In re Royal Bank of Scotland Grp. plc Sec. Litig.*, 2012 WL 3826261, at *8 (S.D.N.Y. Sept. 4, 2012) ("[A] plaintiff challenging a defendant's disclosures regarding its risk management processes must allege facts 'showing that the descriptions of the processes were false or misleading at the time they were included in the public statements, [or] facts showing that the processes were not followed.'") (citation omitted).[5]

It is also well settled in this Circuit that general statements touting a firm's risk management practices and controls are not actionable simply because the defendant ultimately takes on risk or incurs a loss.  *See City of Pontiac*, 752 F.3d at 185; *ECA*, 553 F.3d at 205-06 (statement by JPMorgan that it had "'highly disciplined' risk management" was non-actionable because it "did not, and could not, amount to a guarantee that its choices would prevent failures in risk management practices"); *Stratte-McClure*, 784 F. Supp. 2d at 385 ("generalized statements about the effectiveness of the Company's risk management . . . did not amount to a guaranty that Morgan Stanley's risk management was flawless"); *see also Wachovia*, 753 F.Supp.2d at 354 (statements regarding "conservative" underwriting standards and "careful management of inherent credit risk" were non-actionable); *cf. Ferrellgas*, 2018 WL 2081859, at

---

[5]   Nor can Plaintiffs save their claim by repeating opinions expressed by Thiam on March 23, 2016, including that a "limit that is always increasing is not a limit."  *See* AC ¶¶ 9, 41, 77, 93, 95, 97, 104.  None of Thiam's statements render false any prior statement cited by Plaintiffs. Indeed, Plaintiffs selectively quote from a March 23, 2016 New York Times article (AC ¶ 95), without mentioning that in the same article Thiam affirmatively stated that CS traders "did not act improperly."  Januszewski Decl. Ex. 10 (Mar. 23, 2016 New York Times Article). Thiam's statements, therefore, said exactly nothing about what CS or any individual knew at the time the prior statements were made, nor do they show any of those statements to be false.  *See In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.Supp.2d 365, 378 (S.D.N.Y.2007) ("In order for a statement to be false or misleading, a plaintiff must allege that the speaker was aware of adverse information *at the time he spoke*.") (emphasis added).

*10 ("Because Defendants did not purport to guarantee that Bridger had removed all exposure to commodity price fluctuation, but only 'mitigated' that risk and 'insulate[d]' against it, no reasonable investor would take these statements as assurances that Bridger's business was 'essentially risk-free' or 'impervious to oil price changes', as Plaintiffs insist.") (internal citations omitted).

### 3.   CS's October 21, 2015 Statements About the Distressed Positions Were Not False or Misleading

Finally, Plaintiffs' complaint about statements made during the October 21, 2015 Investor Day presentation is counterfactual.  Plaintiffs suggest that those statements assured investors that the positions were benign.  That is plainly not true.  On their face, CS's statements warned investors that CS had the positions, that CS intended to maintain the positions, and that the positions were risky.  No reasonable investor could have interpreted these disclosures as assurances that the positions were "benign" and presented no risk.

### B.   Plaintiffs Fail to Adequately Allege Scienter

To allege a violation of Section 10(b) Plaintiffs are also required to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).  To qualify as "strong," the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of non-fraudulent intent." *Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) (quoting 15 U.S.C. § 78u–4(b)(2)); *see also Teamsters Local 445 Freight Div. Pension Fund* v. *Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) ("While we normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, [the PSLRA] establishes a more stringent rule for inferences involving scienter. . . .").  Scienter must be adequately alleged with respect to *every* alleged misstatement or omission. *In re Tower Grp.*

*Int'l, Ltd. Sec. Litig.*, 2015 WL 5813393, at *4 (S.D.N.Y. Sept. 18, 2015).  Plaintiffs must also state with particularity facts giving rise to a strong inference that *each defendant* acted with scienter.  *Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008).

