```
UNITED STATES DISTRICT COURT                          USDC SDNY
SOUTHERN DISTRICT OF NEW YORK                         DOCUMENT
                                                      ELECTRONICALLY FILED
------------------------------------------------- X   DOC #:_____
                                                  :   DATE FILED: 2/19/2019
CITY OF BIRMINGHAM RETIREMENT AND                 :
RELIEF SYSTEM, et al.,                            :
                                   Plaintiffs,    :   17 Civ. 10014 (LGS)
                                                  :
              -against-                           :   ORDER
                                                  :
CREDIT SUISSE GROUP AG, et al.,                   :
                                                  :
                                   Defendants.    :
------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

Lead Plaintiffs[1], individually and on behalf of all others similarly situated, bring this putative class action against Defendants Credit Suisse Group AG ("CS"), Brady Dougan, Tidjane Thiam and David Mathers (collectively, the "Individual Defendants"), alleging violations of § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants move to dismiss the First Amended Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, the motion is granted in part and denied in part.

I.  **BACKGROUND**

The following facts are taken from the Complaint and accepted as true only for the purposes of this motion. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

---

[1] Lead Plaintiffs are City of Birmingham Retirement and Relief System, Westchester Putnam Counties Heavy and Highway Laborers Local 60 Benefit Funds, Teamsters Local 456 Pension and Annuity Funds and the International Brotherhood of Teamsters Local No. 710 Pension Plan.

### A. Background

Defendant CS is a multinational financial services holding company with its headquarters in Zurich, Switzerland. CS's ADRs are traded on the New York Stock Exchange ("NYSE"). Defendant Dougan served as the Chief Executive Officer ("CEO") of CS from 2007 through June 30, 2015. On July 1, 2015, Defendant Thiam replaced Dougan as CEO. Dougan and Thiam reviewed, approved, signed and certified CS's filings with the SEC on March 20, 2015, and December 15, 2015, respectively. Defendant Mathers has been the Chief Financial Officer ("CFO") of CS and a member of the Executive Board since October 2010. In his capacity, he signed CS's filings with the SEC, including on March 20, 2015, and December 15, 2015.

During the class period, CS had two main divisions: Private Banking & Wealth Management and Investment Banking.[2] During Dougan's tenure as CEO, CS emphasized its Investment Banking division and expanded its investments in fixed income markets. CS's fixed income franchise included credit and securitized products, which consisted of asset-backed securities, residential mortgage-backed securities and collateralized loan obligations ("CLOs"), among other assets.

CS's Capital Allocation and Risk Management Committee ("CARMC") -- composed of CS's CEO, CFO, Chief Risk Officer and each of the CEOs of the Bank's individual divisions -- met monthly to ensure that CS's investments were properly managed for risk and exposure.

---

[2] As part of the "right sizing" strategy announced in October 2015, the Investment Bank was reorganized by region, with the investment bank operating alongside the geographic divisions in two parts: (i) Global Markets, which included fixed income and (ii) Investment Banking & Capital Markets.

**B. Events During the Class Period**

During the period between March 20, 2015, and February 3, 2016, inclusive (the "Class Period"), Defendants made material misstatements and omissions about CS's risk management system with respect to its fixed income franchise, including its securitized and credit products. On March 20, 2015, CS filed its 2014 Annual Report.[3] The report devoted thirty-five pages to CS's risk protocols and explained that risk limits were critical to risk management.

On July 1, 2015, Thiam replaced Dougan as CEO. Shortly after, Thiam announced that he was conducting an "in-depth strategic review" of each of CS's lines of business to reduce risk and earnings volatility by shrinking the Investment Bank division. On October 21, 2015, during CS's third quarter earnings call, Thiam announced a strategy to "right size" the Investment Bank and emphasize the more stable Private Banking & Wealth Management Division. As part of the right sizing strategy, CS created the Strategic Resolution Unit ("SRU") to downsize investments in risky products. The SRU reported directly to Mathers.

On the third quarter call, Thiam also announced that CS would make a private placement rights offering to raise an additional $6.1 billion of external capital. On November 19, 2015, CS issued the rights offering and reiterated CS's new strategy of reducing capital consumption in Investment Banking and withdrawing from activities that produce "volatile earnings and are capital intensive." On December 15, 2015, CS co-issued $8 billion in long-term debt in debt exchange offerings that closed on January 14, 2016.

