UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, et al.,

           Plaintiffs,

- *against* -

CREDIT SUISSE GROUP AG, BRADY DOUGAN, TIDJANE THIAM and DAVID MATHERS,

           Defendants.

No.: 1:17-CV-10014-LGS

# DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION

Herbert S. Washer
David G. Januszewski
CAHILL GORDON & REINDEL LLP
80 Pine Street
New York, New York 10005
(212) 701-3000

*Attorneys for Defendants
Credit Suisse Group AG, Brady
Dougan, Tidjane Thiam, and David
Mathers*

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARDS ................................................................................................................ 2

    I.    CS'S DISCLOSURES DID NOT GUARANTEE THAT RISK LIMITS COULD NOT BE CHANGED, AND NO REASONABLE INVESTOR COULD HAVE CONCLUDED THAT TO BE THE CASE ..................................................................................................... 3

    II.    THE COURT'S FINDING THAT DISCLOSURES CONCERNING THE DISTRESSED PORTFOLIO WERE ADEQUATE COMPELS DISMISSAL OF THE CLAIMS CONCERNING RISK LIMITS AS WELL .................................................................................................... 6

    III.    THE COURT OVERLOOKED THE CONSEQUENCES OF THE FACT THAT THIAM DID NOT JOIN CS UNTIL JULY 2015 ........................... 8

        1.    Plaintiffs Fail to Allege Scienter as to Thiam ............................................. 9

        2.    Plaintiffs Do Not Demonstrate Standing ................................................... 11

        3.    Thiam Cannot Be Liable Under Section 20(A) ........................................ 13

CONCLUSION ............................................................................................................................ 13

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Amorosa* v. *Ernst & Young LLP*,
   672 F.Supp.2d 493 (S.D.N.Y. 2009)...................................................................................12

*Ashland Inc.* v. *Morgan Stanley & Co.*,
   700 F.Supp.2d 453 (S.D.N.Y. 2010)...................................................................................12

*Blue Chip Stamps* v. *Manor Drug Stores*,
   421 U.S. 723 (1975).............................................................................................................12

*In re Braskem S.A. Sec. Litig.*,
   246 F.Supp.3d 731 (S.D.N.Y. 2017)...................................................................................9n

*Citibank, N.A.* v. *K-H Corp.*,
   968 F.2d 1489 (2d Cir. 1992)...............................................................................................6

*In re Citigroup, Inc. Sec. Litig.*,
   330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd sub nom. Albert Fadem Trust* v. *Citigroup, Inc.*,
   165 F. App'x 928 (2d Cir. 2006) .........................................................................................5

*In re Citigroup Inc. Shareholder Derivative Litig.*,
   964 A.2d 106 (Del. Ch. 2009)..............................................................................................5

*DiVittorio* v. *Equidyne Extractive Indus.*,
   822 F.2d 1242 (2d Cir. 1987)...............................................................................................9

*Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*,
   551 F. Supp. 2d 210 (S.D.N.Y. 2008)................................................................................10

*Gordon* v. *Burr*,
   506 F.2d 1080 (2d Cir. 1974).............................................................................................13

*Kalnit* v. *Eichler*,
   264 F.3d 131 (2d Cir. 2001)...............................................................................................10

*Kriss* v. *Bayrock Grp. LLC*,
   2017 WL 1901966 (S.D.N.Y. May 8, 2017) .......................................................................2

*In re Lehman Bros. Sec. & ERISA Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011)..................................................................... 3, 5-6, 8

*Lentell* v. *Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005)............................................................................................ 6-7

*In re Manulife Fin. Corp. Sec. Litig.*,
   276 F.R.D. 87 (S.D.N.Y. 2011) ..................................................................................................8

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013)........................................................................................3

*In re QLT Inc. Sec. Litig.*,
   312 F. Supp. 2d 526 (S.D.N.Y. 2004)........................................................................................7

*Shrader* v. *CSX Transportation Inc.*,
   70 F.3d 255 (2d Cir. 1995).........................................................................................................2

*In re UBS AG Sec. Litig.*,
   2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012)..........................................................................9n

*Wilson* v. *Merrill Lynch & Co.*,
   671 F.3d 120 (2d Cir. 2011).....................................................................................................13n

Pursuant to Local Civil Rule 6.3, Defendants respectfully submit this memorandum of law in support of their motion for reconsideration of the Court's February 19, 2019 Order (Dkt. 60) (the "Order").

