## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, et al., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 1:17-cv-10014-LGS ) |
| CREDIT SUISSE GROUP AG, et al., | ) **CLASS ACTION** ) |
| Defendants. | ) ) |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF UNOPPOSED MOTION FOR FINAL APPROVAL OF THE PROPOSED SETTLEMENT AND APPROVAL OF THE PLAN OF ALLOCATION**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 4

    I.      THE PROPOSED SETTLEMENT WARRANTS FINAL
          APPROVAL ............................................................................... 4

        A.   The Proposed Settlement Is Procedurally Fair ........................... 7

        B.   The Proposed Settlement is Substantively Fair .......................... 11

        C.   The Notice Campaign Satisfied the Requirements of Rule 23 and
            Due Process ............................................................................... 22

        D.   The Reaction of the Class to Date Favors Approval ................... 244

    II.     THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED ......... 25

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*In re Am. Bank Note Holographics, Inc.*,
   127 F.Supp. 2d 418 (S.D.N.Y. 2001)...............................................................15, 19

*Bryant v. Potbelly Sandwich Works, LLC*,
   No. 1:17-cv-07638 (CM) (HBP), 2020 WL 563804 (S.D.N.Y. Feb. 4, 2020).......................25

*Charron v. Weiner*,
   731 F.3d 241 (2d Cir. 2013)...........................................................................15

*Chavarria v. N.Y. Airport Serv.*,
   875 F. Supp. 2d 164 (E.D.N.Y. 2012) ............................................................16, 17

*In re China Sunergy Sec. Litig.*,
   No. 07 Civ. 7895-DAB, 2011 WL 1899715 (S.D.N.Y. May 13, 2011)..............................2, 17

*Christine Asia Co., Ltd., et al. v. Yun Ma*,
   No. 1:15-md-02631, 2019 WL 5257534 (S.D.N.Y. Oct. 16, 2019) ...............................5, 7, 13

*City of Providence v. Aeropostale*,
   No. 11 Civ. 7132 (CM), 2014 WL 1883494 (S.D.N.Y. May 9, 2014)....................................16

*D'Amato v. Deutsche Bank*,
   236 F.3d 78 (2d Cir. 2001)...........................................................................4, 7, 11

*Detroit v. Grinnell Corp.*,
   495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds by Goldberger v.*
   *Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ............................................ *passim*

*In re Facebook, Inc., IPO Secs. & Derivative Litig.*,
   343 F. Supp. 3d 394 (S.D.N.Y. 2018)..............................................................14, 15

*In re Gilat Satellite Networks, Ltd.*,
   No CV-02-1510, 2007 WL 1191048 (E.D.N.Y. Apr. 19, 2007) .............................................12

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*,
   No. 7:13-cv-03073-NSR-LMS, 2017 WL 6729863 (S.D.N.Y. Nov. 1, 2017).......................25

*In re GSE Bonds Antitrust Litig.*,
   19-cv-1704 (JSR), 2019 WL 6842332 (S.D.N.Y. Dec. 16, 2019)................................6, 10, 18

*In re GSE Bonds Antitrust Litig.*,
   414 F. Supp. 3d 668 (S.D.N.Y. 2019).................................................................21

*Guevoura Fund Ltd. v. Sillerman*,
   No. 1:15-cv-07192-CM, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ...................10, 12, 16

*Hayes v. Harmony Gold Min. Co. Ltd.*,
   509 F. App'x 21 (2d Cir. 2013) ...........................................................................................11

*In re IMAX Sec. Litig.*,
   283 F.R.D. 178 (S.D.N.Y. 2012) ...................................................................................12, 16

*In re Initial Pub. Offering Sec. Litig.*,
   671 F. Supp. 2d 467 (S.D.N.Y. 2009)...................................................................................19

*James v. China Grill Mgmt., Inc.*,
   No. 18 Civ. 455 (LGS), 2019 WL 9698568 (S.D.N.Y. Apr. 29, 2019)
   (Schofield, J.) .................................................................................................................19, 23

*In re Luxottica Grp. S.p.A. Sec. Litig.*,
   233 F.R.D. 306 (E.D.N.Y. 2006) ..........................................................................................12

*Maley v. Del Glob. Techs. Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002)...................................................................................18

*In re Marsh ERISA Litig.*,
   265 F.R.D 128 (S.D.N.Y. 2010). ...........................................................................................19

*McReynolds v. Richards-Cantave*,
   588 F.3d 790 (2d Cir. 2009)............................................................................................6, 10

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
   No. 02 MDL 1484(JFK), 2007 WL 313474 (S.D.N.Y. Feb. 1, 2007)....................................17

*In re Namenda Direct Purchaser Antitrust Litig.*,
   No. 15 Civ. 7488 (CM), 2020 WL 2749223 (S.D.N.Y. May 27, 2020)...........................20, 22

*Newman v. Stein*,
   464 F.2d 689 (2d Cir. 1972)....................................................................................................5

*In re Nissan Radiator/Transmission Cooler Litig.*,
   No. 10-CV-7493(VB), 2013 WL 4080946 (S.D.N.Y. May 30, 2013) ....................................10

*Padro v. Astrue*,
   No. 11-CV-1788 (CBA) (RLM), 2013 WL 5719076 (E.D.N.Y. Oct. 18, 2013) ..........9, 23, 24

*In re PaineWebber Ltd. P'ships. Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ...........................................................................................18

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*,
   05-md-1720 (MKB) (JO), 2019 WL 6875472 (E.D.N.Y. Dec. 19, 2019) ...............................6

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*,
  827 F.3d 223 (2d Cir. 2016)..........................................................................7

*In re Signet Jewelers Ltd. Sec. Litig.*,
  No. 1:16-cv-06728-CM-SDA, 2020 WL 4196468 (S.D.N.Y. July 21, 2020)................ *passim*

*In re Veeco Instruments Inc. Sec. Litig.*,
  No. 05 MDL 01695(CM), 2007 WL 4115809 (S.D.N.Y. Nov. 7, 2007) ..............................18

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d Cir. 2005).......................................................................5, 23

## STATUTES

15 U.S.C. § 78u-4 ....................................................................................20

28 U.S.C. § 1715 .....................................................................................25

28 U.S.C. § 1711 .....................................................................................24

## OTHER AUTHORITIES

Fed. R. Civ. P..................................................................................*Passim*

Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action
  Litigation: 2019 Full-Year Review* ...........................................................2, 17

Pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, Lead Plaintiffs City of Birmingham Retirement and Relief System, Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds, Teamsters Local 456 Pension and Annuity Funds, and the International Brotherhood of Teamsters Local No. 710 Pension Plan (collectively, "Lead Plaintiffs"), respectfully submit this memorandum of law in support of their motion for final approval of the proposed settlement of this securities class action (the "Action") against defendants Credit Suisse Group AG ("Credit Suisse" or the "Company"), Brady W. Dougan, Tidjane Thiam, and David R. Mathers (the "Individual Defendants" and, collectively with Credit Suisse, "Defendants," and together with Lead Plaintiffs, the "Parties"), and approval of the proposed Plan of Allocation.[1]

## PRELIMINARY STATEMENT

After more than two-and-a-half years of hard-fought litigation, Lead Plaintiffs have agreed to settle this action for a cash payment of $15,500,000 for the benefit of the Settlement Class.  As discussed in greater detail below, Lead Plaintiffs respectfully submit that the Settlement is an excellent result for the Class and that final approval of the settlement is warranted, based on the following factors:

The Outstanding Results: Under any measure, the $15,500,000 million Settlement is an exceptional result, representing approximately between 23.7% to 63.4% of the Class's maximum estimated aggregate damages of $24 million to $65 million – multiples more than the typical

---

[1] The Court is respectfully referred to the accompanying Joint Declaration of Steven B. Singer, Carol V. Gilden, and Daniel S. Sommers in Support of Lead Plaintiffs' Motion for Final Approval of the Proposed Settlement and Approval of the Plan of Allocation, and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Decl."), for a more detailed description of the case and the proposed Settlement. Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated July 8, 2020 (Dkt. 133) (the "Settlement" or "Stipulation").

recovery in securities class actions. *In re China Sunergy Sec. Litig.*, No. 07 Civ. 7895-DAB, 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011) (noting an average recovery of 3% to 7% of estimated damages); Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review*, NERA Jan. 21, 2020 at p. 20, Fig. 13 (median recovery in securities class actions in 2019 was approximately 2.1% of estimated damages).

Extensive Litigation Efforts: The Parties reached the Settlement only after vigorous litigation, by which time Lead Plaintiffs and Lead Counsel had developed a thorough understanding of the strengths and weaknesses of the claims and defenses in the Action. The $15,500,000 million Settlement was achieved after Lead Counsel: (1) conducted an extensive investigation of all potential claims that could be asserted against Credit Suisse and its executives or others, (2) conducted interviews with fact witnesses in connection with the pre-filing investigation, (3) filed an amended complaint based on the results of that investigation, (4) opposed Defendants' motion to dismiss, which was granted in part and denied in part, (5) successfully opposed Defendants' motion to reconsider the Court's ruling denying in part their motion to dismiss, (6) engaged in extensive negotiations with counsel for Defendants to obtain agreement on the scope, search terms, and confidentiality restrictions on documents to be produced by Defendants, including with respect to the application of strict European privacy laws, (7) obtained over 1.5 million pages of documents from Defendants and conducted extensive document review and analysis, (8) worked with an economics expert regarding market efficiency issues and filed a pre-motion conference letter with the Court on class certification, (9) participated in two separate mediation sessions conducted a year apart by Michelle Yoshida of Phillips ADR Enterprises, an experienced and highly respected mediator, and exchanged detailed written mediation briefs before both sessions, and (10) negotiated and drafted appropriate documentation of the Settlement,

including the Stipulation and the Notices to be issued to potential Class Members.  Joint Decl. ¶¶ 12-20.  Thus, the Settlement is the culmination of substantial investigation, discovery practice, document review, vigorous litigation and a thorough mediation process with a nationally regarded private mediator.

The Risks Involved: In reaching the Settlement, Lead Plaintiffs and Lead Counsel considered the numerous risks associated with continuing the litigation, including the risks of recovering less than the Settlement Amount after substantial delay or of no recovery at all.  Lead Plaintiffs and Lead Counsel believe their case against Defendants is strong, but acknowledge Defendants had credible arguments concerning liability. For example, with respect to the fundamental question of whether the challenged statements were false or misleading, Defendants argued, among other things, that (i) Credit Suisse's public filings accurately described Credit Suisse's risk management framework, including that Credit Suisse's risk appetite and risk limits may change; and (ii) that Credit Suisse did not repeatedly raise, breach, or otherwise violate its applicable risk limits.  While Lead Plaintiffs had responses to those arguments, these defenses, which Defendants would have continued to press, created a real risk that Lead Plaintiffs could ultimately recover materially less than the Settlement Amount – or nothing at all. Defendants also argued that Lead Plaintiffs could not establish scienter because Defendants made no statements about Credit Suisse's risk limits and controls which the Individual Defendants believed to be false at the time they were made. Moreover, even if Lead Plaintiffs successfully proved these elements and liability at trial, Defendants vigorously contested loss causation and damages.  These and many other risks support the reasonableness of the Settlement.

 Arm's-Length Settlement Negotiations: The Settlement is the product of the Parties' hard fought, arm's-length negotiations, comprising two separate mediations conducted under the

auspices of Michelle Yoshida of Phillips ADR Enterprises, P.C., a highly respected mediator with substantial experience overseeing negotiations of complex securities class actions. Joint Decl. ¶¶ 21-22.  Ms. Yoshida fully supports the Settlement as fair, reasonable and adequate and in the best interests of the proposed Settlement Class Members.  Joint Decl., Ex. 1 (Declaration of Michelle Yoshida In Support of Approval of the Class Action Settlement).

In light of the results achieved, the risks of litigating this Action, and the substantial delay that would result from the continued litigation of this action through trial and the inevitable subsequent appeals, Lead Plaintiffs and Lead Counsel strongly believe that the Settlement is a highly favorable result.  The $15,500,000 Settlement achieved by Lead Plaintiffs and Lead Counsel avoids the risks and uncertainties of continued litigation and provides an immediate and substantial financial benefit for the Class.  Accordingly, Lead Plaintiffs respectfully submit that the Court should approve the Settlement as fair, adequate and reasonable.

Lead Plaintiffs also request that the Court approve the proposed Plan of Allocation for the Net Settlement Fund. The Plan of Allocation is designed to equitably distribute the Settlement Fund proceeds on a *pro rata* basis to Authorized Claimants. It was prepared with the assistance of Lead Plaintiffs' expert, who calculated the alleged artificial inflation in the prices of Credit Suisse ADRs during the Settlement Class Period, and is substantially similar to numerous other plans that have been approved in this District and around the country as fair, adequate, and reasonable.

