**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, et al., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 1:17-cv-10014-LGS ) |
| CREDIT SUISSE GROUP AG, et al., | ) **CLASS ACTION** ) |
| Defendants. | ) ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFFS' UNOPPOSED MOTION FOR AN AWARD OF ATTORNEYS'**
**FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

# **TABLE OF CONTENTS**

I.  INTRODUCTION ................................................................................................. 1

II.  ARGUMENT ........................................................................................................ 5

    A.  The "Percentage of the Fund Method" is the Appropriate Method for
Awarding Attorneys' Fees in Common Fund Cases ................................. 5

    B.  The *Goldberger* Factors Support the Fee Request ................................... 7

        1.  First Step in Applying the *Goldberger* Factors .......................... 8

            a.  Comparison to Court-Approved Fees in Other Common
Fund Settlements ................................................................ 8

            b.  The Magnitude and Complexity of the Action Support the
Fee Request ...................................................................... 10

        2.  Second Step in Applying the *Goldberger* Factors .................... 11

            a.  The Quality of Representation and the Results Achieved
Support the Fee Request ................................................... 11

            b.  The Risk of Litigation Supports the Fee Request ........................ 13

            c.  Public Policy Considerations Support the Fee Request ............... 17

            d.  Other Relevant Factors—Lead Plaintiffs' Approval and the
Settlement Class's Reaction Support the Reasonableness of
the Requested Fee ....................................................... 18

        3.  Third Step in Applying the *Goldberger* Factors—Lodestar Cross-
Check ....................................................................................... 20

    C.  Lead Counsel are Entitled to Reimbursement of Their Litigation Expenses ........ 21

    D.  Reimbursement Awards are Fair and Reasonable ................................. 22

    E.  Lead Counsel Respectfully Request that Any Attorneys' Fee Award be
Payable Upon Approval of the Settlement ............................................ 23

III.  CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Asare v. Change Group of New York, Inc.*,
  No. 12 Civ. 3371 (CM), 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) ................................ 21

*Athale v. Sinotech Energy Ltd.*,
  No. 11 Civ. 05831 (AJN), 2013 WL 11310686 (S.D.N.Y. Sept. 4, 2013) ............................ 21

*Blum v. Stenson*,
  465 U.S. 886 (1984) ........................................................................................................... 20

*Boeing Co. v. Van Gemert*,
  444 U.S. 472 (1980) ............................................................................................................. 6

*Cantu-Guerrero v. Lumber Liquidators, Inc.*,
  952 F.3d 471 (4th Cir. 2020) ............................................................................................. 24

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
  No. 1:12-CV-05329-SAS, 2016 WL 10519025 (S.D.N.Y. March 14, 2016) ......................... 9

*City of Providence v. Aeropostale, Inc.*,
  No. 11 CIV 7132 CM GWG, 2014 WL 1883494 (S.D.N.Y. May 9, 2014) ................ 9, 11, 13

*Denney v. Jenkens & Gilchrist*,
  230 F.R.D. 317 (S.D.N.Y. 2005) ......................................................................................... 11

*Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974) ............................................................................................... 16

*Farbotko v. Clinton Cty. of N.Y.*,
  433 F.3d 204 (2d Cir. 2005) ............................................................................................... 20

*Fogarazzo v. Lehman Brothers, Inc.*,
  No. 03 Civ. 5194 (SAS), 2011 WL 671745 (S.D.N.Y. Feb. 23, 2011) ................................ 10

*Goldberger v. Integrated Res.*,
  209 F.3d 43 (2d. Cir. 2000) ........................................................................................ *passim*

*Guevoura Fund Ltd. v. Sillerman*,
  No. 1:15-CV-07192-CM, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ......................... 4, 21

*Hicks v. Stanley*,
  No. 01 CIV 10071 (RJH), 2005 WL 2757792 (S.D.N.Y. Oct. 24, 2005) ................... 5, 18, 23

*In re AOL Time Warner, Inc. Sec. & ERISA Litig.*,
 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006) ............................................................. 15

*In re Bear Stearns Cos. Inc. Sec., Derivative & ERISA Litig.*,
 909 F.Supp.2d 259 (S.D.N.Y.2012) .............................................................. 10, 12

*In re BHP Ltd. Sec. Litig.*,
 No. 1:16-cv-01445, 2019 WL 1577313 (S.D.N.Y. Apr. 10, 2019) ........................... 9

*In re BioScrip, Inc. Sec. Litig.*,
 273 F. Supp. 3d 474 (S.D.N.Y. 2017) ............................................................... 6, 9

*In re China Sunergy Sec. Litig.*,
 No. 07-civ-7895 (DAB), 2011 WL 1899715 (S.D.N.Y. May 13, 2011) .................... 12

*In re Colgate-Palmolive Co. ERISA Litigation*,
 36 F. Supp. 3d 344 (S.D.N.Y. 2014) ......................................................... *passim*

*In re Deutsche Bank AG Sec. Litig.*,
 No. 1:09-cv-01714, 2020 WL 3162980 (S.D.N.Y. June 11, 2020) ........................... 9

*In re Facebook, Inc. IPO Sec. & Derivatives Litig.*,
 No. 12-2389, 2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ..................................... 9

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
 No. 02-CV-3400 CM PED, 2010 WL 4537550 (S.D.N.Y. Nov. 8, 2010) ............... 16

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
 No. 13 CIV. 7789 (LGS), 2018 WL 5839691 (S.D.N.Y. Nov. 8, 2018) ........ 6, 7, 8, 20

*In re Global Crossing Sec. & ERISA Litig.*,
 225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................... 22

*In re GSE Bonds Antitrust Litig.*,
 No. 19-CV-1704 (JSR), 2020 WL 3250593  (S.D.N.Y. June 16, 2020) .................. 20

*In re Hi-Crush Partners L.P. Sec. Litig.*,
 No. 12-Civ-8558 (CM), 2014 WL 7323417 (S.D.N.Y. Dec. 19, 2014) .................. 12

*In re Initial Public Offering Securities Litigation*,
 671 F.Supp.2d 467 (S.D.N.Y.2009) ................................................................. 18

*In re Interpublic Sec. Litig.*,
 No. 02 Civ. 6527 (DLC), 2004 WL 2397190 (S.D.N.Y. Oct. 26, 2004) ................. 21

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   246 F.R.D. 156 (S.D.N.Y. 2007) ................................................................................. 21

*In re Platinum and Palladium Commodities Litig.*,
   No. 10-cv-3617, 2015 WL 4560206 (S.D.N.Y. July 7, 2015) .................................. 20

*In re Prothena Corp PLC Sec. Litig.*,
   No. 1:18-CV-06425-ALC, 2019 WL 6528672 (S.D.N.Y. Dec. 4, 2019) ................... 9

*In re Revolution Lighting Techs., Inc. Sec. Litig.*,
   No. 1:19-CV-00980-JPO, 2020 WL 4596811 (S.D.N.Y. Aug. 11, 2020) ............... 23

