**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF BIRMINGHAM RETIREMENT AND RELIEF SYSTEM, et al., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No.: 1:17-cv-10014-LGS ) |
| CREDIT SUISSE GROUP AG, et al., | ) **CLASS ACTION** ) |
| Defendants. | ) ) ) |

**<u>MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR APPROVAL OF DISTRIBUTION OF NET SETTLEMENT FUND</u>**

i


# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................. 2

III. CLAIMS ADMINISTRATION ...................................................................................... 3
    A. Class Notice ........................................................................................................ 3
    B. Claims Submission and Review .......................................................................... 4
    C. Deficiency Process ............................................................................................... 5
    D. Processing of Late but Otherwise Eligible Claims .............................................. 6
    E. Quality Assurance Process .................................................................................. 7

IV. DISTRIBUTION OF NET SETTLEMENT FUND ........................................................ 8

V. AUTHORIZATION FOR PAYMENT TO CLAIMS ADMINISTRATOR .................. 11

VI. RELEASE OF CLAIMS ............................................................................................... 12

VII. RECORD RETENTION AND DESTRUCTION ......................................................... 12

VIII. CONCLUSION .............................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Citigroup Inc. Secs. Litig.*,
   No. 09 MD 2070-JES, 2014 WL 2445714 (S.D.N.Y. May 30, 2014) ..................................8, 9

*In re Eletrobras Secs. Litig.*,
   467 F. Supp. 3d 149 (S.D.N.Y. 2020)................................................................................7, 12

*In re Goldome Secs. Litig.*,
   No. 88 Civ. 4765-JES, 1991 WL 113263 (S.D.N.Y. June 20, 1991) ....................................7, 8

**I.     INTRODUCTION**

Court-appointed Lead Plaintiffs City of Birmingham Retirement and Relief System, Westchester Putnam Counties Heavy & Highway Laborers Local 60 Benefit Funds, Teamsters Local 456 Pension and Annuity Funds, and the International Brotherhood of Teamsters Local No. 710 Pension Plan (together, "Lead Plaintiffs") respectfully submit this Memorandum of Law in Support of Lead Plaintiffs' Motion for Approval of Distribution of Net Settlement Fund (the "Distribution Order").

If entered by the Court, the Distribution Order will, among other things, (i) approve Claims Administrator Epiq Class Action & Claims Solutions, Inc.'s ("Epiq") administrative determinations regarding the acceptance and rejection of claims submitted in connection with the Settlement[1] of the above-captioned action ("Action"); (ii) direct distribution of the Net Settlement Fund, after deduction or reservation of the payments requested herein, to Settlement Class Members whose Proof of Claim Forms ("Claim Forms" or "Claims") have been accepted; (iii) approve the plan for re-distribution and/or donation of any funds remaining in the Net Settlement Fund following the initial distribution to Settlement Class Members; (iv) direct payment out of the Settlement Fund to Epiq in the amount of $385,000 for the balance of its fees and expenses incurred and to be incurred in connection with the administration to date and the initial distribution of the Settlement Fund; (v) authorize the destruction of paper and electronic copies of Claim Forms, and all related paper documents, one year after distribution of the Net Settlement Fund; and (vi) for such other and further relief as this Court deems appropriate. If the Court enters the Distribution

---

[1] Capitalized terms not defined herein shall have the same meanings as given in the Amended Stipulation and Agreement of Settlement, filed on August 19, 2020 (the "Stipulation") (ECF No. 138-2), or the Declaration of Jordan Broker in Support of Lead Plaintiff's Motion for Approval of Distribution of Net Settlement Fund ("Broker Dec." or "Broker Declaration") attached hereto.

Order, Authorized Claimants will receive their pro rata share of the Settlement Fund in accordance with the Plan of Allocation. The proposed plan for distributing the Net Settlement Fund is set forth in the accompanying Proposed Order and the Declaration of Jordan Broker in Support of Lead Plaintiffs' Motion for Approval of Distribution of Net Settlement Fund (the "Broker Declaration" or "Broker Dec.") on behalf of Epiq.