Where, as here, a defendant is a corporate entity, plaintiffs must plead facts that "create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  *Dynex*, 531 F.3d at 195.  For individual defendants, plaintiffs must either plead facts showing that the defendants had both motive and opportunity to commit the fraud, or must plead facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.  *Wachovia*, 753 F. Supp. 2d at 348.  Plaintiffs fail to do either here.

### 1.      Plaintiffs Fail to Plead Any Motive

In order to allege that any defendant had motive, plaintiffs must show that the individual received a "concrete and personal benefit" as a result of the purported fraud.  *Kalnit* v. *Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted).  Plaintiffs make no such allegation here.  Instead, Plaintiffs' sole allegation as to motive is that CS suppressed the truth about its risk management systems and risk limits in order to raise $14 billion of capital that was supposedly necessary to "stay alive."  AC ¶ 123.  Even if credited, this allegation is far too general and fails to identify any concrete or personal benefit to any defendant.  Courts routinely reject such allegations as insufficient.  *See PXRE*, 600 F. Supp. 2d at 532 ("[T]he alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price—even if such a drop would allegedly threaten the 'survival' of a company—is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit.");  *see also Glickman* v. *Alexander & Alexander Serv.,*

*Inc.*, 1996 WL 88570, at *6 (S.D.N.Y. Feb. 29, 1996) (explaining that "a desire to raise much needed capital" is an insufficient generalized motive to support an inference of scienter).

**2.      Plaintiffs Do Not Adequately Allege Any Individual Was Reckless or Engaged in Conscious Misbehavior**

Plaintiffs are also unable to plead scienter by alleging either conscious misbehavior or recklessness.[6]  Recklessness, in the securities fraud context, is defined as "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n* v. *MDC Partners, Inc.*, 2016 WL 5794774, at *20 (S.D.N.Y. Sept. 30, 2016) (Sullivan, J.).  Having failed to establish motive, Plaintiffs' burden in alleging recklessness is higher and the strength of their circumstantial allegations must be correspondingly greater to survive a motion to dismiss.  *Id.*  To meet this standard, Plaintiffs must specifically allege that Defendants had knowledge of facts or information that contradicted their public statements – at the time they made them – or that they failed to review or check information they had a duty to check, or that they ignored obvious signs of fraud.  *Wachovia*, 753 F. Supp. 2d at 351.

Here, Plaintiffs purport to satisfy the scienter requirement by providing dozens of paragraphs of allegations asserting that senior management was aware, or should have been aware, of the Distressed Positions and the applicable limits based on (1) statements in the Corp. Fin. Response affirming that the positions were fully authorized and known to appropriate managers (AC ¶¶ 106-108), (2) the Individual Defendants' participation in setting and reviewing

---

[6]   Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information, or knowing sale of a company's stock at an unwarranted discount."  *Wachovia*, 753 F. Supp. 2d at 351.  Plaintiffs have alleged no facts to support an inference that Defendants engaged in any illegal or untoward behavior.

– 18 –

risk limits as members of CARMC (AC ¶ 109), (3) statements in the 2014 Annual Report touting CS's "comprehensive risk management processes" (AC ¶¶ 110-111), (4) the "in-depth" review done in coordination with the "right-sizing" of the investment banking division, which would have made senior management aware of the positions (AC ¶¶ 118-122), and (5) various statements by the financial press, industry insiders, and unnamed "Confidential Witnesses" (AC ¶¶ 112-116, 124-128).

Plaintiffs have, in other words, pleaded at great length that senior management was or should have been aware of the positions in the Distressed Portfolio. But that is beside the point. What Plaintiffs need to allege, but cannot, is that one or more of the Defendants made statements which they knew at the time to be false. But alleging that senior management was aware of positions that complied with all applicable limits demonstrates that CS's statements about risk limits and controls were *true*, not false. And they certainly do nothing to establish that any individual was aware that any of those statements were false at the time they were made.