---

[3] The 2014 Credit Suisse Annual Report may be considered on this motion. *United States ex rel. Wood v. Allergan, Inc.*, 899 F.3d 163, 169 (2d Cir. 2018) (acknowledging that, on a motion to dismiss, courts may consider documents appended to or incorporated in a complaint and matters of which judicial notice may be taken); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (acknowledging that the court may take judicial notice of regulatory filings).

On February 4, 2016, CS disclosed that it had taken a $633 billion write-down due to mark-to-market losses in its CLO and distressed debt positions. Although Thiam stated that CS started cutting the positions "aggressively" since the October earnings call, Defendants had not previously disclosed the exposures to investors. During the Class Period, the fixed income exposure was over $4.3 billion, consisting of $1.3 billion in CLOs and $3 billion in distressed debt. After the disclosure, the price of CS's ADRs declined 11 percent from $16.69 on February 3, 2016, to $14.89 on February 4, 2016.

### C. Events After the Class Period

On a March 23, 2016, earnings call, CS announced that an additional $346 million in write-downs would be charged against CS's first quarter earnings for 2016. In total, the illiquid positions contributed to $1 billion in write-downs. Following the announcement, Thiam stated that the exposure resulted from CS raising its internal risk limits and allowing for more exposures to the CLOs and distressed debt investments.

### D. The Alleged Material Omissions and Misrepresentations

The Complaint alleges material omissions and misstatements made during the Class Period in violation of § 10(b) of the Exchange Act. The Complaint's allegations of material omissions and misstatements fall into two categories. The first category concerns statements in the 2014 Annual Report and the December 15, 2015, Registration Statement and Prospectus about CS's risk limits and controls. The Complaint alleges that the report states that CS's risk limits were "binding" and breaches are "rare."

The 2014 Annual Report states that CS "maintain[ed] a comprehensive Group-wide risk appetite framework, providing a robust foundation for risk appetite setting and management across the Group" and that CS's risk profile was "restricted to the planned level of our risk

4

appetite through the use of risk controls, such as limits, guidelines, tolerances and targets." The report states that CS had several levels of risk limits. The risk limits were "binding thresholds that require discussion to avoid a breach and trigger immediate remediating action if a breach occurs." The first level of risk limits were "set by the Board in consultation with the Risk Committee and [were] binding," and any breach of these limits "would result in an immediate notification to the Chairman of the Board's Risk Committee and the Group CEO." CARMC set the next level of risk limits and was specifically "responsible for allocating divisional risk limits and more specific limits deemed necessary to control the concentration of risk within individual lines of business." Divisional management set a final level of risk limits based on a "detailed framework of more than 100 individual risk limits" that were intended to "trigger senior management discussions with the businesses involved, risk management and governance committees in case of change in the overall risk profile." The Complaint alleges that these statements were materially false and misleading because Defendants were amassing large exposures to "highly risky and illiquid CLO and distressed debt investments" in repeated breach of the "purportedly binding limits."

The second category concerns statements from CS's October 21, 2015, press release and CS's October 21, 2015, third quarter earnings call about positions in the distressed portfolio. In CS's October 21, 2015, media release, CS announced that it was "taking decisive action to strengthen [its] balance sheet and capital position to the point where it will not be any more a source of concern for [their] clients, [] investors or [] regulators." In an earnings call on the same day, Thiam announced a new right sizing strategy to shrink the Investment Bank. Thiam told investors that he did not plan to prioritize reducing positions in securitized products and credit because although they were "ugly ducklings that nobody likes," they also "generate a lot of

5

profit," and he "[didn't] mind burning some capital . . . 35–40% -- as an incoming CEO in a company that doesn't have enough profit[.]"  The Complaint alleges that these statements were misleading because CS had amassed $4.3 billion in exposure -- $1.3 billion in CLOs and $3 billion in distressed debt -- and Defendants gave investors the impression that these positions were entirely benign and did not require an aggressive wind down.

**E. Scienter**

The Complaint alleges scienter based on inferences from the facts summarized above.  In addition, the Complaint relies on confidential witnesses ("CW").