## PRELIMINARY STATEMENT

In the Order, the Court dismissed all Plaintiffs' claims of alleged misrepresentations concerning the Distressed Portfolio.[1]  What now remain are only Plaintiffs' claims alleging certain misstatements regarding Credit Suisse Group AG's ("CS") procedures to control and monitor risk.  Specifically, the Court concluded that the Amended Complaint stated a claim based on CS's alleged failure to disclose that it could and, on occasion did, raise its risk limits. Order at 12.  Defendants seek reconsideration in part because, in sustaining claims against Defendant Tidjane Thiam, the Court overlooked the significance of the fact that he did not arrive at CS until July 2015.  Separately and importantly, the Court did not consider, in the context of the remaining claim, that Thiam cannot be liable for statements made before he arrived, and the challenged statements subsequent to his arrival do not support any claim.

We respectfully submit that the Court's findings that CS adequately disclosed the actual risks associated with the Distressed Portfolio defeat the remaining omission claim as well.  First, in seemingly finding that CS represented that it would never change its risk limits, the Court appears to have accepted the Amended Complaint's mischaracterizations of both the nature of CS's risk management structure and the conduct leading to CS's adjustments of its risk limits. But simply put, CS never said that its risk limits were locked in place, unable to be changed.  A closer examination of the Annual Report (from which Plaintiffs selectively quote) reveals that CS's risk limits were part of a flexible risk management structure, which was designed to adapt

---

[1]   Unless otherwise indicated, capitalized terms have the same meanings as in Defendants' Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint ("Moving Br.") (Dkt. 51).

to changes in CS's risk profile.[2]  Because this structure contemplated that risk limits would need to be reevaluated and adjusted over time, the occasional increases upon which Plaintiffs rely (once a year over three years) cannot amount to "effective breach[es]" of those limits.  No reasonable investor could have concluded that CS's risk limits could not be changed.

The Order also reveals a second flaw that undermines the Amended Complaint:  it does not adequately plead loss causation as to the remaining claims.  In holding that CS adequately disclosed both the extent and the nature of the risks associated with the Distressed Portfolio, the Order eliminates any plausible theory of loss causation tied to statements concerning the risk limits themselves.  In the wake of the Court's holding that CS "was not hiding the extent of its risk exposure" (Order at 15), the Amended Complaint cannot link any portion of Plaintiffs' losses to any earlier alleged misrepresentations concerning applicable risk limits.

## LEGAL STANDARDS

"The decision to grant or deny a motion for reconsideration rests within the sound discretion of the district court."  *Kriss* v. *Bayrock Grp. LLC*, 2017 WL 1901966, at *1 (S.D.N.Y. May 8, 2017) (Schofield, J.) (citation and internal quotation marks omitted).  Reconsideration is appropriate where the movant can "point to controlling decisions or data that the court overlooked."  *Id*. (citation omitted).  These are "matters, in other words, that might reasonably be expected to alter the conclusion reached by the court."  *Shrader* v. *CSX Transportation Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).  Reconsideration is justified here.

---

[2]     *See* https://www.credit-suisse.com/media/assets/corporate/docs/about-us/investor-relations/financial-disclosures/financial-reports/csg-ar-2015-en.pdf ("Annual Report").

## I. CS'S DISCLOSURES DID NOT GUARANTEE THAT RISK LIMITS COULD NOT BE CHANGED, AND NO REASONABLE INVESTOR COULD HAVE CONCLUDED THAT TO BE THE CASE

In sustaining Plaintiffs' allegations that CS "effectively breached" its risk limits by redefining or reallocating those limits over time, the Court misunderstood the nature of CS's arguments concerning its overall risk management structure, as well as Plaintiffs' allegations concerning CS's adherence to that structure. Order at 13. The fault lies with the Amended Complaint's jumbled allegations, which seek to draw a superficial equivalence between those allegations and those at issue in *In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258 (S.D.N.Y. 2011), and *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277 (S.D.N.Y. 2013). But as explained in Defendants' Motion to Dismiss papers, a closer examination of the facts alleged here show that they bear little resemblance to either of those cases. *See* Reply Memorandum of Law in Support of Defendants' Motion to Dismiss ("Reply Br."), Dkt. 58.