**ARGUMENT**

**I.    THE PROPOSED SETTLEMENT WARRANTS FINAL APPROVAL**

Under Rule 23(e) of the Federal Rules of Civil Procedure, the Settlement should be approved if the Court finds it "fair, reasonable, and adequate."  *See* Fed. R. Civ. P. 23(e)(2); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) ("The District Court must carefully scrutinize the settlement to ensure its fairness, adequacy and reasonableness, and that it was not a

product of collusion.") (internal citations omitted).  "A court determines a settlement's fairness by looking at both the settlement's terms and the negotiating process leading to settlement." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005); *see also In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-cv-06728-CM-SDA, 2020 WL 4196468, at *1 (S.D.N.Y. July 21, 2020) (same).

Public policy favors the settlement of disputed claims among private litigants, particularly in complex class actions such as this one. *See Wal-Mart*, 396 F.3d at 116 ("We are mindful of the 'strong judicial policy in favor of settlements, particularly in the class action context.'") (citation omitted); *Christine Asia Co., Ltd., et al. v. Yun Ma*, No. 1:15-md-02631, 2019 WL 5257534, at *8 (S.D.N.Y. Oct. 16, 2019)  ("The law favors compromise and settlement of class action suits."). Recognizing that a settlement represents an exercise of judgment by the negotiating parties, the Second Circuit has cautioned that, while a court should not give "rubber stamp approval" to a proposed settlement, it should "stop short of the detailed and thorough investigation that it would undertake if it were actually trying the case." *Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir. 1974), *abrogated on other grounds by Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) (hereinafter *"Grinnell"*). Because "'[t]he very purpose of a compromise is to avoid the trial of sharply disputed issues and to dispense with wasteful litigation,' the court must not turn the settlement hearing 'into a trial or a rehearsal of the trial.'" *Newman v. Stein*, 464 F.2d 689, 692 (2d Cir. 1972) (citation omitted).

The Court considers whether the settlement is "fair, reasonable, or adequate" under the factors set forth in recently amended Federal Rule of Civil Procedure 23(e)(2), which consider whether:

> (A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
    (i) the costs, risks, and delay of trial and appeal;
    (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
    (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
    (iv) any agreement required to be identified under Rule 23(e)(3); and
(D) the proposal treats class members equitably relative to each other.

The first two prongs address the settlement's "procedural fairness" and the second two its "substantive fairness." 2018 Advisory Note.

As the Advisory Committee Notes to the 2018 amendments indicates, "the four new Rule 23 factors were intended to supplement rather than displace" the factors the Second Circuit historically used for settlement analysis, referred to as the *Grinnell* factors. *In re GSE Bonds Antitrust Litig.*, 19-cv-1704 (JSR), 2019 WL 6842332, at *1 (S.D.N.Y. Dec. 16, 2019) (citing 2018 Advisory Notes to Fed. R. Civ. P. 23(e)(2) ("2018 Advisory Note"). *See also In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 05-md-1720 (MKB) (JO), 2019 WL 6875472, at *14 (E.D.N.Y. Dec. 19, 2019) (noting the "significant overlap between the Rule 23(e)(2) and *Grinnell* factors, which complement, rather than displace each other.") The *Grinnell* factors consider:

(1) the complexity, expense and likely duration of the litigation, (2) the reaction of the class to the settlement, (3) the stage of the proceedings and the amount of discovery completed, (4) the risks of establishing liability, (5) the risks of establishing damages, (6) the risks of maintaining the class action through the trial, (7) the ability of the defendants to withstand a greater judgment, (8) the range of reasonableness of the settlement fund in light of the best possible recovery, [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Grinnell*, 495 F.2d at 463 (internal citations omitted); *see also McReynolds v. Richards-Cantave*, 588 F.3d 790, 804 (2d Cir. 2009). "[N]ot every factor must weigh in favor of [the] settlement,

rather the court should consider the totality of these factors in light of the particular circumstances." *Christine Asia Co., Ltd.*, 2019 WL 5257534 at *9.

The proposed settlement easily satisfies the Rule 23(e)(2) factors and the *Grinnell* factors; the settlement thus warrants final approval.

### A.  The Proposed Settlement Is Procedurally Fair

#### 1.  Rule 23(e)(2)(A) – Plaintiffs Have Adequately Represented the Class

Rule 23(e)(2)(A) requires a Court to find that the class representatives and class counsel have adequately represented the Class.  Adequacy considers whether the proposed settlement class is "sufficiently cohesive to warrant adjudication."  *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 827 F.3d 223, 232 (2d Cir. 2016).  Lead Plaintiffs here have the same interests as Class members, as Lead Plaintiffs maintain all were injured by the same allegedly materially false and misleading statements.  The Settlement Class is therefore sufficiently cohesive, and Lead Plaintiffs are adequate representatives.

#### 2.  Rule 23(e)(2)(A) – Lead Counsel Have Adequately Represented the Class

In appointing Lead Counsel as interim class counsel, the Court has already made initial determinations of their adequacy.  *See* 2018 Advisory Note (noting that interim appointment entails an evaluation of counsel's adequacy to represent the Class).  At final approval, the Court considers counsel's representation of the Class, including the vigor of settlement negotiations, the extensiveness of the litigation, and the results obtained.  *See id.*; *D'Amato*, 236 F.3d at 85.  This Rule 23(e)(2) factor overlaps with the third *Grinnell* factor considering the stage of the proceedings.

At the time of settlement, Lead Counsel had been litigating this Action for approximately two-and-a-half years. Joint Decl. ¶ 6.  Lead Plaintiffs conducted an extensive investigation prior

7

to drafting and filing the consolidated amended complaint, which included, among other things, a thorough review of (i) Credit Suisse's public filings with the SEC; (ii) presentations, press releases, media and analyst reports made by or about the Company; (iii) transcripts of Credit Suisse's conference calls with analysts and investors; (iv) publicly available data relating to Credit Suisse securities; (v) interviews with former employees of the Company; (vi) consultation with relevant experts; (viii) review of other materials and data concerning the Company; and (ix) research of the applicable law with respect to the claims asserted in the Action, and the potential defenses thereto. Joint Decl. ¶ 6.  Additionally, Lead Plaintiffs engaged James F. Miller, an investment banking expert, to review Credit Suisse's SEC filings and public disclosures and provide insight on the investment banking matters central to this case.  *Id.* ¶ 14.  Lead Counsel synthesized the results of its investigation into a 63-page Amended Complaint (Dkt. 40).  Lead Counsel next drafted and filed an extensive opposition to Defendants' motion to dismiss, addressing Defendants' arguments for dismissal. Joint Decl. ¶ 15.  After the Court denied Defendants' motion in part, Defendants moved for reconsideration, which Plaintiffs opposed, and the Court ultimately denied.  *Id.* ¶ 16.