*In re Signet Jewelers Ltd. Sec. Litig.*,
   No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468 (S.D.N.Y. July 21, 2020) ........ 23

*In re Sturm, Ruger, & Co., Inc. Sec. Litig.*,
   No. 09-cv-1293, 2012 WL 3589610 (D. Conn. Aug. 20, 2012) .............................. 12

*In re Telik, Inc. Sec. Litig.*,
   576 F.Supp.2d 570 (S.D.N.Y. Sept. 10, 2008) ...................................................... 13

*In re Veeco Instruments Inc. Sec. Litig.*,
   No. 05 MDL 01695 (CM), 2007 WL 4115808 (S.D.N.Y. Nov. 7, 2007) ............... 19

*Maley v. Del Global Techs Corp.*,
   186 F. Supp. 2d 358 (S.D.N.Y. 2002) .................................................................... 16

*Pelzer v. Vassalle*,
   655 F. App'x 352 (6th Cir. 2016) ........................................................................... 24

*Ressler v. Jacobson*,
   149 F.R.D. 651 (M.D. Fla. 1992) ........................................................................... 19

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir.1997) ............................................................................... 17

*Shapiro v. J.P. Morgan Chase & Co.*,
   No. 11 CIV 7961 CM, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ......... 15, 17, 18

*Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*,
   258 F.Supp.2d 254 (S.D.N.Y.2003) ....................................................................... 17

*Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*,
   No. 01-CV-11814(MP), 2004 WL 1087261 (S.D.N.Y. May 14, 2004) ................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................ 18

*U.S., ex rel Fox Rx, Inc. v. Omnicare, Inc.*,
  No. 12-cv-275, 2015 WL 1726474 (S.D.N.Y. April 15, 2015) .............................. 20

*Varljen v. H.J. Meyers & Co.*,
  No. 97 CIV 6742 (DLC), 2000 WL 1683656 ...................................................... 23

*Velez v. Novartis Pharm. Corp.*,
  No. 04 CIV 09194 CM, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .................. 10

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
  396 F.3d 96 (2d Cir. 2005) .................................................................................. 6

## STATUTES

15 U.S.C. §78u-4(a)(4) ................................................................................................ 5

## RULES

Fed. R. Civ. P. 23 ........................................................................................................ 15

## OTHER AUTHORITIES

Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their
  Fee Awards*, 7 J. Empirical Legal Stud. 811 (2010) ............................................ 8, 9

Brian T. Fitzpatrick, *The End of Objector Blackmail?*,
  62 Vand. L. Rev. 1623 (2009) ............................................................................ 24

H.R. Conf. Rep. No. 104-369 (1995) ........................................................................ 19

Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class Action
  Litigation: 2019 Full-Year Review" (NERA Jan. 21, 2020) ........................... 2, 8, 12

Newberg on Class Actions §16:5 (5th ed.) ............................................................... 22

Theodore Eisenberg, Geoffrey Miller, and Roy Germano, *Attorney's Fees In
  Class Actions: 2009-2013*, New York University Law Review,
  Vol. 92:937 (2017)........................................................................................ 8, 9, 21

Lead Plaintiffs, City of Birmingham Retirement and Relief System ("City of Birmingham"), Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds ("Local 60"), Teamster Local 456 Pension and Annuity Funds ("Teamsters Local 456"), and the International Brotherhood of Teamsters Local No. 710 Pension Plan ("Teamsters Local 710") (collectively, "Lead Plaintiffs"), respectfully request that the Court grant their motion for an award of (i) attorneys' fees in the amount of 30% of the Settlement Fund, representing a negative 0.81 multiplier of Plaintiffs' Counsel's lodestar; (ii) reimbursement of $367,083.75 in litigation expenses that Plaintiffs' Counsel reasonably and necessarily incurred in prosecuting and resolving the Action; and (iii) $21,319.00 in total time and expenses incurred by Lead Plaintiffs, directly related to their representation of the Settlement Class, as authorized by the Private Securities Litigation Reform Act of 1995 ("PSLRA").[1]

## I.  INTRODUCTION

The proposed $15,500,000 million Settlement resolves all claims in the Action and, under any measure, represents an outstanding outcome for the Class and fully supports Lead Counsel's fee request.  Indeed, as Lead Plaintiffs describe in their accompanying memorandum in support of final approval of the Settlement and the Plan of Allocation (the "Final Approval Memo"), the proposed Settlement secures a substantial recovery representing an extraordinarily high percentage of between 23.7% to 63.4% of Plaintiffs' estimated damages in this action—a rate

---

[1] Lead Plaintiffs respectfully refer the Court to the accompanying Joint Declaration of Steve Singer and Carol Gilden and Daniel S. Sommers in Support of Lead Plaintiffs' Unopposed Motion for Final Approval of the Proposed Settlement and Approval of Plan of Allocation, and Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Joint Decl."), filed herewith, for a detailed description of the Action and the Settlement. "¶_" references are to the Joint Declaration.  Unless otherwise indicated, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement, dated July 8, 2020 (Dkt. 133) (the "Settlement" or "Stipulation"), all emphasis has been added, and internal quotation marks have been omitted.

that is **11 to 30 times greater** than the 2.1% median recovery for securities class actions in 2019.[2] Moreover, if the Court or a jury embraced any of Defendants' anticipated challenges to Lead Plaintiffs' claims, damages at issue in the litigation would have been materially impacted, perhaps to zero. Against the real risk of a diminished or no recovery, Lead Counsel obtained a meaningful and immediate benefit to the Settlement Class, all while avoiding the substantial expense, delay, and uncertainty inherent in continued litigation.

The $15.5 million Settlement is even more significant in light of the very real risks Lead Counsel faced in prosecuting this action. Lead Plaintiffs' claims centered on Credit Suisse's alleged misrepresentations related to the Company's "binding" risk limits, which were alleged to have been raised to accommodate growing exposure to highly risky and illiquid positions in its fixed income franchise. The Company's alleged violations of its own risk control and risk limit policies allegedly allowed Credit Suisse to amass $4.3 billion in exposure to these investments, which included collateralized loan obligations ("CLOs") and distressed debt instruments. These securities, which were difficult to liquidate and consumed substantial amounts of regulatory capital, allegedly made the Bank susceptible to enormous losses in the volatile credit markets. Credit Suisse ultimately incurred over $1 billion in losses from these investments, the announcement of which allegedly led to a decline in the price of the Company's ADRs. While Lead Plaintiffs continue to maintain their belief in the viability of their claims, Defendants raised significant challenges to these allegations throughout the litigation.