## II.     BACKGROUND

On December 16, 2020, the Court entered a judgment granting final approval of the Settlement between Lead Plaintiffs and defendants Credit Suisse Group AG ("Credit Suisse"), Brady W. Dougan, Tidjane Thiam, and David R. Mathers (together with Credit Suisse, "Defendants"). ECF No. 157. Pursuant to the terms of the Settlement, Defendants have paid $15,500,000.00 into escrow for the benefit of the Settlement Class.

As detailed below and in the accompanying Broker Declaration, following Notice, the Claims Administrator received 31,715 Claims. Broker Dec. ¶ 32. Epiq determined that 20,267 claims are acceptable, and that 11,448 claims should be rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Court-approved Plan of Allocation. *Id.*

The Effective Date set forth in the Settlement has passed, and all Claims have been processed. There is a single request for Court review of Epiq's claim determinations that Lead Counsel respectfully submits was properly denied by Epiq due to the absence of a Recognized Loss under the Court-approved Plan of Allocation.

Accordingly, subject to Court approval, the Net Settlement Fund may now be distributed to Authorized Claimants in accordance with the approved Plan of Allocation. Lead Plaintiffs respectfully request that the Court enter the Distribution Order, which among other things approves

Epiq's claim determinations and authorizes Epiq to implement the distribution plan, as fully set forth in the Broker Declaration.

### III.     CLAIMS ADMINISTRATION

#### A.     Class Notice

The Stipulation provides for the Settlement of this Action on behalf of a Class "consisting of all persons and entities who purchased or otherwise acquired the ADRs of Credit Suisse between March 20, 2015, and February 3, 2016, inclusive, and who were allegedly damaged thereby. Excluded from the Settlement Class are (i) Defendants; (ii) the officers and directors of Credit Suisse (at all relevant times); (iii) members of their immediate families and their legal representatives, successors or assigns; and (iv) any firm or entity in which any Defendant has or had a controlling interest." ECF No. 157 ¶ 3. The Court granted Lead Plaintiffs' Motion for Preliminary Approval on August 24, 2020, including approving the selection of Epiq as Claims Administrator. ECF No. 141 ("Preliminary Approval Order"). Epiq is a firm specializing in the administration of class action settlements and has over twenty years of experience handling the administration of complex settlements of securities class actions. Pursuant to the Preliminary Approval Order, a Notice of Proposed Settlement of Class Action ("Notice") was mailed to all Settlement Class Members who could be identified through reasonable effort. *See* ECF No. 151-2 (Declaration of Jordan Broker Regarding (I) Mailing of Notice and Claim Form; (II) Publication of Summary Notice; (III) Call Center Services; (IV) the Settlement Website; (V) Requests for Exclusion and Objections Received to Date; and (VI) Distribution Timing); Broker Dec. ¶ 4. Additionally, a summary notice of the Settlement was published in *Investor's Business Daily* and released via *PR Newswire* on September 28, 2020. ECF No. 151-2 ¶ 12. The Notice, Claim Form, Stipulation, Preliminary Approval Order, and other important case documents were posted on the Settlement Website, which Epiq maintained to enable Settlement Class Members to access

information about the case and the Settlement. *Id.* ¶ 16. Epiq also provided support and information to Settlement Class Members through a case-specific toll-free telephone helpline. *Id.* ¶¶ 13-14.

**B.      Claims Submission and Review**

Pursuant to the Stipulation, the Notice, and the Preliminary Approval Order, all Settlement Class Members wishing to participate in the Settlement Fund were required to submit Claim Forms by mail, postmarked no later than January 20, 2021, or to submit a Claim Form electronically by that same date. Broker Dec. ¶ 6. As set forth in the Broker Declaration, Epiq reviewed and processed 31,715 Claim Forms submitted by potential Settlement Class Members. Broker Dec. ¶ 8. Epiq has now prepared detailed reports listing (i) all valid Claim Forms by Authorized Claimants; (ii) all Claim Forms that were submitted after the claims submission deadline but on or before April 1, 2021 that are otherwise valid; and (iii) rejected Claim Forms with the rejection reasons (including claims that had a Recognized Loss of zero). *See id.* ¶ 34; Broker Dec. Exhibits C-1 through C-3.