To the extent Plaintiffs seek to allege that the Defendants had access to facts contradicting their public statements, Plaintiffs are required to specifically identify the reports or statements containing the allegedly contrary information. *Dynex*, 531 F.3d at 196. Plaintiffs must further allege that the information was available to Defendants "*at the same time* they made their misleading statements" and explain how that information specifically contradicted Defendants' public statements. *PXRE*, 600 F. Supp. 2d. at 536 (emphasis in original) (citations and internal quotation marks omitted).

Plaintiffs seem to recognize their inability to meet this standard, because they do not even try to tie any of their prolix assertions about scienter to any particular challenged statement or

show how it reflects that the speaker knew or should have known that it was false.[7]  This failure

alone warrants dismissal of the AC.  *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d

600, 629 (S.D.N.Y. 2017) ("The PSLRA further requires that the complaint 'state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind' *with respect to each alleged misstatement or omission*.") (citing 15 U.S.C. § 78u–

4(b)(2)) (emphasis added); *Tower Grp.*, 2015 WL 5813393, at *4 (same).[8]

The AC is devoid of any allegations identifying the specific contradictory information

that was available to the Individual Defendants, or any other unnamed officers of CS, at the same

time as the alleged misstatements.  Instead, Plaintiffs point to statements by confidential

witnesses discussing unspecified emails sent from "the risk management team" to the CFO and

CEO (AC ¶ 125), unspecified "risk reports" sent to Thiam (AC ¶ 126), and unspecified CARMC

meetings (AC ¶ 128) which would allegedly have made the recipients aware of the Distressed

Portfolio positions and risk limits.  In the first place, these allegations are insufficient because, as

discussed above, they do not even claim that the information in the unspecified emails and

---

[7]  Plaintiffs allege that CS's December 2016 Corp. Fin. Response letter, which they
mischaracterize as reflecting that limits on the Distressed Portfolio were raised in November
2015, raises an inference that Defendants Thiam and Mathers recklessly disregarded that
information when they touted CS's risk limits a month later in December 2015 in connection
with the Exchange Offering (AC ¶ 107).  However, as noted above, the Corp. Fin. Response
letter actually reflects that the last limit increase that resulted in additional net capacity
applicable to the Distressed Portfolio occurred on July 31, 2014, (Januszewski Decl. Ex. 9
(Corp. Fin. Response) at 4) well in advance of any of the purported misstatements.

[8]  Similarly all of Plaintiffs' scienter allegations are either undated or refer to an Individual
Defendant's state of knowledge at an unspecified time period.  This also warrants dismissal.
*See Wachovia,* 753 F. Supp. 2d at 352 (declining to find an inference of recklessness based on
confidential witness's undated allegations); *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL
1725553, at *13 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.) (no inference of scienter where
plaintiffs failed to allege "any dates or time frame in which Defendants were put on notice of
contradictory information.").

reports demonstrated that any risk limits or controls were *breached*, only that they existed.  As a result, they do not speak to the falsity of the challenged statements.

Even in cases — unlike this one — where the reports identified by Plaintiffs *could* speak to the falsity of the challenged statements, it still is not enough unless Plaintiffs can specify *how* the information in the reports specifically contradicted the challenged statement.  *Wachovia*, 753 F. Supp. 2d at 351 (allegations that "Defendants 'received reports detailing significant and widespread problems with Wachovia's lending,'" were insufficient to plead scienter where plaintiffs failed to "specify which reports revealed the widespread lending problems, what information those reports contained, and whether the reports contradicted the public declarations of Defendants") (citations and internal quotations omitted); *Lighthouse Fin. Grp.* v. *Royal Bank of Scotland Grp., PLC*, 2013 WL 4405538, at *7 (S.D.N.Y. Aug. 5, 2013) ("It is not enough to simply allege that defendants were receiving 'reports;' rather, Plaintiffs must plead that the information that defendants' [sic] were receiving was different than that reported to the market.") (citation omitted), *aff'd sub nom. IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund* v. *Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015); *PXRE*, 600 F. Supp. 2d. at 536 (dismissing securities fraud complaint for failure to allege recklessness where "Plaintiff fail[ed] to allege that Defendants had knowledge of *specific* contradictory information, or, in several instances, that the information was available at the same time that Defendants made the challenged statements") (emphasis in original).