The Complaint alleges scienter by virtue of the Individual Defendants' position on CARMC.  During the Class Period, all the Individual Defendants were at some point a member of CARMC.  As members of CARMC, the Individual Defendants directly participated in reviewing and setting risk limits.  CS stated that risk limits were raised at a minimum every year from 2013 to 2015.  Specifically, on July 31, 2013, the limit was "redefined" because "equities were added"; on July 31, 2014, the limit "was increased. . . to accommodate business growth"; and in November 2015, the limit was "retired and replaced" with higher "new limits" that were "designed to better reflect the total exposure of the distressed franchise."  The Complaint alleges that the November 2015 limit raise "was directly reviewed and approved by CARMC and senior management, meaning Defendants Thiam and Mathers, who were members of CARMC at this time, themselves raised the risk limit to accommodate the massive exposures of the outsized positions."  The CWs confirmed that Defendant Thiam had access to emails from the risk management team about the positions and both Thiam and Mathers would have known about the positions as members of CARMC.  Further, in response to a 2016 SEC inquiry about CS's $1 billion write-down, CS disclosed that "the positions that led to the write-downs were fully

6

authorized" and subject to "risk limits that were established and approved by senior management, [CARMC], and Risk Management Committee and the Board of Directors Risk Committee."

## II. STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016) (quoting *Littlejohn v. City of N.Y.,* 795 F.3d 297, 306 (2d Cir. 2015). "In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached to the complaint as an exhibit, any statements or documents incorporated in it by reference, and any document upon which the complaint heavily relies." *ASARCO L.L.C. v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014) (quoting *In re Thelen L.L.P.,* 736 F.3d 213, 219 (2d Cir. 2013)).

7

Plaintiffs assert claims under § 10(b) of the Exchange Act and its implementing rule, Rule 10b-5. That rule makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5. To allege a violation of § 10(b) and Rule 10b-5, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B). "[T]he plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. § 78u(b)(2)(A).

The six elements of a claim under § 10(b) and Rule 10b-5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 804 (2011); *accord Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016).

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of the [Private Securities Litigation Reform Act ("PSLRA")] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Emps. Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)). "A securities

fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI*, 493 F.3d at 99. Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'" *Id*. at 104 (citing and quoting *Segal v. Gordon*, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

"The PSLRA expanded on the Rule 9(b) pleading standard, requiring that 'securities fraud complaints specify each misleading statement; that they set forth the facts on which [a] belief that a statement is misleading was formed; and that they state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (quoting *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).

The Complaint also asserts a claim under § 20(a) of the Exchange Act. To state a claim under § 20(a), the complaint must sufficiently plead "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays P.L.C.*, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotation marks omitted). If the Complaint does not allege a primary violation, then the § 20(a) claim must be dismissed.

### III. DISCUSSION

The Complaint alleges that Defendants' misleading statements allowed CS to amass $4.3 billion in exposure to CLOs and distressed debt instruments, resulting in a $1 billion write-down and a loss to investors. The Complaint alleges that CS misled investors about (1) CS's

9

procedures to monitor and control risk, (2) the extent of CS's positions in CLOs and distressed debt and (3) the riskiness of those investments. The Complaint states a claim only as to the first of these statements and omissions. Principally at issue on this motion is whether the Complaint sufficiently pleads three of the six elements of securities fraud -- a material misrepresentation or omission, scienter and loss causation.

### A. Section 10(b) Violation

#### 1. Material Omissions and Misrepresentations

As noted above, the first element of a Rule 10b-5 violation is that the defendant made an omission or misstatement of material fact. "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information. Disclosure is required under these provisions only when necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal quotation marks omitted) (quoting Rule 10b-5, 17 C.F.R. § 240.10b-5(b); *accord In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) ("Vivendi"). "[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth, even where there is no existing independent duty to disclose information on the issue or topic." *Id*. at 258 (internal quotation marks omitted).

A statement or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available" to the market. *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., P.L.C.*, 783 F.3d 383, 390 (2d Cir. 2015) (internal quotation marks and citations omitted). "To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an

investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014).

### a. Risk Limits and Controls

The Complaint sufficiently alleges that CS made materially misleading statements about its risk limits and controls, including misrepresentations about CS's "purported fidelity to its own risk management policies." The Complaint details CS's comprehensive system for reviewing and managing risk. The Complaint describes three levels of risk limits, set by the Board, CARMC and divisional management, respectively. At each level, the Complaint alleges that the majority of these limits were "monitored on a daily basis" and any excess was "subject to formal escalation procedures." The Complaint alleges that these statements were misleading to investors because the limits were "illusory" and "in reality, Defendants had been amassing large exposures to highly risky and illiquid CLO and distressed debt investments in repeated breach of these purportedly 'binding' limits."