Both *Lehman* and *MF Global* suggest that a bank's statements concerning its operation within specific risk limits may be actionable where the plaintiff plausibly alleges a blatant disregard of those limits. But those cases differ from the allegations here in at least two crucial respects. First, both cases involved actual, substantial, and frequent breaches of a bank's risk limits. *Lehman*, 799 F. Supp. 2d at 284 ("Plaintiffs claim that Lehman exceeded its risk appetite limit every month from July 2007 to February 2008[.]"); *MF Glob.*, 982 F. Supp. 2d at 297-98 (alleging three breaches over a year, including one breach that persisted for more than a month before board's approval of a trading limit increase and another breach that was not immediately reported to the board). Second, both Lehman and MF Global raised their risk limits only *after* breaching them. *MF Glob.*, 982 F. Supp. 2d at 316-17; *Lehman Bros.*, 799 F. Supp. 2d at 284-85. In contrast here, Plaintiffs allege that CS increased or redefined its risk limits, at most, once a year, over a three-year period. Order at 13. Plaintiffs also concede that the limits were not

breached before they were raised, and they conspicuously plead no allegations concerning the circumstances that led to the increase. Opp. Br. at 12. In fact, the SEC letter submitted with CS's motion to dismiss provides a valid business reason for each increase, sharply contrasting with the excesses and hazards that plagued both Lehman and MF Global. *See* Januszewski Decl. in Support of Motion to Dismiss ("Januszewski Decl."), Ex. 9 (Dkt. 52-9).[3]

These plain differences undercut Plaintiffs' ability to allege plausibly that CS operated outside its publicly disclosed risk management structure. Indeed, the Annual Report explained in multiple places that CS's risk appetite might change over time and implied that the risk limits would change accordingly:

- The Risk Committee provides guidance regarding "the ***development of our risk profile***. . . including the ***regular review of*** major risk exposures and ***overall risk limits***." Annual Report at 128 (emphasis added);

- The Board approves "the risk appetite framework" on an "***annual***[]" basis and reviews it "***semi-annual[ly]***." Id. at 131 (emphasis added); and

- "Group-wide risk appetite is determined in conjunction with the financial and capital planning process ***on an annual basis***. . . ." *Id.* (emphasis added).

Even the Amended Complaint acknowledges that risk limits may change over time by alleging that CS's risk controls were meant to, among other things, "trigger senior management discussions with the businesses involved, risk management and governance committees ***in case of [a] change in the overall risk profile***" (AC ¶ 39 (emphasis added)), and that CARMC "was designated to ***meet on a monthly basis to set*** and enforce Credit Suisse's 'binding' risk limits" (AC ¶ 4) (emphasis added). Read as a whole, the Annual Report confirms that CS's risk limits were not meant to serve as an unmovable cap on risk appetite. Nor could a risk limit set in 2013

---

[3] Even assuming that increasing or redefining a risk limit "effectively breach[es]" that limit, the Annual Report accurately disclosed that breaches may occur and that such events—which are alleged to have occurred once a year over a three-year period, and only once during the Class Period—are rare. *See* Annual Report at 132; *see also* Order at 4.

plausibly be expected to constrain CS's ability to take on risk in 2015.  Instead, the Report described CS's risk management structure as a "comprehensive . . . framework" meant to ensure that CS monitors and thoughtfully adjusts its risk profile based on the judgment of senior management and various risk committees.[4]  *See* Annual Report at 134.

That CS ultimately did adjust its risk profile, in accordance with disclosed procedures for doing so, was a matter of business judgment, falling outside the scope of the securities laws.  *See In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376-77 (S.D.N.Y. 2004) ("Failure to process a transaction in a manner consistent with Plaintiff's view of the proper application of stated management policies is a far cry from the sort of fraudulent or manipulative conduct contemplated by section 10(b) . . . ."), *aff'd sub nom. Albert Fadem Trust* v. *Citigroup, Inc.*, 165 F. App'x 928 (2d Cir. 2006); *In re Citigroup Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 126 (Del. Ch. 2009) ("The essence of the business judgment of managers and directors is deciding how the company will evaluate the trade-off between risk and return . . . . It is almost impossible for a court, in hindsight, to determine whether the directors of a company properly evaluated risk and thus made the 'right' business decision.").  Even the Court in *Lehman* acknowledged that risk management policies are not necessarily static and may be properly altered by management.  799 F. Supp. 2d at 284.  The ultimate result in *Lehman*, however, hinged on the discord between Lehman's statements that it had "enforc[ed] adherence to [its] risk policies" and allegations of "routine" breaches of those limits.  *Id.* at 284-85.  But "routine" in *Lehman* meant "frequent, significant departures" from Lehman's risk limits.  *Id.* at 285.  Specifically, plaintiffs alleged breaches of one limit "every day from mid-October 2007 through mid-May 2008," breaches of another limit "every day from early October 2007 until September