The Parties also engaged in extensive discovery. After extensive and hotly contested discovery negotiations, including numerous meet-and-confer sessions and lengthy pre-motion discovery correspondence to resolve multiple disputes over the scope of discovery, Lead Counsel obtained documents from Defendants and undertook review and analysis of over 222,000 documents totaling over 1.5 million pages, as well as two installments of a lengthy privilege log. *Id.* ¶ 17.  The documents included detailed and voluminous reports regarding Credit Suisse's risk control infrastructure, as well as emails and internal documents replete with acronyms and jargon that made development of the evidentiary record difficult and time-consuming.  *Id.* ¶¶ 17, 58. Additionally, Lead Plaintiffs produced over 1,100 documents totaling over 30,000 pages. *Id.* ¶ 17.

In addition, Lead Plaintiffs served requests for admission, which Defendants responded to, and Defendants served interrogatories and requests for admissions. *Id*. At the time that the Parties held their second mediation session in June 2020, Lead Plaintiffs had requested depositions of ten current and former employees of Credit Suisse, some of whom resided in the United States and others in Europe, and Defendants had requested depositions of Lead Plaintiffs. *Id.* ¶ 18.

Lead Plaintiffs prepared a detailed pre-motion conference letter on class certification, which included a summary of the opinions of expert Chad Coffman.  *Id.* ¶ 19. Defendants filed their opposing letter, and the parties were preparing to commence full class certification briefing at the time of the final mediation. *Id.*  In connection with mediation, Lead Plaintiffs prepared two rounds of detailed mediation submissions and reviewed Defendants' mediation submissions setting forth their arguments on liability, loss causation, and damages. *Id.* ¶ 6.

In sum, Lead Counsel spent thousands of hours investigating, litigating, and zealously advocating for the positive resolution of this Action, which effort resulted in a settlement for the Class.

For these reasons, at the time the Settlement was reached, Lead Plaintiffs and Lead Counsel "obtained sufficient information to be able to intelligently assess the strengths and weaknesses of the case and appraise settlement proposals." *Padro v. Astrue*, No. 11-CV-1788 (CBA) (RLM), 2013 WL 5719076, at *6 (E.D.N.Y. Oct. 18, 2013).  Lead Plaintiffs and Lead Counsel have a well-informed basis for their belief that the Settlement is a favorable resolution of the Action for the Class, and this factor strongly supports approval of the Settlement. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *1 (finding that two years of litigation, including discovery and multiple days of mediation, supported counsel's understanding of the case and weighed in favor of final approval); *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10-CV-7493(VB),

2013 WL 4080946, at *7 (S.D.N.Y. May 30, 2013) (finding this factor weighed in favor of approval where "plaintiffs conducted an investigation prior to commencing the action" and consulted with experts). As such, the stage of proceedings and amount of discovery completed support approval of the Settlement and reflect that Lead Counsel adequately represented the Class.

### 3. Rule 23(e)(2)(B) - The Settlement Was Reached After Arm's-Length Negotiations with the Assistance of an Experienced Mediator and Is Procedurally Fair

Rule 23(e)(2)(B) requires procedural fairness, as evidenced by negotiation of the settlement at arm's length. *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *2. A mediator's involvement in settlement negotiations helps demonstrate their fairness. *Id.* The 2018 amendments to Rule 23(e) reflect the long-standing Second Circuit rule that a strong initial presumption of fairness attaches to a proposed settlement reached as a result of arm's-length negotiations between experienced counsel after meaningful discovery. *See Guevoura Fund Ltd. v. Sillerman*, No. 1:15-cv-07192-CM, 2019 WL 6889901, at *6 (S.D.N.Y. Dec. 18, 2019) ("There can also be no question that Lead Counsel was fully informed of the strengths and weaknesses of the Class Claims . . . by the time the Stipulation was executed); *McReynolds*, 588 F.3d at 803 ("We have recognized a presumption of fairness, reasonableness, and adequacy as to the settlement where a class settlement [is] reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."). The Settlement here is entitled to this strong presumption of fairness because all parties in the Action are represented by counsel experienced in litigating these types of claims, Joint Decl. ¶¶ 57-62; the Settlement was the result of arm's-length negotiations before an experienced mediator, *id.* ¶¶ 21-22; and the parties understood the strengths and weaknesses of the claims and defenses before settlement was reached, *id.* ¶¶ 63-68. The use of a mediator and the fact of multiple mediation sessions supports that the settlement was reached through arms-length negotiation. *See In re Signet Jewelers*, 2020 WL 4196468, at *3.

Ms. Yoshida personally endorsed the fairness of the Settlement, providing a declaration which states in pertinent part:

> In conclusion, based upon my experience as a neutral, I believe this Settlement represents a recovery and outcome that is fair, reasonable and adequate. I further believe that the Settlement is in the best interests of all parties because the Parties avoid the burdens and risks associated with taking this case through further motion practice, additional discovery, trial, and appeals. I therefore strongly support approval of the Settlement in all respects . . . The product of these efforts, in my view, is a fair and reasonable compromise and a substantial recovery.  While settlement approval is the province of this Court, I respectfully recommend approval of all the terms of this settlement.

*See* Ex. 1, Yoshida Decl. ¶¶ 10-11.

The active involvement and endorsement of an experienced independent mediator is strong evidence of the absence of any collusion, further supporting the presumption of fairness of the Settlement. *See D'Amato*, 236 F.3d at 85 (a mediator's involvement in settlement negotiations "helps to ensure that the proceedings were free of collusion and undue pressure"); *Hayes v. Harmony Gold Min. Co. Ltd.*, 509 F. App'x 21, 23 (2d Cir. 2013) (finding settlement was fair where settlement terms were "recommended by an independent and experienced mediator").

Because the Settlement was vigorously negotiated at arm's length by experienced counsel before a highly regarded and independent mediator, resulting in an excellent and immediate recovery for the benefit of the Settlement Class, the Settlement is procedurally fair.

### B.  The Proposed Settlement is Substantively Fair

#### 1.  Rule 23(e)(2)(C)(i) – The Relief Provided to the Class is Superior to the Risks of Continued Litigation

Rule 23(e)(2)(C)(i) considers whether the relief provided for the class is adequate, considering the costs, risks, and delay of trial and appeal.  This prong encompasses seven of the pre-amendment *Grinnell* factors: the complexity, expense, and likely duration of the litigation (factor 1), risks of establishing liability (factor 4), risks of establishing damages (factor 5), risks of

maintaining the class action through trial (factor 6), the ability of the defendants to withstand a greater judgment (factor 7); and the range of reasonableness of the settlement fund in light of the best possible recovery (factor 8) and in light of all the attendant risks of litigation (factor 9).  These factors weigh in favor of final approval.