Specifically, Defendants maintained that the statements related to Credit Suisse's risk management framework were not false or misleading. In support of this argument, Defendants

---

[2] Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review" (NERA Jan. 21, 2020) at p. 20, Fig. 13.

noted, among other things, that Credit Suisse disclosed that its risk appetite and risk limits may change and that Credit Suisse's overall exposure to distressed debt decreased, rather than increased, over the Class Period.  Defendants also argued that Lead Plaintiffs could not establish scienter because Defendants made no statements about Credit Suisse's risk limits and controls which the Individual Defendants believed to be false at the time they were made.  Defendants also had strong  arguments that the Class would not be able to establish loss causation, at least as to one of the corrective disclosures, and that, even if the Class could do so, damages were at most only a small fraction of Plaintiffs' asserted damages and substantially less than the Settlement Amount.  For example, Defendants argued that Plaintiffs could not show that the ADR price decline following the February 4, 2016 earnings announcement at the end of the Class Period was attributable to Credit Suisse's losses in its fixed income franchise, particularly in light of the confounding factors announced at the time, including a goodwill impairment charge of 3.8 billion Swiss francs, litigation charges of 820 million Swiss francs, and the overall challenging market conditions for investment banks globally during this time.  Any one of these risks could have meant a substantially reduced recovery or the end of the litigation in its entirety. These risks would persist at every stage of the litigation—at summary judgment, at trial, and on appeal.

Despite these considerable risks, and as set forth in greater detail in the Joint Declaration, Lead Counsel's vigorous prosecution of this Action produced an outstanding recovery for the Class, thereby justifying the requested fee award.  Plaintiffs' Counsel expended over 11,650 hours litigating this Action, which included: (i) a wide-ranging investigation, prior to drafting and filing the Amended Class Action Complaint (the "Complaint"), into the claims giving rise to the Complaint, including interviewing numerous former employees of the Company and

consulting with an investment banking expert; (ii) successfully opposing in part a motion to dismiss that meaningfully challenged every element of Lead Plaintiffs' claims and successfully opposing a motion for reconsideration; (iii) engaging in extensive fact discovery, including reviewing over 1.5 million pages of documents produced by Defendants; (iv) preparing to move for class certification, including the submission of a pre-motion conference letter on class certification and working with an economics expert specializing in market efficiency and damages to prepare an expert report in support of class certification; and (v) engaging in settlement negotiations, including two full-day mediation sessions before a nationally acclaimed mediator, which involved the preparation of detailed mediation statements.  Joint Decl. ¶¶ 14-19.

Given the substantial recovery Lead Counsel obtained for the Settlement Class in the face of the significant risks posed by this litigation—as well as the complexity and amount of work involved, and Lead Counsel's skill and expertise in completing that work—Lead Counsel's fee request of 30% of the Settlement Amount is fair and reasonable.  Indeed, courts in this district have awarded percentage fees of 30% or higher in comparable securities class actions, and the reasonableness of Lead Counsel's fee request is also supported by the lodestar crosscheck, which yields a negative multiplier of 0.81 — meaning that the value of Plaintiffs' Counsel's time is substantially higher than the amount of the fee requested, which courts have recognized fully supports the reasonableness of the fee.  *See Guevoura Fund Ltd. v. Sillerman*, No. 1:15-CV-07192-CM, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) ("Courts have repeatedly recognized that the reasonableness of the fee request" is reinforced where "'the percentage fee would represent a negative multiplier of the lodestar.'")

Lead Counsel also seek an award of litigation expenses of $367,083.75.  The expenses incurred by Lead Counsel are reasonable and routinely paid for in representative litigation.  Lead

Plaintiffs also respectfully move for a total of $21,319.00[3] in lost wages and out-of-pocket expense reimbursements pursuant to 15 U.S.C. §78u-4(a)(4) for their representation of the Class. Lead Plaintiffs collectively spent significant hours, which could have been spent on their pension funds' business, overseeing the Action, reviewing pleadings and briefs, collecting and producing documents, and supervising Lead Counsel.  The costs and expenses requested by Lead Plaintiffs and their counsel are reasonable in amount, and they were necessarily incurred in the successful prosecution of the Action.  *See Hicks v. Stanley*, No. 01 CIV. 10071 (RJH), 2005 WL 2757792, at *10 (S.D.N.Y. Oct. 24, 2005).

Finally, the Class's positive reaction and Lead Plaintiffs' endorsement further support granting this motion.  Lead Plaintiffs—sophisticated institutional investors who were closely involved in the prosecution of the Action and the Settlement negotiations—have reviewed and fully endorsed Lead Counsel's 30% fee request and expense request.  Additionally, while the deadline for Settlement Class Members to object to the requested attorneys' fees has not yet passed, thus far no objections to the fee request have been lodged.

For these reasons, and as set forth in more detail below and in the Joint Declaration, Lead Plaintiffs and Lead Counsel respectfully request that the Court approve this motion.

## II.   ARGUMENT

### A.   The "Percentage of the Fund Method" is the Appropriate Method for Awarding Attorneys' Fees in Common Fund Cases

As the U.S. Supreme Court has long recognized, "a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee

---

[3] Specifically, City of Birmingham requests a time and expense award of $1,868.75, Local 60 requests a time and expense award of $3,177.25, Teamsters Local 456 requests a time and expense award of $3,648.00, and Teamsters Local 710 requests a time and expense award of $12,625.00.

from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "What constitutes a reasonable fee is properly committed to the sound discretion of the district court." *Goldberger v. Integrated Res*., 209 F.3d 43, 47 (2d. Cir. 2000).

There are two methods that may be used in the Second Circuit to calculate attorneys' fees from the common fund: (1) the "lodestar" method (which requires the court to look at reasonable hours billed by counsel and apply a multiplier based on the *Goldberger* factors, discussed below), and (2) the "percentage of the fund" method (which requires the court to award a reasonable percentage of the total value of the common fund lead counsel obtained for the class). *See Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005). For years, "the trend in this Circuit has been toward the use of a percentage of recovery as the preferred method of calculating the award for class counsel in common fund cases, particularly in complex securities class actions." *In re BioScrip, Inc. Sec. Litig.*, 273 F. Supp. 3d 474, 495–96 (S.D.N.Y. 2017).

Indeed, the vast majority of courts—including this Court—have utilized the "percentage of the fund" method as the preferred method to calculate attorneys' fees in common fund cases. Indeed, as this Court has held, the percentage method "'directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation.'" *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2018 WL 5839691, at *1 (S.D.N.Y. Nov. 8, 2018) ("*Forex*"), *aff'd sub nom. Kornell v. Haverhill Ret. Sys*., 790 F. App'x 296 (2d Cir. 2019*)*, quoting *Wal-Mart*, 396 F.3d at 121; *see also In re Colgate-Palmolive Co. ERISA Litigation*, 36 F. Supp. 3d 344, 348 (S.D.N.Y. 2014). Nevertheless, the lodestar method remains useful as a "cross check on the reasonableness of the requested percentage." *Id.*, citing *Goldberger*, 209 F. 3d at 43.

### B.      The *Goldberger* Factors Support the Fee Request

In evaluating a proposed fee, courts in the Second Circuit are guided by the following so-called "*Goldberger* factors":

> (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.

*Colgate-Palmolive*, 36 F. Supp. 3d at 347 (citing *Goldberger*, 209 F. 3d at 50).