The 2,741 Claim Forms submitted in paper form were opened, scanned into a database, imaged, and assigned a unique number. *See* Broker Dec. ¶ 8. This process included unfolding documents, removing staples, sorting documents into action Claim Forms and requests for Claim Forms, and scanning the Claim Forms into a database. *Id.* The information from each Claim, including the name, address, and the Claimant's account number/information from his, her, or its supporting documentation, and the Claimant's purchase/acquisition transactions, sale transactions, and holdings listed on the Claim, was entered into data files housed on Epiq's network to process Claim Forms submitted for the Settlement. *Id*.

Additionally, Epic processed 28,974 Claim Forms submitted electronically via either a computer disc or electronic submission of a file. *Id.* ¶ 11. Electronic claims were reviewed and analyzed to ensure they were formatted as required and to identify any potential data issues or

inconsistencies. *Id.* ¶ 12. If any issues or inconsistencies arose, Epiq notified the sender; if the file was in an acceptable format, it was loaded into Epiq's database. *Id.*

### C.      Deficiency Process

Epiq evaluated and processed all Claim Forms and supporting documentation to determine, among other things, whether each Claimant had purchased or acquired Credit Suisse securities during the Class Period, and whether the Claims had been submitted by excluded persons or was filed on behalf of a Class Member requesting exclusion. Broker Dec. ¶¶ 8-15. Epiq utilized internal codes to identify and classify any deficiency or ineligibility condition in the paper or electronic claim. *Id.* ¶¶ 9-10, 13-14. Much of Epiq's efforts in handling the administration involved Claimant communications, so that all Claimants had sufficient opportunity to cure any deficiencies and file a complete Claim. As demonstrated by the Broker Declaration, Epiq received all submitted Claims and, to the extent that a Claim was deficient, Epiq notified the Claimant of the deficiency and advised the Claimant on how to cure the deficiency. Broker Dec. ¶¶ 18-20, 21-22. Epiq made substantial efforts, by way of Deficiency Notices and Transaction Reports, to provide Claimants, using both paper Claim Forms and Electronic Claims, a fair opportunity to cure deficiencies. *Id.*; Broker Dec. Exhibit A (sample Deficiency Notice). Epiq sent 1,469 Deficiency Notices to Claimants who had submitted deficient Paper Claims and to 75 filers who submitted a total of 11,145 deficient Electronic Claims[2] (primarily due to missing information or documentation) in an effort to inform the Claimants of their ineligibility or defective claim and the steps necessary to correct the deficiencies. Broker Dec. ¶¶ 19, 21. The Deficiency Notices and the Transaction Reports advised Claimants that the submission of the appropriate information and/or trade

---

[2] Electronic Claims are generally submitted by nominees, and a single filer can be responsible for submitting thousands of claims. In this case, a total of 94 filers submitted 28,974 electronic Claims. Broker Dec. ¶ 21(a) n.2.

documentation required to complete the Claim had to be sent within twenty days from the date of the letter, or the Claim would be recommended for either full or partial rejection. *Id.* ¶¶ 19, 23. Epiq reviewed all responses to deficiency letters to determine whether the response resolved the deficiency and worked with Claimants to attempt to resolve the deficiency. *Id.* ¶¶ 20, 22, 24. Only a single Claimant's disagreement with Epiq's determination is unresolved; all other disputes have been cured or withdrawn. *Id.* ¶¶ 24-25. The unresolved Claim was rejected because it did not result in a Recognized Loss under the Court-approved Plan of Allocation. *Id.* ¶ 25. The Claimant identified purchases and sales between December 15, 2015 and January 5, 2016; under the Plan of Allocation, shares bought and sold in that period did not result in a Recognized Loss because the alleged artificial inflation of the purchases was equal to the alleged artificial inflation of the sales. *Id.* Thus, the Claim was denied. *Id.; see also* Broker Dec. Exhibit B (copy of the Claimant's Proof of Claim, supporting documentation, and correspondence).[3]

### D. Processing of Late but Otherwise Eligible Claims

The Stipulation contemplates that the Court may approve extending the deadline for Settlement Class Members to allow acceptance of Claims that are otherwise eligible to participate in the Settlement. *See* Stipulation ¶ 25. In the interest of maximizing Class participation in the Settlement, subject to Court approval, Co-Lead Counsel authorized Epiq to accept the submission of claims submitted late but prior to April 1, 2021 because doing so did not materially delay distribution of the Net Settlement Fund.

Through April 1, 2021, Epiq received 433 Claim Forms that were postmarked after the Court-approved claim filing deadline of January 20, 2021; 246 claims were, apart from their late submission, otherwise eligible. Broker Dec. ¶ 26.