In the place of specific pleadings about the substance of the internal communications and how they contradicted specific public statements, Plaintiffs have simply alleged that there were channels of information about risk management.  This is also not enough to plead recklessness. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *American Express. Co.*, 724 F.

Supp. 2d 447, 462 (S.D.N.Y. 2010) ("The complaint must provide specificity about [risk management's] conclusions, including when they were made and how they were presented to the Individual Defendants."), *aff'd* 430 F. App'x 63 (2d Cir. 2011); *Goplen* v. *51job, Inc.,* 453 F.Supp.2d 759, 773 (S.D.N.Y. 2006) (plaintiffs' "bare assertions" that the individual defendants, "had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports . . . without any further facts or details, do not adequately demonstrate defendants' knowledge of facts or access to information contradicting their public statements").

Similarly, Plaintiffs' allegation that Defendants Thiam and Mathers undertook an "in-depth" review of CS's business lines shortly after Thiam assumed the role of CEO on July 1, 2015, which allegedly put them on notice of the Distressed Portfolio (AC ¶¶ 118-19), is also insufficient to plead scienter.  Plaintiffs again fail to identify what information Defendants Thiam or Mathers obtained during this review that specifically contradicted CS's subsequent public statements.  *See Dynex,* 531 F.3d at 196; *PXRE,* 600 F. Supp. 2d. at 536; *see also S. Cherry St., LLC* v. *Hennessee Grp. LLC*, 573 F.3d 98, 112 (2d Cir. 2009) (affirming dismissal of securities fraud claim for failure to plead scienter where complaint pleaded only that defendant "'would' have learned the truth" if it had conducted due diligence).  This is a particularly curious allegation of scienter in light of the fact that the review culminated in a presentation to investors that discussed the securitized products and credit positions, and the decision not to exit those positions, in detail.  *See* Section I.A.3, *supra*.

## C.     Plaintiffs Fail to Adequately Allege Loss Causation

The AC should be dismissed for the independent reason that it does not properly plead loss causation, which is "the proximate causal link between the defendant's alleged misconduct and the plaintiff's economic harm."  *Wilamowsky* v. *Take-Two Interactive Software, Inc*., 818 F. Supp. 2d 744, 751 (S.D.N.Y. 2011) (Sullivan, J).  In this Circuit, there are two generally

recognized avenues to plead loss causation: Plaintiffs must allege "either that (i) a corrective disclosure informed the market of the fraud, and the market reacted negatively; or (ii) the risk concealed from investors materialized and caused a foreseeable loss." *Francesca's*, 2015 WL 1600464, at *18; *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir.2010). Although it is less than clear which approach Plaintiffs are attempting, it is clear that they have failed to do either.

Plaintiffs allege that CS's "disclosures on February 4, 2016 revealed to the market the false and misleading nature of Defendants' statements and omissions and the materialization of the risks of their true risky illiquid investment practices." AC ¶ 134. Specifically, Plaintiffs allege that CS disclosed $633 million in mark-to-market losses which were the direct result of the CS's violation of its own policies regarding binding risk limits. *Id*. This disclosure, Plaintiffs allege, caused a $1.80 decline in the price of CS ADRs. AC ¶ 135.

The fundamental problem with this allegation is that it has no factual basis. As discussed previously, Plaintiffs have not pleaded any facts showing a "violation of [CS's] policies regarding 'binding' risk limits." To the contrary, the facts pleaded show that CS had binding risk limits and risk management controls in place, and that the Distressed Portfolio positions were in compliance with those limits at all times. The fact that CS ultimately experienced losses in that portfolio does not "reveal" anything that was previously concealed. Instead, it reveals only that there was unusual volatility and difficulty in the relevant markets that caused trading losses for CS and other financial institutions. *See* Section I.A.1, *supra*.