Construing the allegations in the light most favorable to Plaintiffs, the Complaint sufficiently pleads that CS's statements regarding its "binding" risk limits were materially misleading in light of the Complaint's allegations that CS routinely revised its limits. Despite assurances in the 2014 Annual Report that in "2014 and 2013, no Board limits were exceeded," the Complaint alleges that on at least three occasions -- July 31, 2013, July 31, 2014, and in November 2015 -- the limit was "redefined," "increased" or "retired and replaced" to accommodate CS's growing risk exposure. *See Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 189 (S.D.N.Y. 2010) (quoting *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000)) ("[M]isstatements regarding risk management, discipline, monitoring and credit quality are not

11

'puffery' where . . . they were 'misrepresentations of existing facts.'"). *See also In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013) (finding defendant's statements that it was operating within specific risk limits were actionable as a "misrepresentation of existing fact[s]"). *See In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 284 (S.D.N.Y. 2011) ("Even assuming that Lehman's risk management policies were not static and properly could be altered by the Executive Committee in a way that would permit the previous policies to be exceeded, . . . the statements that Lehman 'enforc[ed] adherence to [its] risk policies' and that '[m]anagment's Finance Committee oversees compliance with [risk] policies and limits' arguably were materially misleading."). In light of Defendants' statements about CS's risk controls and trading limits, Defendants' failure to disclose that it could raise, and in fact was repeatedly raising risk limits with respect to CS's illiquid investments constitutes a material omission. *See* 17 C.F.R. § 240.10b-5 (Under 10b-5 it is unlawful "to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.").

Defendants argue that the challenged statements are too general to be actionable. Defendants cite cases that are unpersuasive because they involve broad statements about risk management, reputation, integrity and compliance. In *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, the court found that UBS's representations were not materially misleading where UBS stated that it "(1) avoided 'concentrated positions' of assets, (2) implemented asset portfolio limits, and (3) engaged in limited 'propriety' investing . . ." while knowing that "UBS had no portfolio limits." 752 F.3d at 185. The statements at issue in *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. J.P. Morgan Chase Co*., are similarly more general than the statements and omissions here. *See*, 553 F.3d at 205-06 (holding that J.P. Morgan Chase's

("JPMC") statements that JPMC had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process" and that JPMC would "continue to reposition and strengthen [its] franchises with a focus on financial discipline" were "no more than 'puffery'" and were "too general" to be material).

Here the Complaint alleges that CS represented a comprehensive and multi-layered risk management system, involving "more than 100 individual risk limits," designed to "trigger" oversight in the event of a change in the risk profile. The Complaint alleges, and the report itself bears out, that the 2014 Annual Report devoted over thirty-five pages to describing CS's "extensive risk protocols." *See In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) (holding that statements about safety and risk management were material where Defendant made these representations "over and over"). Although the Annual Report repeatedly represented that risk limits were "binding" and no breaches occurred, the Complaint identifies at least three instances when the limits were not binding and effectively breached. The Complaint sufficiently pleads materially misleading statements and omissions about CS's risk limits and controls.

### b. Extent and Risk of the Distressed Portfolio

The Complaint alleges that Defendants misled investors about the extent and risk of the distressed portfolio. CS's statements about the distressed portfolio are not actionable because they are not false. The Complaint alleges that CS materially misled investors by stating that it was "taking decisive action to strengthen [the] balance sheet and capital position" and that the distressed portfolio contained securitized products that "generate a lot of profit" without disclosing the risk inherent in CS's positions and assuring investors that they were "benign."

13

Plaintiffs mischaracterize Defendants' statements during the October 21, 2015, earnings call. Thiam did not state or imply that the securitized products were "benign":

> Then you've got the two ugly ducklings that nobody likes, securitized products and credit. Because they generate a lot of profit, but they consume a lot of capital. But personally, to generate 35 % or 50% of return I don't mind burning some capital . . . 35–40% -- as an incoming CEO in a company that doesn't have enough profit, not enough capital, that's not my top priority to tackle this.

He said that his "top priority" was not to reduce holdings in these profitable but risky products. Thiam's description of securitized products and credit as capital intensive conveys that they were risky.[4] CS explicitly warned investors of the risk with respect to its positions in the distressed portfolio. Tim O'Hara, Head of Equities, Investment Banking, explained CS's "right sizing" approach. To determine which positions needed to be reduced, CS looked at (1) connection with the international wealth management business; (2) capital usage and (3) profitability. CS provided a chart to investors indicating that Securitized Products and Credit were "non-acceptable" from a "capital usage" and "connection to wealth management" perspective but were not part of the right sizing due to their profitability. On the earnings call, O'Hara disclosed that the businesses subject to the right sizing strategy utilize "40% of [CS's] risk weighted assets" and "43% of [CS's] leverage exposure," making the earning profile "more volatile."