---

[4]  Regardless of whether CS elects to adjust its risk limits through a defined process, the limits are meaningful because they affect trading decisions by CS employees.

15, 2008" and a firm-wide risk limit breach "at least forty-four times during the Class Period." *Id.* at 287 n.192; *see also id.* at 284 ("Plaintiffs claim that Lehman exceeded its risk appetite limit every month from July 2007 to February 2008.").

Against the backdrop of these allegations, Lehman's disclosures that it "enforc[ed] adherence to [its] risk policies" were plausibly misleading because no reasonable investor would understand that "enforce[ment]" to embrace the type of routine, *post-hoc* approval of existing breaches alleged by the *Lehman* plaintiffs.  In contrast, the Amended Complaint's allegations that CS undertook annual adjustments to its risk limits—as contemplated by the Annual Report, and which were not specific to particular limit-exceeding positions—can hardly be characterized as breaches, let alone as routine breaches.

## II. THE COURT'S FINDING THAT DISCLOSURES CONCERNING THE DISTRESSED PORTFOLIO WERE ADEQUATE COMPELS DISMISSAL OF THE CLAIMS CONCERNING RISK LIMITS AS WELL

Even assuming arguendo that CS had misrepresented that its risk limits could never be changed, the Court's holding that CS adequately disclosed the risks associated with CS's actual investments that ultimately led to the write-downs (Order at 15) destroys Plaintiffs' ability to show loss causation arising from the risk limits themselves (Order at 18).  To survive Defendants' motion to dismiss with respect to loss causation (Moving Br. at 22-24), Plaintiffs had to demonstrate sufficient allegations that "'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission *concealed something from the market* that, when disclosed, negatively affected the value of the security." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005) (emphasis added) (internal citation omitted).  "[S]imilar to proximate cause," the loss causation pleading element required Plaintiffs to show that the "damage suffered was a foreseeable consequence of the misrepresentation." *Citibank, N.A.* v. *K-H Corp.*, 968 F.2d 1489, 1495 (2d Cir. 1992).  But

where "an intervening cause supersedes the effects of an initial misrepresentation," loss causation necessarily fails. *In re QLT Inc. Sec. Litig.*, 312 F. Supp. 2d 526, 536 (S.D.N.Y. 2004).

Here, Defendants' motion papers demonstrated that CS's disclosures concerning the contents of, and the risks associated with, the Distressed Portfolio superseded any possible effect of statements concerning CS's risk limits. *See* Reply Br. at 8. *In re QLT Inc. Sec. Litig.* illustrates this point. In *QLT,* plaintiffs failed to plead adequately loss causation arising from April 2000 statements exaggerating product demand where a December 2000 sales forecast ultimately disclosed the demand shortfall. 312 F. Supp. 2d at 536. The *QLT* Court determined that the later sales forecast "was clearly an intervening cause that superseded any direct effect of the alleged exaggeration contained in" the April press release. *Id.* at 537. "Accordingly, loss causation linking the damages sought by plaintiffs and the alleged exaggeration of market size cannot be shown on the pleadings." *Id.* Similarly, the Amended Complaint cannot link Plaintiffs' losses to CS's statements concerning its risk limits in the wake of CS's later disclosures concerning the actual risks associated with the Distressed Portfolio. Indeed, Plaintiffs have repeatedly built their theory of loss causation on CS's positions in "outsized and highly illiquid CLO and distressed debt positions." AC ¶ 60; *see also* AC ¶ 64 (attributing Plaintiffs' losses to "the revelation that the legacy positions transferred to the SRU carried far more risk than investors had been led to believe"). Now, faced with the Court's finding that "the market was aware of the extent of CS's risk exposure" (Order at 15), Plaintiffs' theory is unworkable without a direct link between the risk limits and their eventual losses. *See Lentell*, 396 F.3d at 174 (where the "relationship between the plaintiff's investment loss and the information misstated" is highly "attenuated," the fraud claim may not lie).