> ### a.  The Complexity, Expense and Likely Duration of the Litigation Supports Approval of the Settlement

"[I]n evaluating the settlement of a securities class action, federal courts, including [courts in this District] have long recognized that such litigation is notably difficult and notoriously uncertain." *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 189 (S.D.N.Y. 2012) (citation omitted). Indeed, courts recognize that "[s]ecurities class actions are generally complex and expensive to prosecute." *In re Gilat Satellite Networks*, *Ltd.*, No CV-02-1510, 2007 WL 1191048, at *10 (E.D.N.Y. Apr. 19, 2007). Accordingly, "[c]lass action suits readily lend themselves to compromise because of the difficulties of proof, the uncertainties of the outcome, and the typical length of the litigation." *In re Luxottica Grp. S.p.A. Sec. Litig.*, 233 F.R.D. 306, 310 (E.D.N.Y. 2006).  Even for a case such as this that is at the discovery stage, the "substantial time and expense that would be involved in continuing to prosecute the Action through trial and the inevitable post-trial motions and appellate proceedings . . . would have added significantly to the time and expense of this Action and, even if Lead Plaintiff was ultimately successful, delayed by years any recovery to the Class." *Guevoura Fund*, 2019 WL 6889901 at *7.

This Action was no exception. Prosecuting it required obtaining and analyzing a large body of evidence covering events spanning the entire Class Period.  Moreover, a significant number of the Individual Defendants and other key witnesses are located overseas in numerous countries, including Switzerland and other European countries with strict privacy laws and limitations on taking discovery. Lead Plaintiffs and Lead Counsel fully appreciated that it would be difficult to

obtain witness testimony abroad, and that at the very least, foreign depositions would add to the complexity, expense, and likely duration of the litigation. *Id.* ¶ 18.  *See, e.g., Christine Asia Co., Ltd.*, 2019 WL 5257534 at *10 (noting the expense and difficulty of litigation against a foreign defendant and conducting foreign depositions as contributing to the complexity, expense, and duration of litigation *Grinnell* factor in support of settlement).

### b. The Risks of Establishing Liability and Damages Support Approval of the Settlement

Although Lead Plaintiffs and Lead Counsel believe that the claims asserted against Defendants have merit, they also recognize that there were significant risks as to whether they would ultimately be able to prove liability and establish loss causation for their claims in the Action, as well as with respect to the amount of damages that Lead Plaintiffs could establish.

*Risks of Establishing Liability.*  Lead Plaintiffs recognize that there were significant risks to establishing liability and acknowledge that Defendants have put forth credible arguments concerning liability.  Defendants fundamentally disagreed with Lead Plaintiffs' argument that the challenged statements were false or misleading, arguing, among other things, that (i) Credit Suisse's public filings accurately described Credit Suisse's risk management framework, including that Credit Suisse's risk appetite and risk limits may change; and (ii) that Credit Suisse did not repeatedly raise, breach, or otherwise violate its applicable risk limits.  Defendants also argued that Credit Suisse's overall exposure to distressed debt decreased, rather than increased, over the Class Period, in an effort to undercut Lead Plaintiffs' theory that the Company was violating its risk limits and risk controls to take on excessive risky debt.  Defendants also argued that Lead Plaintiffs could not establish scienter because, they argued, Defendants made no statements about Credit Suisse's risk limits and controls which the Individual Defendants believed to be false at the time they were made.

While Plaintiffs prevailed in part at the motion to dismiss stage, they would face different standards and a more fully developed record in future stages of the case and thus faced the risk of "an unfavorable decision on summary judgment, an unfavorable outcome at trial, and lengthy appeals even if Lead Plaintiffs prevailed.  Such risks could limit recovery, or eliminate it altogether," and thus these "inherent risks" support approval of the Settlement.  *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 343 F. Supp. 3d 394, 412 (S.D.N.Y. 2018).

*Risks of Establishing Damages.*  Defendants also had substantial arguments regarding damages that if accepted in whole or in part at summary judgment, trial, or on appeal, could eliminate or dramatically reduce the Class's recovery.

With respect to damages, Defendants argued that there was no "corrective disclosure" regarding Credit Suisse's risk limits and controls and that any ADR price decline was attributable to myriad other factors unrelated to this lawsuit.  Specifically, Defendants argued that no information related to risk limits and risk controls was released on October 21, 2015 and so that date did not constitute a corrective disclosure, meaning Lead Plaintiffs were not entitled to damages stemming from any decline in the ADR price on that date.  Defendants also argued that a host of information unrelated to this lawsuit was announced on both October 21, 2015 and February 4, 2016 and so any stock price decline was attributable in whole or in part to information unrelated to this lawsuit.  Defendants emphasized the release of confounding information on February 4, 2016, including that the earnings announcement disclosed not only information relevant to this lawsuit regarding mark-to-market losses in the investment bank, but also totally unrelated information, including a goodwill impairment charge of 3.8 billion Swiss francs, litigation charges of 820 million Swiss francs, and the overall challenging market conditions for investment banks globally during this time.

"A costly and lengthy battle of the experts" would have been required to address these disputes. *In re Facebook, Inc., IPO Secs. & Derivative Litig.*, 343 F. Supp. 3d at 413; *see also In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d 418, 426-47 (S.D.N.Y. 2001) ("In such a battle, Plaintiffs' counsel recognize the possibility that a jury could be swayed by experts for Defendants."). The litigation therefore presented substantial risks that Lead Plaintiffs would not ultimately recover the total recoverable damages, even if Lead Plaintiffs prevailed on liability. The Settlement Lead Plaintiffs achieved here allows Class Members to recover a substantial sum of money while avoiding continued lengthy litigation that faced significant challenges.

### c.  Risk of Maintaining the Class Action Through Trial Supports Approval of the Settlement

Additionally, Defendants' pre-motion letter on class certification raised numerous arguments as to why class certification was improper, including that Defendants would rebut the fraud-on-the-market presumption of reliance by showing absence of price impact from the alleged misrepresentations or a statistically significant decline  on the dates of the alleged corrective disclosures, that damages could not be determined on a class-wide basis, and that one or more Lead Plaintiffs was subject to unique defenses precluding a finding of typicality and adequacy under Federal Rule of Civil Procedure 23.   While Lead Plaintiffs believe they would have prevailed, there was no guarantee that Lead Plaintiffs would maintain this action as a class action, as courts may exercise their discretion to reevaluate class certification at a later stage.   The Settlement avoids any uncertainty on this issue, and thus militates in favor of approval. *See Charron v. Weiner*, 731 F.3d 241, 249 (2d Cir. 2013).