In *Forex* and *Colgate-Palmolive*, this Court utilized a three-step approach in applying the *Goldberger* factors.  *Forex*, 2018 WL 5839691, at *2 (citing *Colgate-Palmolive*, 36 F. Supp. 3d at 348).  First, the Court determines a baseline reasonable fee by reference to other common fund settlements of a similar size, complexity and subject matter.  *Id.*  This first step considers three of the *Goldberger* factors—the requested fee in relation to the settlement, the magnitude and complexity of the case, and the policy considerations of avoiding a windfall to class counsel.  *Id.* The second step involves adjusting the baseline fee based on the *Goldberger* factors of risk, quality of representation and other public policy concerns.  *Id.*  In the third step, the Court applies the lodestar method as a cross-check, which addresses the final *Goldberger* factor of the time and labor expended by counsel.  *Id.*

As explained below, Lead Counsel's request for a fee in the amount of 30% of the Settlement Fund is fair and reasonable, particularly because the requested fee represents a 0.81 lodestar multiplier.  The requested fee represents a modest upward adjustment from a baseline fee percentage and is justified by, among other things, the exceptional result (as demonstrated by the settlement amount of 23.7% to 63.4% of plaintiffs' potential damages), the risky nature of this contingent litigation, and the substantial time and labor expended by counsel.

1.      **First Step in Applying the *Goldberger* Factors**

a.      **Comparison to Court-Approved Fees in Other Common Fund Settlements**

"Under the percentage method, the fee is a reasonable percentage of the total value of the settlement fund created for the class." *Colgate-Palmolive*, 36 F. Supp. 3d at 348. Thus, the first step under this Court's approach "is to determine a baseline reasonable fee by looking to other common fund settlements of a similar size, complexity and subject matter." *Forex*, 2018 WL 5839691, at *2.

This Court has previously cited to empirical studies of attorneys' fee awards in class action settlements, which provide "an unbiased and useful reference for comparing fee cases of similar magnitude as a starting point for the sliding scale." *Colgate-Palmolive*, 36 F. Supp. 3d at 349. According to a report published by NERA Economic Consulting, for securities class action settlements settled between 2010 and 2019 with a gross settlement value ranging from $10 million to $25 million, the median of plaintiffs' attorneys' fees as a percentage of settlement value was 25%. *See* Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review" (NERA Jan. 21, 2020), at 25. Professor Brian T. Fitzpatrick's study of all federal class action settlements in 2006 and 2007 calculated the same 25% median for settlements ranging from $10 million to $30 million. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 839, Table 10 (2010).

In Professors Theodore Eisenberg, Geoffrey Miller, and Roy Germano's *Attorney's Fees In Class Actions: 2009-2013*, New York University Law Review, Vol. 92:937, 948 (2017) ("Eisenberg & Miller"), the authors reported that, between 2009 and 2013, for settlements between $12 million and $23.4 million, the mean fee percentage was 26%. Eisenberg & Miller

8

further found that, between 2009 and 2013, the median fee percentage for class recoveries in the Southern District of New York was 31%, and the median fee percentage for class recoveries in the Second Circuit was 30%. *Id.* at 950-951.

The fact remains that fee awards of 30% or more are routinely awarded in class action settlements in this District for cases similar in size to the present Action. *See In re Prothena Corp PLC Sec. Litig.*, No. 1:18-CV-06425-ALC, 2019 WL 6528672, *1 (S.D.N.Y. Dec. 4, 2019) (awarding 30% of $15.75 million settlement, plus interest; settlement represented recovery of between 3% and 16.5% of class's possible damages); *In re Ubiquiti Networks, Inc. Securities Litigation*, No. 18-cv-01620 (VM), at 6 (S.D.N.Y. March 27, 2020) (Dkt. No. 49) (awarding 33.3% of $15 million settlement, plus interest; case settled at motion to dismiss stage and represented recovery of 11% of class's possible damages); *In re Deutsche Bank AG Sec. Litig.*, No. 1:09-cv-01714, 2020 WL 3162980, at *1 (S.D.N.Y. June 11, 2020) (awarding 33.3% of $18.5 million settlement, plus interest; settlement represented 47% of reasonably recoverable class-wide damages); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, No. 1:12-CV-05329-SAS, 2016 WL 10519025, at *1 (S.D.N.Y. March 14, 2016) (awarding 30% of $14 million settlement, plus interest; settlement represented 20% of estimated recoverable damages); *In re Facebook, Inc. IPO Sec. & Derivatives Litig.*, No. 12-2389, 2015 WL 6971424, at *9-13 (S.D.N.Y. Nov. 9, 2015) (awarding 33% of $26.5 million settlement, plus interest); *In re BHP Ltd. Sec. Litig.*, No. 1:16-cv-01445, 2019 WL 1577313, *1 (S.D.N.Y. Apr. 10, 2019), *aff'd*, 806 Fed. Appx. 17 (2d Cir. 2020) (awarding 30% of $50 million settlement, plus interest; settlement represented 20% of estimated recoverable damages); *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM GWG, 2014 WL 1883494, at *20 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 Fed. Appx. 73 (2d Cir. 2015) (awarding 33% of $15 million

settlement); *Velez v. Novartis Pharm. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852, at *21 (S.D.N.Y. Nov. 30, 2010) ("District courts in the Second Circuit routinely award attorneys' fees that are 30 percent or greater.") (collecting cases).

As discussed below, the remaining *Goldberger* factors warrant a 30% fee award.

> **b.** **The Magnitude and Complexity of the Action Support the Fee Request**

Securities class actions are by their very nature complicated, and district courts in this Circuit have long recognized that securities class actions are "notably difficult and notoriously uncertain" to litigate. *In re Bear Stearns Cos. Inc. Sec., Derivative & ERISA Litig.*, 909 F.Supp.2d 259, 266 (S.D.N.Y.2012); *see also Fogarazzo v. Lehman Brothers, Inc.*, No. 03 Civ. 5194 (SAS), 2011 WL 671745, at *3 (S.D.N.Y. Feb. 23, 2011) ("courts have recognized that, in general, securities actions are highly complex").

This case was no exception. As described in greater detail in the Joint Declaration, Lead Plaintiffs' claims raised numerous complex legal and factual issues concerning Credit Suisse's risk limits and risk controls, as well as the Company's exposure to illiquid investments in CLOs and other exotic distressed debt instruments. Indeed, Credit Suisse's 2014 Annual Report devoted no less than 35 pages to its internal risk controls, and Lead Counsel engaged a former investment banker as a consulting expert to advise on these matters given the complexity involved in assessing the impact of the risk controls disclosures on the misrepresentations and omissions alleged in this case.