---

[3] The Claimant's personally identifying information has been redacted from Exhibit B.

Lead Plaintiffs request that the Court approve acceptance of the 246 late but otherwise eligible claims so that those claims may be accepted and included in the distribution. *See In re Eletrobras Secs. Litig.*, 467 F. Supp. 3d 149, 150 (S.D.N.Y. 2020) (accepting late but otherwise valid proofs of claim); *In re Goldome Secs. Litig.*, No. 88 Civ. 4765-JES, 1991 WL 113263, at *2 (S.D.N.Y. June 20, 1991) (accepting class representatives' request "that certain untimely filed but otherwise valid claims be accepted for approval by the Court and that such persons be included in the list of authorized Claimants entitled to share in the net settlement fund").

Lead Counsel believes that, when the equities are balanced, it would be unfair to prevent an otherwise valid claim from participating in the Net Settlement Fund solely because it was submitted after the deadline, but while all claims were still being processed. The untimely filing of these claims and their provisional acceptance has not caused any delay in the distribution to Claimants with timely and valid claims. Broker Dec. ¶ 26. However, to ensure that a final cut-off date exists after which no more Proofs of Claim may be accepted and to permit proportional distribution of the Net Settlement Fund, Lead Plaintiffs request that the Court approve a final cut-off date of April 1, 2021. *See id.* ¶ 27.

### E.   Quality Assurance Process

Throughout the claim administration process, Epiq conducted quality assurance review to ensure the accuracy and integrity of its process. These steps included ensuring that Proofs of Claim were processed properly, deficiency and ineligibility message codes were applied properly, Deficiency Notices were sent to the appropriate Claimants, and that Epiq's computer systems operated properly. *See id.* ¶¶ 28-29. Additionally, Epiq conducted a final quality control check including (i) confirming that Proofs of Claim that are recommended for approval have no messages denoting ineligibility; (ii) confirming that Proofs of Claim that are recommended for rejection have messages denoting ineligibility; (iii) confirming that all Proofs of Claim requiring "deficiency"

7

notices were sent such notices; (iv) performing a sample review of deficient Proofs of Claim; (v) reviewing a sampling of Proofs of Claim with high Recognized Losses; (vi) sampling Proofs of Claim that had been determined to be ineligible, including those with no Recognized Losses calculated in accordance with the Plan of Allocation, in order to verify that all transactions had been captured correctly; and (vii) retesting the accuracy of the calculation program. *Id.* ¶ 30. Epiq also conducted a questionable claim filer search against its database of known questionable filers, which contains names, addresses, and aliases of individuals compiled from previous settlements that Epiq has administered and of individuals from whom fraudulent claims were received. *Id.* ¶ 31. In addition, all of Epiq's claim processors are trained to identify and flag potentially inauthentic documents for further review by a project manager and Securities Team. *Id.*

## IV.   DISTRIBUTION OF NET SETTLEMENT FUND

In summary, Epiq received and has completed the processing of the 31,715 Proofs of Claim submitted. *Id.* ¶ 32. Epiq has determined that 20,267 are acceptable, and that 11,448 should be wholly rejected because they are either ineligible, wholly deficient, or have no Recognized Loss when calculated in accordance with the Court-approved Plan of Allocation.[4]  *Id.* The Broker Declaration provides further detail on the bases for rejection of the ineligible Proofs of Claim. *Id.* ¶ 33-34; Broker Dec. Exhibits B; C-1 through C-3.

---

[4] *See In re Citigroup Inc. Secs. Litig.*, No. 09 MD 2070-JES, 2014 WL 2445714, at *2-*3 (S.D.N.Y. May 30, 2014) (upholding claims administrator's rejection of claims where claimants did not hold shares during the necessary time period and therefore "suffered no loss"); *In re Goldome Secs. Litig.*, 1991 WL 113263, at *1, *3 (accepting claims administrator's rejection of claims where "(1) the purchase took place outside the class period; (2) the claim showed no purchase of the stock; . . . (5) the claim submitted was duplicate of a previously filed claim; (6) the claimant failed to correct a deficiency in the documents provided to the claims administrator after being given notice; or (7) the claimant withdrew the claim.").