Where, as here, an alleged corrective disclosure merely reported mark-to-market losses suffered by previously disclosed positions, loss causation is not established. *See, e.g.*, *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005) (Merrill's eventual downgrades

– 23 –

of certain stock did not amount to a corrective disclosure); *Francesca's*, 2015 WL 1600464, at *19 (holding that public statements did not amount to a corrective disclosure concerning the Company's purportedly improper and undisclosed deteriorating vendor relationships where they merely "reaffirmed" prior disclosures); *Lighthouse,* 2013 WL 4405538, at *11 (holding that plaintiffs failed to plead loss causation where "all of the partial disclosures were driven by RBS writing down the *value* of the securities that the market was aware that it owned").

This is especially so here, where CS clearly disclosed in the 2014 Annual Report that its risk management practices were not a guarantee that CS would never suffer losses, particularly in a volatile market like the one that existed in the second half of 2015.  The report explicitly stated that "[n]o risk management procedures can anticipate every market development or event, and our risk management procedures and hedging strategies, and the judgments behind them, may not fully mitigate our risk exposure in all markets or against all types of risk."  Januszewski Decl. Ex. 1 (CS 2014 Annual Report) at 43.  CS further disclosed that that risk management practices "may not always be effective, particularly in highly volatile markets" (*id.* at 139) and that "market fluctuations and volatility" could lead to "significant losses on our trading and investment activities" (*id.* at 39).  These disclosures were also incorporated by reference in CS's December 2015 Exchange Offering Registration Statement.  AC ¶ 102.

## II.    PLAINTIFFS FAIL TO PLEAD SPECIFIC CLAIMS AGAINST EACH OF THE INDIVIDUAL DEFENDANTS

For the reasons discussed above, the claims against CS and the Individual Defendants must be dismissed.  As to each Individual Defendant, Plaintiffs' specific pleading failures provide addition bases to dismiss each of the claims.

Under the heighted pleading requirements of Rule 9(b), a complaint asserting claims against multiple defendants must put each defendant on notice of the nature of his or her

participation in the alleged fraud.  *DeBlasio* v. *Merrill Lynch & Co., Inc.*, 2009 WL 2242605, at

*10 (S.D.N.Y. July 27, 2009) (Sullivan, J.).  Plaintiffs may not assert blanket allegations against

all of the defendants collectively.  *UBS*, 2012 WL 4471265, at *9; *see also Filler* v. *Hanvit Bank*,

2003 WL 22110773, at *3 (S.D.N.Y. Sept. 12, 2003) (holding that the plaintiffs had failed to

meet the requirements of Rule 9(b) because they failed to "make allegations with respect to each

defendant, but instead refer[red] only generally to the defendants as 'the Banks'").  Moreover,

Plaintiffs "cannot automatically impute scienter on the basis of conclusory statements of

associations, and must 'state with particularity facts giving rise to a strong inference' that *each*

*defendant* acted with scienter."  *Edison Fund* v. *Cogent Inv. Strategies Fund, LTD*, 551 F. Supp.

2d 210, 228 (S.D.N.Y. 2008) (citation omitted) (emphasis added).

      Plaintiffs' sparse and undifferentiated allegations with respect to the Individual

Defendants fall far short of satisfying the heightened pleading requirements of Rule 9(b) and the

PSLRA.

      **D.**    **Dougan and Mathers**

      As discussed in Section I.B, *supra*, the AC fails to allege that either Dougan or Mathers

had a cognizable motive to commit securities fraud, or that either had access to specific reports

or information that contradicted any of the alleged misstatements at the time those statements

were made.  Lacking any evidence that Defendants had information contradicting CS's public

statements about its risk practices and risk limits, Plaintiffs nevertheless insist that the Individual

Defendants must have been aware of the purported falsity those statements based on their

"positions and access to material non-public information" (AC ¶ 26) but, "it is practically

hornbook law that 'accusations' such as these, which are 'founded on nothing more than a

defendant's corporate position[,] are entitled to no weight.'"  *Rockwell*, 2018 WL 1725553, at