---

[4] The 2014 Credit Suisse Annual Report notes CS's efforts to come into compliance with the Basel III capital framework requirements. Basel III introduced capital reforms in response to the 2007-2008 financial crisis to strengthen bank capital requirements by increasing bank liquidity and decreasing leverage. Basel III focused in part on risk-weighted assets and relies on the general proposition that banks need less capital to cover exposure to safer assets and more capital to cover riskier exposures. Thus, one could infer that CS's capital intensive positions in securitized products and credit were riskier investments. *See* Bank for International Settlements, Finalising Basel III 2010-2017 (December 2017) https://www.bis.org/bcbs/publ/d424_inbrief.pdf.

14

The Complaint alleges that Defendants "never disclosed the existence of these material exposures to investors in October or any time prior, nor did they disclose any plan to aggressively reduce them." The Complaint alleges that the 2014 Annual Report did not disclose CS's $3 billion in exposure to "highly illiquid distressed debt investments" or its $1.3 billion in exposure to CLOs. The Complaint alleges that neither during the November 19, 2015, $6 billion rights offering nor the December 15, 2015, $8 billion exchange offering did Defendants disclose the extent of its CLO and distressed debt investments.

CS, however, was not hiding the extent of its risk exposure. Both the 2014 Annual Report and the October 21, 2015, earnings call disclosed the relative weakness of CS's Investment Banking division, which included fixed income. The report disclosed the extent of risk-weighted assets in the Investment Banking division. During the October 21, 2015, earnings call, O'Hara described the right sizing strategy and explicitly stated that businesses subject to the new strategy, including fixed income, accounted for "40 percent of CS's risk weighted assets, and . . . 43 percent of [CS's] leverage exposure." That CS created the SRU and adopted a right sizing strategy communicated concern about the extent of risky positions. Immediately following the earnings call, the Complaint notes that several financial analysts reported disappointment with the size of CS's announced cuts to the fixed income unit. For example, the October 21, 2015, Morningstar report stated, "The revised strategy, which will significantly cut macro businesses . . . will cut only about 20 percent of the investment bank's risk-weighted assets." For purposes of a motion to dismiss, these analyst reports -- in addition to CS's public acknowledgment of the need to "right size" the Investment Bank -- illustrate that the market was aware of the extent of CS's risk exposure. The Complaint implies as much by alleging that

investors and analysts expected CS to "substantially scale back" the capital intensive positions in the Investment Bank.

## 2. Scienter

The Complaint sufficiently pleads scienter as to each Defendant and alleged misstatements and omissions about risk limits and controls. The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). "This standard requires courts to take into account 'plausible opposing inferences.'" *Matrixx*, 563 U.S. at 48 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)). "For an inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (alterations and emphasis in original). In making this determination, a court must review "all the allegations holistically." *Tellabs*, 551 U.S. at 326.

A complaint may satisfy the scienter requirement as to a corporation "by pleading facts sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., L.L.C.*, 797 F.3d 160, 177 (2d Cir. 2015) (internal quotation marks omitted).

The Complaint's allegations are sufficient to support an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The Complaint alleges that the Individual Defendants knew facts or had access to information contradicting CS's public statements regarding the risk limits. First, Defendants

16

knew about the risk limits as members of CARMC during the Class Period. The 2014 Annual Report states that CS established CARMC to actively monitor risk, recommend risk limits to the Board and set and allocate risk limits to the business lines. Second, in response to a 2016 SEC inquiry about CS's $1 billion write-down, CS disclosed that "the positions that led to the write-downs were fully authorized" and subject to "risk limits that were established and approved by senior management, [CARMC], and Risk Management Committee and the Board of Directors Risk Committee." Defendant Dougan, who was CEO from 2007 to June 30, 2015, served on CARMC for at least part of the class period. Defendants Thiam and Mathers, as CEO and CFO, respectively, were also members of CARMC during the class period.