Even if the Amended Complaint plausibly connected Plaintiffs' losses to statements concerning CS's risk limits, Plaintiffs would still have to plead facts sufficient to "(1) 'support an inference that it was defendant's fraud-rather than other salient factors-that proximately caused plaintiff's loss;' or (2) 'apportion the losses' between the misrepresentation and other salient factors." *In re Manulife Fin. Corp. Sec. Litig.*, 276 F.R.D. 87, 103 (S.D.N.Y. 2011); *see also Lehman*, 799 F. Supp. 2d at 305 ("[T]he complaint must allege facts that support an inference that [the defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or *an ascertainable portion* of the that [sic] loss absent the fraud.") (emphasis added). The Amended Complaint makes almost no attempt to break out any portion of losses attributable to CS's increase in risk limits from those attributable to the risk associated with the Distressed Portfolio. The closest Plaintiffs come is their reference to Thiam's after-the-fact statements concerning risk limits. But even that attempt falls woefully short given that the price of CS's ADRs rose nearly 1% following Thiam's March 23, 2016 pre-market statements.[5] *See Waters* v. *Gen. Elec. Co.*, 2010 WL 3910303, at *8 (S.D.N.Y. Sept. 29, 2010) ("The Court cannot find, and Plaintiffs have not cited, a single section 10b–5 case in which the plaintiff prevailed on a motion to dismiss when the stock price increased after an announcement revealing an alleged fraud."), a*ff'd sub nom. GE Inv'rs* v. *Gen. Elec. Co.*, 447 F. App'x 229 (2d Cir. 2011).

### III. THE COURT OVERLOOKED THE CONSEQUENCES OF THE FACT THAT THIAM DID NOT JOIN CS UNTIL JULY 2015

As Plaintiffs concede, Defendant Thiam did not join CS until July 2015. (AC ¶ 22) In the moving papers, Thiam argued that his arrival midway through the class period provided additional grounds for dismissal of claims against him. Moving Br. at 26-27; Reply Br. at 9-10.

---

[5] https://finance.yahoo.com/quote/CS/history?period1=1458619200&period2=1458705600&interval=1d&filter=history&frequency=1d.

Although noting the date of Thiam's arrival (Order at 2), the Court did not address those arguments unique to Thiam, particularly in the context of the remaining omission claim. Thiam cannot be liable for alleged misstatements in CS's 2014 Annual Report, filed by CS months earlier, on March 20, 2015. *See DiVittorio* v. *Equidyne Extractive Indus.*, 822 F.2d 1242, 1249 (2d Cir. 1987).[6] Nor can Thiam be liable for statements incorporated by reference into the December 15, 2015 Registration Statement, because Plaintiffs (i) failed to plead scienter as to those statements, and (ii) purchased their ADRs on or before filing of the Registration Statement.

### 1. Plaintiffs Fail to Allege Scienter as to Thiam

Plaintiffs' remaining claims hinge on allegations that CS misrepresented its risk controls and "effectively breached" its risk limits on three occasions (July 31, 2013, July 21, 2014, and in November 2015). Thus, to sustain this claim, Plaintiffs must plead specific facts demonstrating that Thiam had knowledge – as of December 15, 2015, the date CS's risk statements were incorporated into the 2015 Registration Statement – of these alleged "breaches." Moving Br. at 19. In concluding that Plaintiffs adequately alleged scienter, the Court relied on a general allegation that "Defendants knew about the risk limits as members of [the Capital Allocation and Risk Management Committee ("CARMC")]." Order at 16-17. But Thiam did not serve on CARMC when the risk limits were adjusted in 2013 and 2014, long before his arrival at CS. Nor do Plaintiffs allege that Thiam acquired actual knowledge concerning those adjustments years later, after he joined CS (and before the Registration Statement was issued). For this reason, Plaintiffs have not, and cannot, state with particularity facts giving rise to a strong inference that

---

[6] *See also In re Braskem S.A. Sec. Litig.*, 246 F.Supp.3d 731, 764 (S.D.N.Y. 2017) (dismissing claims against CEO based on a failure to "allege that [he] played any concrete role in connection with the creation or dissemination of [certain] forms."); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at n.20 (S.D.N.Y. Sept. 28, 2012) ("[T]he Individual Defendants plainly cannot be held liable for 'alleged losses resulting from statements made ….before they had assumed the r[o]les in which they are alleged to have committed fraud.'") (internal citations omitted).