### d.  Credit Suisse's Ability to Withstand a Greater Judgment is a Neutral Factor

While Credit Suisse could withstand a greater judgment, that factor does not counsel against approval of the settlement.  "[A] defendant is not required to empty its coffers before a

settlement can be found adequate." *In re IMAX*, 283 F.R.D. at 191.  A settlement's reasonableness "is better analyzed in light of the amount of the Settlement compared to the substantial risks Lead Plaintiff faced in proving liability and damages, and not on whether . . . Defendants could have paid more." *Guevoura Fund Ltd.*, 2019 WL 6889901, at *9.  Here, all factors – including this Action's complexity, the significant risks in establishing liability and damages, and the substantial and immediate recovery the Settlement offered – weigh strongly in favor of approval.  *City of Providence v. Aeropostale*, No. 11 Civ. 7132 (CM) (GWG), 2014 WL 1883494, at *9 (S.D.N.Y. May 9, 2014) (noting that courts "generally do not find the ability of a defendant to withstand a greater judgment to be an impediment to settlement when the other factors favor the settlement.").

> **e. The Range of Reasonableness of the Settlement Fund, in Light of the Best Possible Recovery and Possible Recovery in Light of the Attendant Risks of Litigation, Supports Approval of the Settlement**

The last two factors that courts consider are the range of reasonableness of the settlement fund in light of (i) the best possible recovery and (ii) possible recovery in light of litigation risks. The issue for the Court is not whether the settlement represents the best possible recovery, but how the settlement relates to the strengths and weaknesses of the case. A court "consider[s] and weigh[s] the nature of the claim, the possible defenses, the situation of the parties, and the exercise of business judgment in determining whether the proposed settlement is reasonable." *Grinnell*, 495 F.2d at 462 (citation omitted). "The determination of a reasonable settlement 'is not susceptible of a mathematical equation yielding a particularized sum,' but turns on whether the settlement falls within 'a range of reasonableness.'" *Chavarria v. N.Y. Airport Serv.*, 875 F. Supp. 2d 164, 174 (E.D.N.Y. 2012) (citation omitted). Thus, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Grinnell*, 495 F.2d at 455. "In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a

thousandth part of a single percent of the potential recovery." *Chavarria*, 875 F. Supp. 2d at 175 (citation omitted).

The Settlement here is well within the range of reasonableness in light of the risks presented by this litigation. The proposed $15,500,000 million Settlement Amount represents approximately 23.7% to 63.4% of the Class's maximum estimated aggregate damages which ranged from $24 million to $65 million—a rate that is ***11 to 30 times greater*** than the 2.1% median recovery for securities class actions in 2019.[2]   The damages range was calculated by Lead Plaintiffs' expert, Chad Coffman, who determined that the most aggressive damages calculation for the Class was approximately $65 million.  Joint Decl. ¶ 4.  Considering Defendants' argument that no corrective disclosure was made on October 21, 2015 would, if accepted, reduce damages to $54 million; then, if Defendants' strong arguments that confounding information disclosed on February 4, 2016 meant that only 45% of the stock price decline seen on that day was attributable to the alleged fraud, the damages would be reduced to $24 million.  *Id.*  Although Lead Plaintiffs believe that they have a sound basis for proving their conservative, and even their more aggressive damages models, due weight must be given to the arguments raised by Defendants that, if successful, would have greatly reduced or eliminated damages altogether. Lead Plaintiffs and Lead Counsel have concluded that, in light of these risks, the Settlement, which provides an immediate and substantial benefit to Class Members, outweighs the benefits of continued litigation.

---

[2] *See* Janeen McIntosh and Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review*, NERA Jan. 21, 2020 at p. 20, Fig. 13;  *In re China Sunergy*, 2011 WL 1899715, at *5 (noting an average recovery of 3% to 7% of estimated damages); *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, No. 02 MDL 1484(JFK), 2007 WL 313474, at *10 (S.D.N.Y. Feb. 1, 2007) (6.25% recovery of estimated damages is "at the higher end of the range of reasonableness of recovery in class action securities litigations").

The recommendation of Lead Plaintiffs also supports the fairness of the Settlement. *See In re Signet Jewelers*, 2020 WL 4196468, at *4. Lead Plaintiffs took an active role in supervising this litigation, as envisioned by the PSLRA, and Lead Plaintiffs strongly endorse the Settlement. Joint Decl., Ex. 3, Declaration of Jay Turner on Behalf of City of Birmingham Retirement and Relief System; Joint Decl., Ex. 4, Declaration of Christine Costa on Behalf of Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds; Joint Decl., Ex. 5, Declaration of Andrew Mackle on Behalf of Teamsters Local 456 Pension and Annuity Funds; Joint Decl., Ex. 6, Declaration of Brian J. O'Malley on Behalf of International Brotherhood of Teamsters Local No. 710 Pension Plan. A settlement reached "under the supervision and with the endorsement of a sophisticated institutional investor … is 'entitled to an even greater presumption of reasonableness.'" *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695(CM), 2007 WL 4115809, at *5 (S.D.N.Y. Nov. 7, 2007) (citation omitted).

## 2. Rule 23(e)(2)(C)(ii) – The Claims Process is Effective: The Plan of Allocation Is Reasonable and Supports Final Approval

"Rule 23(e)(2)(C)(iii) requires courts to examine 'the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *3. The claims process "should deter or defeat unjustified claims" without being "unduly demanding." *Id.* (quoting 2018 Advisory Note). Generally, "[a] plan of allocation that reimburses class members based on the extent of their injuries is [] reasonable." *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 367 (S.D.N.Y. 2002). Plans of allocation, however, need not be tailored to fit each and every class member with "mathematical precision." *In re PaineWebber Ltd. P'ships. Litig.*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997). Rather, broad classifications may be used in order to promote "[e]fficiency, ease of administration and conservation" of the settlement fund. *Id.* at 133-35. A plan of allocation

is fair and reasonable if it is "rationally related to the relative strengths and weaknesses of the respective claims asserted." *James v. China Grill Mgmt., Inc.*, No. 18 Civ. 455 (LGS), 2019 WL 9698568, at *6 (S.D.N.Y. Apr. 29, 2019) (Schofield, J.); *see also In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467, 497 (S.D.N.Y. 2009).