In connection with formal discovery, Lead Counsel undertook to review and analyze over 1.5 million pages of documents, which included intricate reports related to Credit Suisse's risk control infrastructure. Credit Suisse's bankers used hundreds of arcane acronyms and investment banking jargon in their communications and reports, making development of the

evidentiary record difficult and time-consuming.  Indeed, Lead Counsel was required to expend significant time investigating the Company's investment banking division, and its fixed income franchise in particular, which encompassed its CLOs and distressed debt investments. *See, e.g.*, *Denney v. Jenkens & Gilchrist*, 230 F.R.D. 317, 352 (S.D.N.Y. 2005), *aff'd in part, vacated in part, remanded sub nom. Denney v. Deutsche Bank AG*, 443 F.3d 253 (2d Cir. 2006) (finding complexity to be a significant factor where "class counsel had to expend significant time learning the complicated tax shelter business in order to prosecute plaintiffs' claims").

Defendants raised many complex issues related to loss causation and damages, and Defendants contested their liability on falsity and scienter, discussed in greater detail in the risk section below.  Addressing these issues required substantial efforts by Lead Counsel, through detailed analysis of the factual record, intensive legal research, and extensive consultation with experts.

Thus, the magnitude and complexity of this action supports the requested fee award.

### 2.  Second Step in Applying the *Goldberger* Factors

#### a.  The Quality of Representation and the Results Achieved Support the Fee Request

"The quality of the representation and the standing of Lead Counsel are important factors that support the reasonableness of the requested fee." *Aeropostale*, 2014 WL 1883494, at *16. "[T]he quality of representation is best measured by results . . . calculated by comparing the extent of possible recovery with the amount of actual verdict or settlement." *Goldberger*, 209 F. 3d at 55.

Lead Counsel's efforts here obtained a sizeable recovery for the class—$15.5 million, or approximately 23.7%-63.4% of the estimated maximum aggregate recoverable damages of $24 million to $65 million pursuant to Lead Plaintiffs' damages expert's calculations.  Notably, this

recovery is ***11 to 30 times greater*** than the 2.1% median recovery for securities class actions in 2019.   Janeen McIntosh and Svetlana Starykh, "Recent Trends in Securities Class Action Litigation: 2019 Full-Year Review" (NERA Jan. 21, 2020) at p. 20, Fig. 13.   *See also In re Sturm, Ruger, & Co., Inc. Sec. Litig.*, No. 09-cv-1293, 2012 WL 3589610, at *7 (D. Conn. Aug. 20, 2012) (noting that a settlement obtaining 3.5% of the "most aggressive estimate of maximum provable damages … exceeds the average recovery in shareholder litigation" and affirming an average range of 3% to 7% recoveries) (citing *In re China Sunergy Sec. Litig.*, No. 07-civ-7895 (DAB), 2011 WL 1899715, at *5 (S.D.N.Y. May 13, 2011).   Thus, by any measure, the $15.5 million Settlement is an outstanding result that weighs heavily in favor of the requested fee award.

From the outset of this case, Lead Counsel sought to obtain the maximum recovery for the Class.   Lead Counsel devoted substantial amounts of attorney and staff time, as well as its own money and other considerable resources in the vigorous prosecution of this matter.   Joint Decl. ¶¶ 17, 58, 61, 65-67.   Merely investigating and drafting a sufficient amended complaint to survive a motion to dismiss required considerable skill and effort here.   Indeed, Lead Counsel developed the allegations in the Action without the benefit of a pending regulatory action that provided a roadmap for Lead Plaintiffs' claims.[4]   *See In re Hi-Crush Partners L.P. Sec. Litig.,* No. 12-Civ-8558 (CM), 2014 WL 7323417, at *16 (S.D.N.Y. Dec. 19, 2014) ("Lead Counsel did not have the benefit of a 'road map' established by a government investigation off which they could 'piggy back', but instead independently developed factual allegations and legal theories sufficient to survive the PSLRA's heightened pleading standards").   Lead Counsel's advocacy

---

[4] While the SEC sent a letter to Credit Suisse in 2016 inquiring about the events leading to the Company's $1 billion write-down, no action was taken against the Company.

allowed their claims related to Credit Suisse's risk controls and risk limits to survive a motion to dismiss, and after the case did not settle at an initial mediation, Lead Counsel aggressively litigated the action in discovery for over a year to achieve the Settlement.

Moreover, as demonstrated by their firm résumés, Saxena White and Cohen Milstein are highly qualified and experienced law firms in the fields of securities class actions and complex litigation.  *See* Ex. 3 to Exs. 7 and 8 of Joint Decl.  Without question, Lead Counsel's skills and experience were a major factor in obtaining the excellent result achieved here.

Lastly, "the quality of opposing counsel is also important in evaluating the quality of Lead Counsel's work."  *Aeropostale*, 2014 WL 1883494, at *17.  Here, Defendants were represented by Cahill Gordon & Reindel LLP, a nationally recognized law firm that regularly defends major securities class actions and vigorously contested this Action through a motion to dismiss, extensive and hotly contested discovery negotiations, and in the Settlement negotiations. Lead Counsel's ability to obtain the Settlement against this formidable opposition confirms the quality of the representation, supporting Lead Counsel's fee request.

> **b.     The Risk of Litigation Supports the Fee Request**

The "Second Circuit has identified the risk of success as perhaps the foremost factor to be considered in determining a reasonable award of attorneys' fees."  *Aeropostale, Inc.*, 2014 WL 1883494, at *14; *see also In re Telik*, *Inc. Sec. Litig.*, 576 F.Supp.2d 570, 592 (S.D.N.Y. Sept. 10, 2008) (citing *Goldberger*, 209 F.3d at 50) ("Courts have repeatedly recognized that the risk of the litigation is a pivotal factor in assessing the appropriate attorneys' fees to award to plaintiffs' counsel in class actions.").

As further discussed in the Final Approval Memo and Joint Declaration, Lead Counsel faced significant risks in proving liability, establishing loss causation and damages, and in bringing this Action on a contingency basis.

**Risks in proving liability**.  This case involved complicated facts and difficult legal issues, and the risks in litigating these issues were borne out when the Court dismissed Lead Plaintiffs' claims related to Credit Suisse's positions in its distressed portfolio.  With respect to the remaining claims concerning the Company's risk limits and risk controls, Defendants strongly disagreed with Lead Plaintiffs' argument that the challenged statements were false or misleading, and contended that (i) Credit Suisse's public filings accurately described Credit Suisse's risk management framework, including that Credit Suisse's risk appetite and risk limits may change; and (ii) that Credit Suisse did not repeatedly raise, breach, or otherwise violate its applicable risk limits.  Defendants also argued that Credit Suisse's overall exposure to distressed debt decreased, rather than increased, over the Class Period, in an effort to undercut Lead Plaintiffs' theory that the Company was violating its risk limits and risk controls to take on excessive risky debt.  Defendants also argued that Lead Plaintiffs could not establish scienter because Defendants made no statements about Credit Suisse's risk limits and controls which the Individual Defendants believed to be false at the time they were made.  Although Lead Plaintiffs believed they had strong arguments in response to these contentions, they also recognized that there was a real risk that the Court on summary judgment or a jury after trial could have found no violations of the federal securities laws.