The 20,267 acceptable Proofs of Claim represent total Recognized Losses of $27,634,743.19. *Id.* ¶ 35. Of that total, $27,073,440.06 is for Timely Eligible Claims and $561,303.14 is for Late But Otherwise Eligible Claims. *Id.*

Lead Plaintiffs now respectfully move the Court for an order approving Epiq's determinations concerning the acceptance and rejection of the Claim Forms that are included in this motion and approving the proposed plan for distribution of the Net Settlement Fund as set forth in the Broker Declaration (the "Distribution Plan").

Pursuant to the proposed Distribution Plan, Epiq will conduct an initial distribution (the "Initial Distribution") of the available balance of the Net Settlement Fund, after deducting the payments previously allowed and requested herein, any Notice and Administration Costs, $1,007,500.00 in attorneys' fees (to be paid following the completion of distribution), $19,979.00 in cost awards to Lead Plaintiffs (to be paid following the completion of distribution), Taxes, and Tax Expenses to Authorized Claimants who would receive at least $10.00 based on their Recognized Loss in comparison to the total Recognized Losses of all Authorized Claimants. Broker Dec. ¶ 41. An Initial Distribution is warranted at this time to "pursue[ ] the 'goal of expedient settlement distribution.'" *See Citigroup*, 2014 WL 2445714, at *2 (stating that "'much of the value of a settlement lies in the ability to make funds available promptly'").

In the Initial Distribution, Epiq will calculate award amounts to all Authorized Claimants as if the entire Net Settlement Fund were to be distributed now by calculating their *pro rata* share of the fund in accordance with the Plan of Allocation. Broker Dec. ¶ 35. Pursuant to the terms of the Plan of Allocation, Epiq will eliminate any Authorized Claimant whose award amount calculates to less than $10.00. *Id.* ¶ 41.

After eliminating Claimants who would have received less than $10.00, Epiq will calculate the *pro rata* distribution payments for Authorized Claimants ("Distribution Amounts"). Broker Dec. ¶ 41(a). Epiq will then prepare checks for the distribution and registers of such distributions. Lead Plaintiffs propose that the Initial Distribution checks bear the notation, "DEPOSIT PROMPTLY, VOID AND SUBJECT TO RE-DISTRIBUTION IF NOT NEGOTIATED WITHIN 90 DAYS OF DISTRIBUTION," so as to encourage Claimants to promptly cash their distributions and avoid or reduce future expenses relating to unpaid distributions. *Id.* ¶ 41(b). Epiq will issue replacement payments for distributions upon request by payee. *Id.* ¶ 41(b) n.3. Authorized Claimants who do not cash their distribution checks within the time allotted will irrevocably forfeit all recovery from the Settlement, and the funds allocated to all such stale-dated checks will be subject to re-distribution. *Id.* ¶ 41(c).

Pursuant to the Distribution Plan, if any balance is remaining in the Net Settlement Fund after six months from the date of the Initial Distribution, after deducting Epiq's fees and expenses incurred in connection with administering the Settlement for which it has not yet been paid (including the estimated costs of such Second Distribution), the as-yet-unpaid Court-approved attorneys' fees and cost awards to Lead Plaintiffs (*see* ECF 158), and after the payment of any unpaid costs or fees incurred in administering the Net Settlement Fund, and if cost effective, the remaining funds will be distributed to all Authorized Claimants in the Initial Distribution who cashed their distribution payment. Broker Dec. ¶ 41(d).

Additional re-distributions, after deduction of costs and expenses as described above and subject to the same conditions, may occur thereafter until Lead Counsel, in consultation with Epiq, determine that further re-distribution is not cost-effective. *Id.*; ECF No. 157 ¶ 19. If any funds remain in the Net Settlement Fund after determining that further re-distribution is no longer cost-

10

effective, funds shall, subject to Court approval, be contributed to a non-profit charitable organization whose designation is agreed to by Lead Counsel. *Id.* ¶ 41(f)*;* ECF No. 157 ¶ 19. If applicable, Lead Plaintiffs will at that time request that the Court authorize the disposition of such remaining unclaimed or uncashed balance.