*14 (citations omitted).  Additionally, the mere fact that Dougan and Mathers signed CS's filings

– 25 –

with the SEC (AC ¶¶ 21, 25) is plainly "insufficient to support a strong inference of recklessness in the absence of more particularized allegations." *See In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590 (S.D.N.Y. 2010) ("Lead Plaintiff's allegations that [individual defendants] signed MBIA's SEC disclosures and Sarbanes–Oxley certificates are insufficient to support a strong inference of recklessness in the absence of more particularized allegations."); *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 277 (S.D.N.Y. 2014) (finding that plaintiffs allegation that defendant "signed Silvercorp's SEC filings, certifying that they were true" was insufficient as a matter of law to plead recklessness).

### E.    Thiam

Thiam did not assume the role of CEO until July 1, 2015 (AC ¶ 22), and he therefore cannot be liable under Section 10(b) for any claims that rely in any part on conduct that is alleged to have occurred before that date. *See UBS*, 2012 WL 4471265, at *22 & n.20.

With respect to the time Thiam was at CS during the Class Period, Plaintiffs' only allegation specific to Thiam is based on his statements during the October 21, 2015 third quarter earnings call and Investor Day presentation. AC ¶ 100. On that call, Thiam referred to CS's securitized products and credit businesses as "ugly ducklings that nobody likes," because they "consume a lot of capital" but added that "personally, to generate 35% or 40% of return I don't mind burning some capital . . . 35-40% — as an incoming CEO in a company that doesn't have enough profit, not enough capital, that's not my top priority to tackle this." *Id*. Plaintiffs seek to contort Thiam's statement, which clearly stated an intention to assume risk in order to generate profit, into an assurance that CS's positions were "benign." *Id*. But, of course, Thiam said no such thing. Indeed, a reasonable investor would infer from Thiam's statement that securitized products and credit investments were high risk, rather than benign, given the high level of capital

such positions consumed and the potential for profits of 35% to 40%.  Thus, Thiam neither misrepresented nor omitted anything.

Additionally, as discussed above (Section 1.B), Plaintiffs do not allege scienter with respect to any of the statements made by Thiam.  The claims against him fail for that reason as well.

## III.   PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM AGAINST ANY OF THE INDIVIDUAL DEFENDANTS

To state a claim under Section 20(a), a plaintiff must allege facts showing: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commc'ns*, 493 F.3d at 108.

Plaintiffs' failure to establish any primary Section 10(b) violation by CS requires dismissal of their claims for control person liability.  *See Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011) ("Having concluded that [plaintiff] failed to state a claim for any primary violation of the securities laws, we affirm the district court's dismissal of his Section 20(a) claim alleging that [defendant] is liable as a controlling person.").

Additionally, Plaintiffs fail to allege that any Individual Defendant was a "culpable participant" in any alleged violation.  *See ATSI Commc'ns*, 493 F.3d at 108 (alleged controlling person must actually participate in the alleged violation).  The AC alleges that "[i]n their capacities as senior corporate officers of the Company," the Individual Defendants had influence over the activity of CS at various points in time, and signed CS's SEC filings (AC ¶¶ 160-61), but the AC does not allege facts showing that any of them knew of any fraudulent misrepresentations or otherwise participated in any fraud.  For this reason as well, the Section 20(a) claims must be dismissed.  *See Gordon* v. *Barr*, 506 F.2d 1080, 1086 (2d Cir. 1974).

## CONCLUSION

The Court should dismiss the Amended Class Action Complaint with prejudice.


Dated:      New York, New York
            July 2, 2018

                                        CAHILL GORDON & REINDEL LLP

                                        By:   /s/ David G. Januszewski
                                              Herbert S. Washer
                                              David G. Januszewski
                                              S. Penny Windle

                                        80 Pine Street
                                        New York, New York 10005
                                        (212) 701-3000

                                        *Attorneys for Defendants*