Defendants argue that the Complaint does little more than allege "channels of information about risk management." *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 462 (S.D.N.Y. 2010), *aff'd sub nom. Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Express Co.*, 430 F. App'x 63 (2d Cir. 2011) ("the existence of channels [of information] is not enough") (internal quotation marks omitted). This argument is unavailing. The Complaint alleges that the Individual Defendants were part of CARMC, a sub-committee of CS's Executive Board, that met monthly to actively monitor CS's risk positions. The Complaint does not allege scienter solely based on an inference that information was channeled up the corporate hierarchy or on Defendants' executive positions. Rather, the Individual Defendants sat on the committee directly responsible for setting risk limits.

Defendants argue that the Complaint fails to allege scienter because it does not "specifically identify the reports or statements" containing the contrary information. *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d

17

Cir. 2008). The Complaint sufficiently identifies that on July 31, 2013, the limit was "redefined" because "equities were added"; on July 31, 2014, the limit "was increased. . . to accommodate business growth"; and in November 2015, the limit was "retired and replaced" with higher "new limits" that were "designed to better reflect the total exposure of the distressed franchise." The Complaint adequately pleads that Defendants knew about this specific information based on their service on CARMC during the class period.

Taken together, the Complaint's allegations sufficiently raise an inference of scienter with respect to the Individual Defendants and CS's risk limits and controls. Because the Complaint adequately alleges scienter as to the Individual Defendants, CS's scienter is inferred from theirs. *See, e.g., Dynex Capital Inc.*, 531 F.3d at 195 ("[T]he most straightforward way to raise [an inference of requisite scienter] for a corporate defendant will be to plead it for an individual defendant.").

### 3. Loss Causation

The Complaint sufficiently pleads loss causation with respect to CS's risk limits and controls and Plaintiffs' losses. "To plead loss causation, plaintiffs must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Carpenters Pension*, 750 F.3d at 232 (internal quotation marks omitted). "[I]t is enough that the loss caused by the alleged fraud results from the relevant truth leaking out." *Vivendi*, 838 F.3d at 261 (internal quotation marks and alteration omitted). "Plaintiffs must show that a 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" *Id.* at 261–62 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)) (alterations and internal quotation marks omitted). "Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged

18

misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus." *Vivendi*, 838 F.3d at 262. "Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price." *Carpenters Pension*, 750 F.3d at 233 (emphasis in original). In other words, a complaint can sufficiently plead loss causation without alleging facts that disaggregate losses or that rule out other causes.

The Complaint alleges that Defendants' materially misleading statements and omissions about the risk limits and controls resulted in $4.3 billion in exposure to CLOs and distressed debt instruments, which led to a $1 billion write-down that caused CS to record its first full year loss since the 2008 financial crisis. The Complaint alleges that after CS announced the write-down, the price of CS's ADRs declined from a close of $16.69 on February 3, 2016, to a close of $14.89 on February 4, 2016, an 11 percent decrease that amounted to a market capitalization decline of $234 million.

These allegations are sufficient to plead loss causation. They allege facts that, if true, show that disclosure of CS's misleading statements about its risk limits negatively affected the value of CS's ADRs. *See Freudenberg*, 712 F. Supp. 2d at 202–03 (finding loss causation where defendants' false and misleading statements of its "conservative approach" and "loan risk mitigation discipline" caused the stock price to be "artificially inflated; and defendants' disclosures of its overexposure "caused the stock to decline and investors' substantial losses."). *See also Heller v. Goldin Restructuring Fund*, *L.P.*, 590 F. Supp. 2d 603, 623 (S.D.N.Y. 2008) (finding loss causation where defendants' concealment of the undercapitalization of the fund and inability to diversify its portfolio led to a high-risk investment in only one company and resulted in plaintiff's financial loss). Thiam himself stated that continually raising the internal risk limits

19

led to larger exposures to illiquid CLO and distressed debt investments and resulted in the write-downs. Thiam stated to the *Wall Street Journal*, "A limit that keeps moving is not a limit." These allegations are sufficient to plead loss causation because investors in effect were lulled into believing that the risk levels were contained and acceptable.

### B. Section 20(a) Violation

As the Court has denied Defendants' Motion to Dismiss Plaintiffs' § 10(b) claim, and Plaintiffs have otherwise adequately alleged control person liability, Defendants' motion to dismiss the Section 20(a) claim is denied.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED except as to alleged misstatements regarding the extent and risk of the distressed portfolio.

The Clerk of Court is respectfully directed to close the motion at Docket No. 50.

Dated: February 19, 2019
      New York, New York

                                              **LORNA G. SCHOFIELD**
                                    **UNITED STATES DISTRICT JUDGE**