Thiam acted with scienter. *Edison Fund* v. *Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008) (emphasis added).

Nor can Plaintiffs premise liability as to Thiam on the allegation that the risk limit was "'retired and replaced' with higher 'new limits'" in November 2015. First, Plaintiffs have not alleged any increase in distressed debt or CLO capacity in connection with the alleged "retirement" or "replacement" of any limit in November 2015. Plaintiffs' theory is that the risk limits were "effectively breached" and therefore the limits were changed to allow CS to increase its exposure to distressed debt and CLOs. But Plaintiffs do not allege – and cannot allege – any increase in exposure as a result of or in connection with the November 2015 change. To the contrary, CS's December 14, 2016 letter to the SEC, which is cited by both Plaintiffs and the Court as identifying three instances of changes to the risk limits, specifically noted that (i) the last limit increase that resulted in additional net capacity occurred on July 31, 2014 – a year before Thiam arrived at CS; (ii) the relevant positions "decreased every month between June 2015 and March 2016"; and (iii) the "aggregate" limit was replaced in November 2015 by several smaller, more specific limits to reflect better existing exposure, but resulted in "no new net capacity." *See* Januszewski Decl. in Support of Motion to Dismiss, Ex. 9 (Dkt. 52-9).

Simply put, Plaintiffs fail to satisfy the heightened pleading standard of Rule 9(b) with regard to Thiam's alleged scienter. The Second Circuit has repeatedly held that plaintiffs in securities fraud actions must allege particularized facts demonstrating that each defendant knew the statements in question were false. *See, e.g.*, *Kalnit* v. *Eichler*, 264 F.3d 131, 138, 142 (2d Cir. 2001) (recognizing that the PSLRA required securities fraud plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" and "give rise to a strong inference of fraudulent intent" and holding, on that

basis, that plaintiff had failed to plead scienter) (internal quotations omitted). But the Amended Complaint alleges no facts, and certainly no particularized ones, to establish Thiam's knowledge of alleged "effective breaches" resulting in changes to the risk limits in 2013 and 2014. Nor is it plausible that a new CEO would have in the ordinary course reviewed the past history of such risk limits. Even if Thiam had been aware of the changes to the risk limits in November 2015, those changes were not effectuated for the purpose of avoiding an "effective breach" of the existing limits. To the contrary, those changes did not add to CS's risk capacity or facilitate any additional risk investment.

Likewise, Plaintiffs have not alleged, and cannot allege, any basis to conclude that Thiam reviewed the 2014 filing merely because it was referenced in the 2015 Registration Statement, much less that Thiam knew that the debt limit changes that pre-dated his arrival, in July 2015, rendered the general statement about risk limits in the 2014 Annual Statement, which were incorporated by reference in the 2015 Registration Statement, false. In the absence of particularized facts showing that Thiam knew that the reference to the 2014 risk limit discussion incorporated into the Registration Statement was false, the Amended Complaint fails to plead adequately Thiam's scienter.[7]

### 2. Plaintiffs Do Not Demonstrate Standing

Defendants' arguments concerning the timing of when Thiam joined CS also implicate Plaintiffs' standing to assert their claims. The five Named-Plaintiffs executed a total of 23 purchases of CS ADRs during the class period. With only one possible exception, every one of those purchases was made on or before October 30, 2015—that is, one-and-a-half months before the filing of the allegedly misleading 2015 Registration Statement. *See* Singer Decl. in Support

---

[7] Ironically, at Plaintiffs' urging, this Court referenced Thiam's subsequent public comments criticizing the earlier risk limit changes in its analysis of loss causation. *See* Order at 19-20. But as described in Defendants' Moving Brief (at 15 n.5), Thiam's after-the-fact criticism hardly supports a claim of scienter as to him.