In determining the fairness, reasonableness, and adequacy of a proposed allocation plan, courts give considerable weight to the opinion of experienced counsel. *See In re Marsh ERISA Litig.*, 265 F.R.D 128, 145 (S.D.N.Y. 2010) ("In determining whether a plan of allocation is fair, courts give substantial weight to the opinions of experienced counsel."); *In re Am. Bank Note Holographics, Inc.*, 127 F. Supp. 2d at 429-30 ("allocation formula need only have a reasonable, rational basis, particularly if recommended by 'experienced and competent' class counsel . . . the opinion of experienced and informed counsel is entitled to considerable weight.").

Here, Lead Counsel developed the Plan of Allocation in consultation with their economics expert and believe that the Plan of Allocation provides a fair and reasonable method to equitably distribute the Net Settlement Fund among eligible Class Members. Joint Decl. ¶ 9.  If approved, the Plan of Allocation will govern how the Net Settlement Fund will be distributed among Class Members who submit timely and valid Proof of Claim Forms to the Claims Administrator, in accordance with the requirements established by the Court, and who are approved for payment ("Authorized Claimants"). In calculating the estimated alleged artificial inflation allegedly caused by Defendants' alleged misrepresentations and omissions, Lead Plaintiffs' expert considered price changes in Credit Suisse ADRs in reaction to certain public announcements allegedly revealing the truth concerning Defendants' alleged misrepresentations and material omissions, adjusting for price changes that were attributable to market or industry forces. Similar plans of allocation are commonly used and approved in class actions and represent a widely recognized means of fairly

distributing settlement funds to class members. *See In re Namenda Direct Purchaser Antitrust Litig.*, No. 15 Civ. 7488 (CM), 2020 WL 2749223, at *7 (S.D.N.Y. May 27, 2020) (similar plan of allocation developed by expert found fair and reasonable because distribution occurs on a *pro rata* basis, "which courts uniformly approve as equitable.").  The Plan of Allocation outlines the maximum losses an investor can recover, which are equivalent to Lead Plaintiffs' estimate of the artificial inflation of Credit Suisse's ADR price during the Class Period and calculated based on whether the investor held them: (1) over the first disclosure, (2) over the second disclosure; or (3) over both disclosures.  Notice, Dkt. No. 138-1, Ex. A, ¶¶46-63.  Because the Plan of Allocation's methodology tracks the language and requirements of the PSLRA and clearly sets forth the calculated inflation in each of the three different categories of damages, the Plan of Allocation is fair and reasonable. While the Plan of Allocation is not a formal damages study, it reflects Lead Plaintiff's expert's analysis of the alleged artificial inflation of Credit Suisse ADRs during the Class Period and is designed to track the both the language and purpose of the PSLRA's damages provisions found at 15 U.S.C. § 78u-4.

Pursuant to the Plan of Allocation, a "Recognized Loss" amount will be calculated for each Credit Suisse ADR purchased or otherwise acquired during the Class Period (*i.e.*, the period between March 20, 2015 and February 3, 2016, inclusive) that is listed in the Proof of Claim Form submitted and for which adequate documentation is provided. A Class Member's Recognized Loss will depend on, among other things, when the shares were sold (if at all) during the Class Period in relation to the disclosure dates alleged in this Action, whether they were sold after the Class Period during the statutory 90-day look-back period, and the value at which the shares were sold or held.  Notice, Dkt. No. 138-1, Ex. A, ¶¶46-63.

To date, after mailing more than 9,644 Notices, there have been no objections to the Plan of Allocation. Ex. 2, Broker Decl. ¶¶ 17-20.  The Class's positive reaction to the Plan of Allocation also supports its reasonableness.  *In re Signet Jewelers*, 2020 WL 4196468, at \*6.  Because the Plan of Allocation "represents a reasonable method of ensuring the equitable and timely distribution of a settlement fund without burdening the process in a way that will unduly waste the fund," *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 668, 695 (S.D.N.Y. 2019), this factor weighs in favor of approval.

### 3. Rule 23(e)(2)(C)(iii) – The Proposed Award of Attorneys' Fees Supports Final Approval

As explained further in Lead Counsel's motion in support of its request for attorneys' fees and expenses, filed concurrently, Lead Counsel seek a fee of 30% (representing a lodestar multiplier of 0.81) and expense reimbursement of $$367,083.75.  The requested fee is within the range of fees granted in comparable class settlement funds and weighs in favor of granting final approval.

Additionally, as explained further in Lead Counsel's motion in support of its request for attorneys' fees and expenses, the timing of the requested attorneys'-fee payment also supports final approval.  Lead Counsel respectfully submit that awarding all attorneys' fees and expenses upon approval of the Settlement is appropriate due to the excellent result achieved for the Class and aggressive pursuit of the case into discovery, including for a year following the first mediation before reaching a resolution.  Alternatively, should the Court choose to delay Lead Counsel's receipt of attorney's fees  until a distribution is made to the Settlement Class, Lead Counsel respectfully requests that the Court approve payment of half of the fee award as well as reimbursement of litigation expenses upon final approval of the Settlement, with the other half of the fee payable to Lead Counsel upon the first distribution to the Settlement Class.  Under these

circumstances, the requested award of attorneys' fees and expenses and timing of those awards is appropriate and supports final approval.

### 4. Rule 23(e)(2)(C)(iv) – The Supplemental Agreement Has No Bearing on Final Approval

"Rule 23(e)(2)(C)(iv) requires courts to consider 'any agreement required to be identified by Rule 23(e)(3),' that is, 'any agreement made in connection with the proposal.'" *GSE Bonds III* at 13 (quoting Fed. R. Civ. P. 23(e)(2)(C)(iv) and 23(e)(3)). Pursuant to Rule 23(e)(3) and Local Rule 23.1, Plaintiffs disclosed that they had entered into a "Supplemental Agreement" which provides Defendants with the qualified right to withdraw or terminate the Settlement upon the occurrence of certain conditions; at the Court's request, Lead Plaintiffs provided that agreement to the Court for review. Dkt. No. 138. This qualified right arises if potential Settlement Class Members who meet certain criteria exclude themselves from the Settlement Class. Upon reviewing this agreement, the Court granted preliminary approval. Dkt. No. 141. The agreement likewise does not weigh against final approval.

### 5. Rule 23(e)(2)(D) – The Settlement Treats Class Members Equitably Relative to Each Other

As detailed above in Section I.B.2, *supra*, the Plan of Allocation allocates funds among class members on a *pro rata* basis, "which courts uniformly approved as equitable." *In re Namenda Direct Purchaser Antitrust Litig.*, 2020 WL 2749223, at *7. The proposed Settlement therefore meet the requirements of Rule 23(e)(2)(D).