Additionally, Defendants would have aggressively contested class certification.  Defendants' pre-motion letter on class certification raised numerous arguments as to why class certification was improper, including that Defendants would rebut the fraud-on-the-market

14

presumption of reliance by showing absence of price impact from the misrepresentations or a statistically significant decline on the dates of the alleged corrective disclosures, that damages could not be determined on a class-wide basis, and that one or more Lead Plaintiffs was subject to unique defenses precluding a finding of typicality and adequacy under Federal Rule of Civil Procedure 23.  Again, while Lead Plaintiffs believe they had strong arguments in response, the Court could have declined to certify the Class or shortened the Class Period, thus reducing the damages available to the Class.

**Risks in proving loss causation and establishing damages**.  "Proof of damages in complex class actions is always complex and difficult and often subject to expert testimony." *Shapiro v. J.P. Morgan Chase & Co.*, No. 11 CIV. 7961 CM, 2014 WL 1224666, at *11 (S.D.N.Y. Mar. 24, 2014); *see also In re AOL Time Warner, Inc. Sec. & ERISA Litig.*, 2006 WL 903236, at *9 (S.D.N.Y. Apr. 6, 2006) ("[T]he legal requirements for recovery under the securities laws present considerable challenges, particularly with respect to loss causation and the calculation of damages.")

Even if Lead Plaintiffs had proved falsity and scienter, Defendants had credible arguments related to loss causation, and the Court or jury could have greatly reduced the damages available to the Class.  Specifically, Defendants argued that no information related to risk limits and risk controls was released on October 21, 2015 and so that date did not constitute a corrective disclosure, meaning Lead Plaintiffs were not entitled to damages stemming from any decline in the ADR price on that date.  Defendants also argued that a host of information unrelated to this lawsuit was announced on both alleged corrective disclosure dates of October 21, 2015 and February 4, 2016 and that any ADR price decline was attributable in whole or in part to information unrelated to this lawsuit.  In particular, Defendants argued with respect to the

February 4, 2016 stock drop, the earnings announcement disclosed not only information relevant to this lawsuit, but also totally unrelated information, including a goodwill impairment charge, litigation charges, and the overall challenging market conditions for investment banks globally during this time.   While Lead Plaintiffs had strong responses to these arguments, these disagreements would undoubtedly have resulted in a "battle of the experts" at trial with no certainty as to which expert the jury would credit.  *See, e.g. In re Flag Telecom Holdings, Ltd. Sec. Litig*., No. 02-CV-3400 CM PED, 2010 WL 4537550, at *28 (S.D.N.Y. Nov. 8, 2010) (burden in proving the extent of the class's damages weighed in favor of approving fee request).

**Contingency risk**.   The risks associated with undertaking a case "on a contingent fee basis is an important factor in determining an appropriate fee award."  *Flag Telecom Holdings,* 2010 WL 4537550, at *27.  "Class counsel undertook a substantial risk of absolute non-payment in prosecuting this action, for which they should be adequately compensated." *Maley v. Del Global Techs Corp.*, 186 F. Supp. 2d 358, 372 (S.D.N.Y. 2002); *see also Teachers' Ret. Sys. of Louisiana v. A.C.L.N., Ltd.*, No. 01-CV-11814(MP), 2004 WL 1087261, at *3 (S.D.N.Y. May 14, 2004) ("Little about litigation is risk-free, and class actions confront even more substantial risks than other forms of litigation.").  As the Second Circuit has observed:

> No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success.   Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended.

*Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir. 1974).

Lead Counsel here undertook this case on a wholly contingent basis, knowing the litigation could last for years and would require substantial attorney time and a significant expenditure of litigation expenses, with no guarantee of any compensation.   Unlike defense

counsel, who are paid hourly rates and reimbursed for their expenses on a regular basis, Lead Counsel has not been compensated for any time or expense since this case began nearly three years ago, and would have received no compensation at all if this case had not been successful. Indeed, even if the Court certified a class and Lead Plaintiffs were successful at trial, Lead Plaintiffs would still face the risk of an unfavorable ruling in a dispositive post-trial motion or a reversal on appeal. *Strougo ex rel. Brazilian Equity Fund, Inc. v. Bassini*, 258 F.Supp.2d 254, 261 (S.D.N.Y.2003) ("[E]ven if a shareholder or class member was willing to assume all the risks of pursuing the actions through further litigation ... the passage of time would introduce yet more risks ... and would, in light of the time value of money, make future recoveries less valuable than this current recovery."); *Robbins v. Koger Props., Inc*., 116 F.3d 1441, 1449 (11th Cir.1997) (reversing $81 million jury verdict and dismissing case with prejudice in securities action).

Lead Counsel's assumption of this contingency-fee risk strongly supports the reasonableness of their requested fee.

### c.    Public Policy Considerations Support the Fee Request

The sixth *Goldberger* factor, public policy considerations, favors Lead Counsel's fee request. Courts in the Second Circuit have held that "public policy concerns favor the award of reasonable attorneys' fees in class action securities litigation." *Flag Telecom Holdings,* 2010 WL 4537550, at *29; *Colgate-Palmolive*, 36 F. Supp. 3d at 353 (stating the types of common fund cases warranting adjustment "are based on laws reflecting important policy concerns—for example, the protection of consumers or investors"). In *Shapiro v. J.P. Morgan Chase & Co.*, the court recognized "the importance of private enforcement actions and the corresponding need to incentivize attorneys to pursue such actions on a contingency fee basis," holding:

> "[C]lass actions serve as private enforcement tools when ... regulatory entities fail to adequately protect investors ... plaintiffs' attorneys need to be sufficiently incentivized to commence such actions in order to ensure that defendants who engage in misconduct will suffer serious financial consequences ... awarding counsel a fee that is too low would therefore be detrimental to this system of private enforcement."

No. 11-Civ-8331 (CM), 2014 WL 1224666, at *24 (S.D.N.Y. Mar. 24, 2014) (quoting *In re Initial Public Offering Securities Litigation,* 671 F.Supp.2d 467, 515–16 (S.D.N.Y.2009); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 313 (2007) (Supreme Court "has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions").

Additionally, awarding percentage fees support the class action mechanism, which is often the only mechanism by which large numbers of investors can recover for their losses. *See Hicks*, 2005 WL 2757792, at *9 ("[d]ue to the dispersed, and relatively small, losses among a large pool of investors, the class action mechanism and its associated percentage-of-recovery fee award solve the collective action problem otherwise encountered by which it would not be worthwhile for individual investors to take the time and effort to initiate the action").

Significantly, awarding percentage fees that adequately compensate class counsel also promotes "efficient prosecution and early resolution." *Colgate-Palmolive*, 36 F. Supp. 3d at 348. Accordingly, public policy concerns support Lead Counsel's fee request.