## V.      **AUTHORIZATION FOR PAYMENT TO CLAIMS ADMINISTRATOR**

Pursuant to the terms of Epiq's agreement with Lead Counsel to act as the Claims Administrator for the Settlement, Epiq was responsible for several actions, including: dissemination of the Notice and Summary Notice (through both traditional mail and electronically), establishing a settlement website, maintaining a toll-free helpline dedicated to assisting potential Settlement Class Members, and maintaining an address for the receipt of Claim Forms and other correspondence, as well as processing submitted Claim Forms, and the allocation and distribution of the Net Settlement Fund. *See generally*, Broker Dec.

As set forth in the Broker Declaration, Epiq's outstanding fees and expenses for its work performed and to be performed on behalf of the Class in connection with the initial distribution of the Net Settlement Fund total $385,000. *Id.* ¶ 36; Broker Dec. Exhibit D.  As noted in Lead Plaintiffs' interim status updates to the Court and more fully described in the Broker Declaration, due to the higher than anticipated number of potential Claimants and claim rate, Epiq's total fees and expenses did exceed its initial estimate of $350,000. *See* ECF Nos. 162, 163; Broker Dec. ¶¶ 37-39. Notably, Epiq typically receives claims from 15% to 20% of potential class members to whom notice was mailed, but in this case, the response was substantially higher, with Epiq receiving claims for approximately 30% of notices mailed. *Id.* ¶ 39. Lead Plaintiffs request that the Court authorize the payment of $385,000 to Epiq, representing the balance of its fees and

expenses for mailing the Notice, processing the claims, and making the initial distribution from the Net Settlement Fund to accepted Claimants.

## VI.     RELEASE OF CLAIMS

In order to allow for the full and final distribution of the Net Settlement Fund, it is necessary to bar any further claims against the Net Settlement Fund, and to provide that all persons involved in the review, verification, calculation, tabulation, or any other aspect of the claims processing, or involved in the administration or taxation of the Settlement Fund be released and discharged from any and all claims arising from such involvement beyond the amount paid or allocated to them. Accordingly, Lead Plaintiffs respectfully request that the Court bar any such claims against all such persons involved in the review, verification, calculation, tabulation, or any other aspect of the processing of the claims submitted in connection with the Settlement, or otherwise involved in the administration or taxation of the Settlement Fund, or the Net Settlement Fund, and that all such persons be released and discharged from any and all claims arising out of such involvement, and that all Settlement Class Members, whether or not they are to receive payment from the Net Settlement Fund, will be barred from making any further claim against the Net Settlement Fund beyond the amount allocated to them as provided in any distribution orders entered by the Court.

## VII.    RECORD RETENTION AND DESTRUCTION

Lead Plaintiffs also request that the Court permit Epiq to destroy any paper and electronic copies of the Claim Forms and all paper or electronic supporting documentation one year after all funds have been distributed. Broker Dec. ¶ 41(g). *See In re Eletrobras Secs. Litig.*, 467 F. Supp. 3d at 151.

## VIII. CONCLUSION

For all the foregoing reasons, it is respectfully submitted that Lead Plaintiffs' Motion for Approval of Distribution of Net Settlement Fund should be approved, and the Distribution Order should be entered.

Dated: June 15, 2021

Respectfully Submitted,

*/ s / Carol V. Gilden*
Carol V. Gilden (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL PLLC
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
(312) 357-0370
Fax: (312) 357-0369
cgilden@cohenmilstein.com

*/ s / Daniel S. Sommers*
Daniel S. Sommers (pro hac vice)
Molly Bowen (pro hac vice pending)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, Suite 500 East
Washington, DC 20005
(202) 408-4600
Fax: (202) 408-4699
dsommers@cohenmilstein.com
mbowen@cohenmilstein.com

*/ s / Steven B. Singer*
Steven B. Singer (SS-5212)
SAXENA WHITE P.A.
10 Bank Street, 8th Floor
White Plains, New York 10606
(914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com

Maya Saxena
Joseph E. White, III (JW-9598)
Lester R. Hooker
Adam D. Warden (pro hac vice)
SAXENA WHITE P.A.
7777 Glades Road
Suite 300
Boca Raton, FL 33434
(561) 394-3399
Fax: (561) 394-3382
msaxena@saxenawhite.com
jwhite@saxenawhite.com
lhooker@saxenawhite.com
awarden@saxenawhite.com

*Co-Lead Counsel for Lead Plaintiffs and for the Proposed Class*

13