of Motion to Appoint Lead Plaintiffs, Ex. B (Dkt. 23-2). Accordingly, the Plaintiffs cannot allege that they purchased or sold CS securities in connection with the 2015 Registration Statement. At best, they were mere holders of CS ADRs at the time of the alleged misrepresentations in the 2015 Registration Statement and, therefore, they lack standing to sue under Section 10(b).[8]

In *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723 (1975), the Supreme Court imposed a purchaser-seller requirement on plaintiffs seeking to recover under Section 10(b). Based on the *Blue Chip Stamps* purchaser-seller requirement, courts have routinely dismissed claims by plaintiffs who purchased the securities in question before the alleged misrepresentation was made and thus were mere holders at the time of the alleged misrepresentation. *See Ashland Inc.* v. *Morgan Stanley & Co.*, 700 F.Supp.2d 453, 467 (S.D.N.Y. 2010) (holding, based on the purchaser-seller requirement, that "any statements made after the Plaintiffs' last purchase of SLARS . . . [were] not actionable misrepresentations.") (emphasis added); *Amorosa* v. *Ernst & Young LLP*, 672 F.Supp.2d 493, 510-11 (S.D.N.Y. 2009) (recognizing that "the practical impact of *Blue Chip Stamps* would be to limit [the plaintiff's] cause of action to misstatements or omissions . . . that he could have relied upon in connection with his *purchase or sale* of stock (i.e., that are alleged to have occurred prior to the purchase and/or sale dates)" and dismissing Section 10(b) claim on that basis) (emphasis in original).

---

[8] Five of the six purchases of CS ADRs by Plaintiff City of Birmingham Retirement and Relief System ("Birmingham") were made in late October 2015 and thus plainly violate the purchaser-seller requirement. Birmingham made its last purchase on December 15, the very same day on which the 2015 Registration Statement was filed. Because the 2015 Registration Statement was filed at 2:33 p.m. *(see* https://www.sec.gov/Archives/edgar/data/1159510/000104746915009217/0001047469-15-009217-index.htm), if Birmingham's purchase was executed before 2:33 p.m. – its claim (like the claims of all other Plaintiffs) would have to be dismissed for violating the purchaser-seller requirement. Birmingham's failure to plead the timing of its final purchase precludes it from establishing standing.

Even assuming Plaintiffs had otherwise stated a viable claim under Section 10(b) as to Thiam, they have no standing to bring such a claim against him.  The only arguable "statement" Thiam made was his signing of the Registration Statement issued in December 2015.  Because that "statement" occurred after and otherwise had no impact on any of the named plaintiffs' purchases, dismissal of the claims against Thiam is warranted on this additional ground.

### 3. Thiam Cannot Be Liable Under Section 20(A)

For the same reasons that Plaintiffs fail to establish scienter on the part of Thiam, they also fail to allege that he was a "culpable participant" in any alleged violation relating to alleged binding risk controls.  See *ATSI*, 493 F.3d at 108 (alleged controlling person must actually participate in the alleged violation); Moving Br. at 27.  Plaintiffs allege that "[i]n their capacities as senior corporate officers of the Company," the individual defendants, including Thiam, had influence over CS's activities at various points in time, and signed CS's SEC filings (AC ¶¶ 160-61), but as Defendants' Moving Brief argued, Plaintiffs do not allege facts showing that Thiam knew of any fraudulent misrepresentations or otherwise participated in any fraud.  Accordingly, the Section 20(a) claim against Thiam must be dismissed.  See *Gordon* v. *Burr*, 506 F.2d 1080, 1086 (2d Cir. 1974) (declining to find culpable participation by alleged controlling person).[9]

### CONCLUSION

The Court should grant Defendants' motion for reconsideration, and upon reconsideration, dismiss the remaining claims in this case.

---

[9]  Plaintiffs' failure to establish any primary Section 10(b) violation by CS or any other person also requires dismissal of their Section 20 claims against all Individual Defendants.  See *Wilson* v. *Merrill Lynch & Co.*, 671 F.3d 120, 139 (2d Cir. 2011); *see also* Moving Br. at 27.

-14-

Dated:   New York, New York
         March 6, 2019

                                                    CAHILL GORDON & REINDEL LLP

                                                    By: _____
                                                       Herbert S. Washer
                                                       David G. Januszewski
                                          80 Pine Street
                                          New York, New York 10005
                                          (212) 701-3000

                                          *ATTORNEYS FOR DEFENDANTS*