### C. The Notice Campaign Satisfied the Requirements of Rule 23 and Due Process

The Notice provided to the Class satisfied the requirements of Rule 23(c)(2)(B), which requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The

Notice also satisfied Rule 23(e)(1), which requires that notice of a settlement be "reasonable." Fed. R. Civ. P. 23(e)(1). Notice of a settlement is reasonable if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings." *Wal-Mart*, 396 F.3d at 114 (citation omitted).

Both the substance of the Notice and the method of its dissemination to potential Class Members satisfied these standards. The Notice includes all the information required by Rule 23(c)(2)(B) and the PSLRA, 15 U.S.C. § 78u-4(a)(7). In accordance with the Court's Preliminary Approval Order, the Claims Administrator has disseminated 9,644 copies of the Notice to potential Class Members and their nominees as of October 30, 2020 (with an additional 16,821 notices being prepared for mailing). Broker Decl. ¶ 11 & n.2. In addition, the Claims Administrator caused the Summary Notice to be published September 28, 2020 in the *Investor's Business Daily* and disseminated on *PR Newswire* the same day. *Id.* ¶ 12. Copies of the Notice and Proof of Claim Form were made available on a dedicated website maintained by the Claims Administrator, and Lead Counsel featured a link on its website that guided investors to the Claims Administrator's settlement website. Joint Decl. ¶ 38; Broker Decl. ¶¶ 15-16.

This combination of individual mail to all Class Members who could be identified with reasonable effort, supplemented by notice in an appropriate, widely circulated publication, and set forth on Internet websites, was "the best notice practicable under the circumstances" and satisfies the requirements of due process and Rule 23. Fed. R. Civ. P. 23(c)(2)(B). *See, e.g.*, *James*, 2019 WL 9698568, at *1 (Schofield, J.) (granting final approval where notice program "constituted the best notice practicable under the circumstances"); *Padro*, 2013 WL 5719076, at *3 ("Notice need not be perfect, but need be only the best notice practicable under the circumstances, and each

and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members.") (citation omitted).

### D. The Reaction of the Class to Date Favors Approval

The reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy. *See In re Signet Jewelers*, 2020 WL 4196468, at *6; *Padro*, 2013 WL 5719076, at *5 ("The fact that a small number of objections were received weighs in favor of settlement," as does "the positive reaction of the class, particularly in light of its size."). To date, no objections to the Settlement or the Plan of Allocation have been received, and no Class Members have requested exclusion from the Class.[3] Broker Decl. ¶¶ 17-20. This show of support by the Class is particularly significant given that the majority of the Class is comprised of sophisticated institutional rather than retail investors. Because these institutional investors are especially well equipped to evaluate the merits of a litigation settlement, the fact that to date none of these sophisticated class members have objected is additional evidence of the fairness and reasonableness of the Settlement. This overwhelming support of the Settlement by the Class favors final approval.

Pursuant to the Settlement, Defendants' Counsel directed service, upon the appropriate state and federal officials, of notice of the Action in compliance with the requirements of the Class Action Fairness Act, 28 U.S.C. § 1711, *et seq.* (the "CAFA Notice"), on July 14, 2020, within the statutory limit of ten days from Lead Plaintiff's filing of its request for preliminary approval of the Settlement. Joint Decl. ¶ 43; *see also* Dkt. No. 145, ¶ 4 (Declaration of Jenifer Smith Regarding

---

[3] The deadline for requesting exclusion from the Class and for objections is November 19, 2020. As provided in the Preliminary Approval Order, Lead Plaintiffs will file reply papers no later than December 3, 2020, addressing any objections and requests for exclusion that may be received after this brief is filed.

Compliance with 28 U.S.C. § 1715). No objections from any of these officials has been received in response to the CAFA Notice, which further indicates the reasonableness and adequacy of the Settlement. Joint Decl. ¶ 43; *Bryant v. Potbelly Sandwich Works, LLC*, No. 1:17-cv-07638 (CM) (HBP), 2020 WL 563804, at *1 (S.D.N.Y. Feb. 4, 2020); *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, No. 7:13-cv-03073-NSR-LMS, 2017 WL 6729863, at *2 (S.D.N.Y. Nov. 1, 2017).

## II.    THE SETTLEMENT CLASS SHOULD BE FINALLY CERTIFIED

On August 24, 2020, the Court granted Lead Plaintiffs' motion for preliminary approval of the Settlement, and preliminarily certified the Settlement Class for settlement purposes only under Rule 23 of the Federal Rules of Civil Procedure.  Dkt. No. 141 at 2.  Nothing has changed to alter the propriety of certification of the proposed class for settlement purposes and thus, for the reasons set forth in Lead Plaintiffs' preliminary approval papers (Dkt. No. 132 at 16-23),  Lead Plaintiffs respectfully request that the Court grant final certification of the Settlement Class.

## CONCLUSION

For the foregoing reasons, Lead Plaintiffs respectfully request that the Court approve the proposed Settlement and Plan of Allocation as fair, reasonable, and adequate and certify the Class for purposes of the Settlement.

Dated:  November 5, 2020                            Respectfully submitted,

*/ s / Carol V. Gilden*                                      */ s / Steven B. Singer*
Carol V. Gilden (*pro hac vice*)                     Steven B. Singer (SS-5212)
COHEN MILSTEIN SELLERS & TOLL PLLC     SAXENA WHITE P.A.
190 South LaSalle Street, Suite 1705            10 Bank Street, 8th Floor
Chicago, IL 60603                                         White Plains, New York 10606
(312) 357-0370                                            (914) 437-8551
Fax: (312) 357-0369                                     Fax: (888) 631-3611
cgilden@cohenmilstein.com                         ssinger@saxenawhite.com

_/ s / Daniel S. Sommers_
Daniel S. Sommers (_pro hac vice_)
Molly Bowen (_pro hac vice_ pending)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, Suite 500 East
Washington, DC 20005
(202) 408-4600
Fax: (202) 408-4699
dsommers@cohenmilstein.com
mbowen@cohenmilstein.com

Maya Saxena
Joseph E. White, III (JW-9598)
Lester R. Hooker
Adam D. Warden (pro hac vice)
SAXENA WHITE P.A.
7777 Glades Road
Suite 300
Boca Raton, FL 33434
(561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
awarden@saxenawhite.com

_Lead Counsel for Lead Plaintiffs and for the Proposed Class_

26