### d. Other Relevant Factors—Lead Plaintiffs' Approval and the Settlement Class's Reaction Support the Reasonableness of the Requested Fee

As additional factors in assessing Lead Counsel's fee request, courts consider plaintiffs' approval of the requested fee and the lack of objections by class members. Here, Lead Plaintiffs were actively involved in the prosecution and settlement of this Action and have approved the requested fee. Lead Plaintiffs are precisely the type of institutional investors Congress

envisioned as serving as fiduciaries for class actions when it enacted the PSLRA.  The PSLRA was intended to encourage institutional investors to assume control of securities class actions in order to "increase the likelihood that parties with significant holdings in issuers, whose interests are more strongly aligned with the class of shareholders, will participate in the litigation and exercise control over the selection and action of plaintiff's counsel."  H.R. Conf. Rep. No. 104-369, at *32 (1995) U.S.C.C.A.N. 730, 731.  Congress believed that these institutional investors would be in the best position to monitor the prosecution and assess the reasonableness of counsel's fee requests.  Accordingly, Lead Plaintiffs' endorsement of the fee request supports its reasonableness.  *See, e.g.*, *In re Veeco Instruments Inc. Sec. Litig.*, No. 05 MDL 01695 (CM), 2007 WL 4115808, at *8 (S.D.N.Y. Nov. 7, 2007) ("public policy considerations support the award in this case because the Lead Plaintiff . . . – a large public pension fund – conscientiously supervised the work of lead counsel and has approved the fee request.").

The reaction of the settlement class also supports Lead Counsel's requested fee.  As of October 30, 2020, the Claims Administrator has sent the Notice to 9,644 potential members of the settlement class and their nominees (with an additional 16,821 notices being prepared for mailing), informing them, among other things, that Lead Counsel intended to apply to the Court for an award of up to 30% of the Settlement Amount.  While the time to object to Lead Counsel's fee application does not expire until November 19, 2020, to date, not a single objection has been received.  The lack of objections is "strong evidence" of the reasonableness of the fee request.  *Ressler v. Jacobson*, 149 F.R.D. 651, 656 (M.D. Fla. 1992).  This is especially true in this case, where the vast majority of the Class is comprised of sophisticated institutional rather than retail investors.  *See* Joint Decl., Ex. 11.  These institutional investors are especially well equipped to both evaluate the merits of a litigation settlement as well as the reasonableness

of requests for fees and reimbursement of litigation expenses.  The fact that to date none of these sophisticated class members has objected is additional evidence of the fairness and reasonableness of Lead Counsel's requested fee and request for the reimbursement of expenses.

**3.  Third Step in Applying the *Goldberger* Factors—Lodestar Cross-Check**

The last step in this Court's analysis of the *Goldberger* factors is to cross-check the fee award against the lodestar multiplier.  *Forex*, 2018 WL 5839691, at *5.  "The lodestar multiplier is calculated by dividing the fee award by the lodestar (the reasonable hours billed multiplied by a reasonable hourly rate)."  *Id.*  When used as a "mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  *Goldberger*, 209 F. 3d at 50.

The lodestar cross-check here confirms that Lead Counsel's requested 30% fee is reasonable and should be approved.  Plaintiffs' Counsel and its professional staff have spent, in the aggregate, over 11,650 hours in the prosecution of this action, at hourly rates ranging from $220 to $1,075 per hour (*see* Joint Decl. Exs. 7, 8, and 9), which courts in this Circuit have found to be within the reasonable range.  Reasonable hourly rates are determined by the "prevailing market rate," that is, the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).  "The relevant community, in turn, is the district in which the court sits." *Farbotko v. Clinton Cty. of N.Y.*, 433 F.3d 204, 208 (2d Cir. 2005) (citation omitted).  The billing rates used by Lead Counsel are reasonable and within the range routinely approved by Courts in this District.  *See, e.g.*, *In re GSE Bonds Antitrust Litig.*, No. 19-CV-1704 (JSR), 2020 WL 3250593, at *5  (S.D.N.Y. June 16, 2020); *In re Platinum and Palladium Commodities Litig.*, No. 10-cv-3617, 2015 WL 4560206, at *3 (S.D.N.Y. July 7, 2015); *U.S., ex rel Fox Rx, Inc. v. Omnicare, Inc.*, No. 12-cv-275, 2015 WL 1726474, at *2 (S.D.N.Y. April 15, 2015).

Lead Counsel's requested fee of 30% of the common fund will result in a multiplier of only 0.81 of Plaintiffs' Counsel's lodestar amount.  This "negative" multiplier is well below the lower range of lodestar multipliers approved by courts in the Second Circuit, which further demonstrates the reasonableness of the requested fee.  *See Guevoura Fund Ltd. v. Sillerman*, No. 1:15-CV-07192-CM, 2019 WL 6889901, at *18 (S.D.N.Y. Dec. 18, 2019) ("[T]he fact that any reasonable fee would necessarily represent a negative multiplier of the lodestar supports an award at the higher end of the spectrum."); *In re Interpublic Sec. Litig.*, No. 02 Civ. 6527 (DLC), 2004 WL 2397190, at *12 (S.D.N.Y. Oct. 26, 2004) ("In recent years multipliers of between 3 and 4.5 have been common in federal securities cases."); *Asare v. Change Group of New York, Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) ("Typically, courts use multipliers of 2 to 6 times the lodestar"); *Athale v. Sinotech Energy Ltd.*, No. 11 Civ. 05831 (AJN), 2013 WL 11310686, at *8 (S.D.N.Y. Sept. 4, 2013) (stating courts routinely award lodestar multipliers of "between four and five"); *Colgate-Palmolive*, 36 F. Supp. 3d at 353 (lodestar multiplier of five is "large, but not unreasonable").

Further, according to Professors Theodore Eisenberg, Geoffrey Miller, and Roy Germano, for class actions with a settlement amount between $12 million and $23.4 million, the mean multiplier is 1.86 and the median multiplier is 1.35.  *Attorney's Fees In Class Actions: 2009-2013*, New York University Law Review, 92:937, 967 (2017).  This further supports the fairness of the requested fee award.

### C.    Lead Counsel are Entitled to Reimbursement of Their Litigation Expenses

It is well established that "counsel is entitled to reimbursement from the common fund for reasonable litigation expenses."  *Colgate-Palmolive*, 36 F. Supp. 3d at 354 (quoting *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 246 F.R.D. 156, 178 (S.D.N.Y. 2007). In a common fund case, compensable expenses include "reasonable expenses normally charged

to a fee paying client." *See* generally 5 Newberg on Class Actions §16:5 (5th ed.) (collecting cases).

Lead Counsel request reimbursement for the $367,083.75 in expenses incurred in prosecuting this Action, which is less than the $400,000 limit provided for in the Stipulation. These expenses are set forth in the declarations from counsel submitted to the Court and are of the type generally approved by courts for reimbursement.   Joint Decl. Exs. 7, 8, and 9. Plaintiffs' Counsel's expenses include the costs of hiring experts, conducting an investigation, document database management for discovery, mediator fees, and computerized research, among other things, all of which "are properly chargeable to the Settlement fund."   *See In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 468 (S.D.N.Y. 2004) ("The expenses incurred – which include investigative and expert witnesses, filing fees, service of process, travel, legal research and document production and review – are the type for which the paying, arm's length market reimburses attorneys . . . and for this reason, they are properly chargeable to the Settlement fund.").

### D.    Reimbursement Awards are Fair and Reasonable

The PSLRA authorizes the Court to allow reimbursement to representative plaintiffs for their "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class."   As detailed in the Joint Declaration and the Declarations of City of Birmingham, Local 60, Teamsters Local 456, and Teamsters Local 710, Lead Plaintiffs collectively expended substantial time and effort in representing the best interests of the Class in this Action, including the review of pleadings and other filings in this action, regular communications with Lead Counsel concerning the developments therein, substantial participation in discovery, including the collection and production of documents, and supervision of and participation in the settlement process.

Accordingly, Lead Plaintiffs City of Birmingham, Local 60, Teamsters Local 456, and Teamsters Local 710 seek $1,868.75, $3,177.25, $3,648.00, and $12,625.00, respectively, in connection with their participation and supervision of the Action.  Courts in this Circuit "routinely award such costs and expenses both to reimburse the named plaintiffs for expenses incurred through their involvement with the action and lost wages, as well as to provide an incentive for such plaintiffs to remain involved in the litigation and to incur such expenses in the first place."  *Hicks*, 2005 WL 2757792, at *10; *see also Varlen v. H.J. Meyers & Co*., No. 97 CIV 6742 (DLC), 2000 WL 1683656, at *4, n. 2 (S.D.N.Y. Nov. 8, 2000) (reimbursement of such expenses should be allowed because it "encourages participation of plaintiffs in the active supervision of their counsel").

The requested amounts here are in line with those awarded in similar securities class actions under the PSLRA.  *See In re Signet Jewelers Ltd. Sec. Litig*., No. 1:16-CV-06728-CM-SDA, 2020 WL 4196468, at *22–24 (S.D.N.Y. July 21, 2020) (collecting cases and awarding $25,410 to lead plaintiff); *In re Revolution Lighting Techs., Inc. Sec. Litig*., No. 1:19-CV-00980-JPO, 2020 WL 4596811, at *3 (S.D.N.Y. Aug. 11, 2020) (awarding $10,000 to lead plaintiff).

### E.    Lead Counsel Respectfully Request that Any Attorneys' Fee Award be Payable Upon Approval of the Settlement

As a final matter, at the hearing on Lead Plaintiffs' Motion for Preliminary Approval of the Settlement, this Court invited Lead Counsel to address the appropriate timing for payment of attorneys' fees and expenses, noting that it was amenable to paying expenses upon approval of the Settlement, and in some cases had delayed payment of attorneys' fees until distributions are made to the Settlement Class while in other cases had ordered payment of a percentage of the attorneys' fees at the time of final approval.  (Trans. at 19-20).  In this case, Lead Counsel respectfully submits that awarding all attorneys' fees and expenses upon approval of the

Settlement is appropriate.  As discussed above, the Settlement was an excellent result for the Class, and securing such a recovery required substantial time and effort.  Lead Counsel did not seek a quick settlement after overcoming the motion to dismiss—on the contrary, after the first mediation in April 2019 was unsuccessful, Lead Counsel aggressively litigated this matter for over an additional year until a resolution was reached at a second mediation.  Securities fraud cases rarely settle for the percentage of damages secured in this Action, and the significant time spent on this matter resulted in a negative multiplier.

Moreover, the immediate payment of attorney's fees to class counsel upon settlement approval (referred to as "quick pay") is "common" and "does not harm the class members in any discernible way, as the size of the settlement fund available to the class will be the same regardless of when the attorneys get paid." *Cantu-Guerrero v. Lumber Liquidators, Inc. (In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.)*, 952 F.3d 471, 487 (4th Cir. 2020) (citing *Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016)); *see also* Brian T. Fitzpatrick, *The End of Objector Blackmail*?, 62 Vand. L. Rev. 1623, 1643 (2009) (finding that over one third of federal class action settlement agreements in 2006 included quick-pay provisions).

Furthermore, there should be no concern of undue delay in the distribution of the Settlement funds to the Settlement Class, as the class action administrator has already committed to provide Lead Counsel with a distribution declaration within four months following the January 20, 2021 claim filing deadline.  *See* Declaration of class action claims administrator Epiq, Ex. 2 to Joint Decl., ¶ 22.  Lead Counsel are also prepared to provide monthly status updates to advise the Court of the progress of the administration.

If the Court chooses to delay Lead Counsel's receipt of attorney's fees until a distribution is made to the Settlement Class, Lead Counsel respectfully request that the Court approve payment of half of the fee award as well as reimbursement of litigation expenses upon final approval of the Settlement, with the other half of the fee payable to Lead Counsel upon the first distribution to the Settlement Class.  This Court approved similar schedules in *Calfo, et al. v. Messina, Sr. et al.*, 1:15-cv-04010 (LGS) (S.D.N.Y.) (Dkt. 184) and *In re Delcath Systems, Inc. Sec. Litig.*, No. 13-cv-3116 (LGS) (Dkt. No. 141).

## III.    CONCLUSION

For all the foregoing reasons, Lead Counsel respectfully requests that the Court award attorneys' fees of 30% of the Settlement Fund, litigation expenses in the amount of $367,083.75, and PSLRA reimbursement to Lead Plaintiffs City of Birmingham in the amount of $1,868.75, Local 60 in the amount of $3,177.25, Teamsters Local 456 in the amount of $3,648.00, and Teamsters Local 710 in the amount of $12,625.

Dated:  November 5, 2020                              Respectfully submitted,

*/ s / Carol V. Gilden*                              */ s / Steven B. Singer*
Carol V. Gilden (pro hac vice)                       Steven B. Singer (SS-5212)
COHEN MILSTEIN SELLERS & TOLL PLLC                   SAXENA WHITE P.A.
190 South LaSalle Street, Suite 1705                 10 Bank Street, 8th Floor
Chicago, IL 60603                                    White Plains, New York 10606
(312) 357-0370                                       (914) 437-8551
Fax: (312) 357-0369                                  Fax: (888) 631-3611
cgilden@cohenmilstein.com                            ssinger@saxenawhite.com

*/ s / Daniel S. Sommers*                            Maya Saxena
Daniel S. Sommers (pro hac vice)                     Joseph E. White, III (JW-9598)
Molly Bowen (pro hac vice pending)                   Lester R. Hooker
COHEN MILSTEIN SELLERS & TOLL PLLC                   Adam D. Warden (pro hac vice)
1100 New York Ave NW, Suite 500 East                 SAXENA WHITE P.A.
Washington, DC 20005                                 7777 Glades Road
(202) 408-4600                                       Suite 300
Fax: (202) 408-4699                                  Boca Raton, FL 33434

dsommers@cohenmilstein.com                (561) 394-3399
mbowen@cohenmilstein.com                  Fax: (561) 394-3382
                                          msaxena@saxenawhite.com
                                          jwhite@saxenawhite.com
                                          lhooker@saxenawhite.com
                                          awarden@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs and for the Proposed Class*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on November 5, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel or record.

*/s/ [insert signature]*
[insert signature]